IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Global Home Products LLC, et al.,[1] | ) | Case No. 06-_10340_ ) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**AFFIDAVIT OF RANDAL ROMBEIRO,**
**CHIEF FINANCIAL OFFICER OF THE DEBTORS,**
**IN SUPPORT OF FIRST DAY MOTIONS**

| | |
|---|---|
| STATE OF OHIO | ) |
| | ss ) |
| COUNTY OF DELAWARE | ) |

I, Randal Rombeiro, declare as follows:

1.      I am the Chief Financial Officer of Global Home Products LLC and each

of the other captioned debtors (collectively, the "Debtors").[2]

2.      My current duties for the Debtors include general supervision of, and

responsibility for, many aspects of the Debtors' business and financial affairs; assisting with the

Debtors' business plans and strategies; advising and assisting with to the business and financial

activities of the Debtors; and other related matters.

---

[1] The Debtors are the following entities:  Global Home Products LLC; GHP Holding Company LLC; GHP
Operating Company LLC; Anchor Hocking Acquisition Inc.; Anchor Hocking Inc.; AH Acquisition Puerto Rico,
Inc.; Anchor Hocking Consumer Glass Corporation; Anchor Hocking CG Operating Company LLC; Anchor
Hocking Operating Company LLC; Burnes Acquisition Inc.; Intercraft Company; Burnes Puerto Rico, Inc.; Picture
LLC; Burnes Operating Company LLC; Mirro Acquisition Inc.; Mirro Puerto Rico, Inc.; Mirro Operating Company
LLC

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day Motions
(as defined below).

3.     In my capacities with the Debtors, I have general knowledge of the Debtors' books and records, and am familiar with the Debtors' financial and operational affairs.

4.     I submit this Affidavit in support of the "first day" motions of the Debtors (described further below and which are referred to collectively herein as the "First Day Motions"). Except as otherwise indicated, all statements in this Affidavit are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, or my opinion based on my experience with the Debtors' operations and financial conditions. In making my statements based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately recording, preparing or collecting any such documentation and other information. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this Affidavit on behalf of the Debtors.

5.     Based on my personal knowledge, and through my review of the Debtors' books, records and other information, I believe that the relief sought by the Debtors in the First Day Motions is necessary to enable the Debtors to continue to operate as debtors in possession during the course of their respective bankruptcy cases.

6.     Part I of this Affidavit describes the business of the Debtors and the developments that led to the filing of their chapter 11 petitions. Part II sets forth the relevant facts in support of the First Day Motions filed by the Debtors concurrently herewith.

# PART I

## Background

7.     On April 10, 2006 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

8.     The Debtors continue to operate their businesses and manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee of examiner, and no official committee of creditors or equity security holders has yet been appointed.

## Description of Debtor and Summary of Operations

9.     Global Home Products LLC ("Global Home") owns 100% of GHP Holding Company LLC ("Global Holding"). Each of Global Home and Global Holding is a Delaware limited liability company. Global Holding owns 100% of each of Anchor Hocking Acquisition Inc. ("Anchor Acquisition"), Burnes Acquisition Inc. ("Burnes Acquisition"), and Mirro Acquisition Inc., each of which is a Delaware corporation, and which represent the Debtors' three primary businesses and product lines, "Anchor Hocking," "The Burnes Group," and "WearEver." GHP Operating Company LLC ("GHP Operating"), a Delaware limited liability company, is indirectly or directly 100% owned by Anchor Acquisition (44%), Burnes Acquisition (36%), and Mirro Acquisition (20%). GHP Operating owns 100% of each of the Debtors' primary operating companies (collectively, the "Operating Companies"): (a) for the Anchor Hocking businesses – Anchor Hocking CG Operating Company LLC (consumer glass) and Anchor Hocking Company LLC (specialty glass), each of which is a Delaware limited liability company for the Anchor Hocking ; (b) for The Burnes Group businesses- Burnes

Operating Company LLC, a Delaware limited liability company; and (c) Mirro Operating

Company LLC, a Delaware limited liability company, for the WearEver businesses. Each of the

other Debtors is 100% owned directly or indirectly by one of Anchor Acquisition, Burnes

Acquisition, or Mirro Acquisition, and was formed under either Delaware law or the laws of

Canada or Mexico. A chart summarizing the corporate structure of the Debtors is annexed as

Exhibit A to the Affidavit of Randal Rombeiro, Chief Financial Officer of the Debtors, in

Support of First Day Motions. Global Home's headquarters are in Westerville, Ohio. Anchor

Hocking's and WearEver's headquarters are in Lancaster, Ohio. The Burnes Group's

headquarters are in Austin, Texas.

　　　　　10.　　　Global Home Products, through its Anchor Hocking, The Burnes Group

and WearEver businesses, is a leading designer, marketer and manufacturer of well known,

branded consumer and specialty products to retail and hospitality customers and to original

equipment manufacturers.

　　　　　11.　　　Anchor Hocking produces beverageware, cookware, bakeware, home

décor items, and glass components for commercial customers, including the Anchor Hocking®,

Fire-King®, Jade-ite®, Phoenix Glass® and Toscany® brands. Anchor Hocking was founded in

1880 and is the second largest supplier of glassware in the United States. Anchor Hocking's

glassware products cross all price points through retail, specialty, business-to-business, and

hospitality channels. Anchor Hocking manufactures substantially all of its products at its

facilities in Lancaster, Ohio and Monaca, Pennsylvania, and markets its products internationally.

　　　　　12.　　　The Burnes Group designs and sells ready-made picture frames, photo

albums, scrapbooks and related home accessories, including the Burnes of Boston®, Carr®,

Connoisseur® and Rare Woods® brands. The Burnes Group was founded in 1917 and is the premier marketer and manufacturer of ready made picture frames, photo albums, scrapbooks and related decorative accessories in North America. The Burnes Group's wide array of brand and product lines is marketed to a variety of retailers including merchants, department stores, independent specialty retailers, photo stores, hardware, drug stores and grocery stores. The Burnes Group's design and marketing teams continuously conduct extensive research and work closely with customers, suppliers, and domestic manufacturing facilities to regularly introduce new trend-setting products. The Burnes Group outsources the manufacture of most of its products to Asian manufacturers, and manufactures the remaining portion through Mexican subsidiaries, at the non-debtor subsidiaries' maquiladora in Durango, Mexico.

13.     WearEver produces metal bakeware, cookware and accessories, including the AirBake®, Mirro®, Regal®, SmartBake® and WearEver® brands. WearEver was founded in the 1950s, and is recognized as a leading marketer and manufacturer of multi-branded metal cookware and bakeware products and accessories. WearEver sells metal cookware, bakeware and related accessories throughout North America, principally in the opening and mid-tier price points through retail channels. WearEver manufactures the majority of its products at a maquiladora in Nuevo Laredo, Mexico, and also outsources its production to international (primarily Asian) manufacturers.

14.     The Debtors currently employ approximately 1,950 full and part-time employees[3] as of March 2006.

---

[3] This number does not include those employed by non-debtor subsidiaries outside of the United States.

15.     For the 11-month year to date for fiscal years ending March 31, 2005 and

March 31, 2006, the Debtors generated consolidated revenues of $489.2 million and $452.8

million, respectively, with net loss during these years in the amounts of $4.9 million and $60.5

million, respectively. The book value of the Debtors' assets as of February, 2006 was

approximately $472.5 million.

### Recent Corporate History

16.     Global Home was founded in connection with the acquisition of the

Anchor Hocking, Burners Group and WearEver businesses from Newell Rubbermaid in April

2004, in consideration of approximately $310 million in cash and seller-retained receivables (the

"Purchase Price").

### Equity and Significant Indebtedness

17.     Global Home Products Investors LLC owns approximately 97.75% of the

issued and outstanding common stock of Global Home, and 100% of the issued and outstanding

preferred stock of Global Home. The remaining approximately 2.25% of the common stock of

Global Home is owned by ten individuals all of whom are present or former officers or directors

of one or more of the Debtors.

18.     As of the Petition Date, the Debtors maintained a senior secured revolving

line of credit with Wachovia Bank, National Association, as agent acting for the financial

institutions party thereto as lenders ("Wachovia"), pursuant to that certain Loan Agreement,

dated as of June 22, 2004, as amended (the "Wachovia Loan Agreement"). The Wachovia Loan

Agreement provided for a revolving credit and term loan facility of up to $200,000,000. The

funds loaned by Wachovia to the Operating Debtors pursuant to the Wachovia Loan Agreement

were calculated on a formula providing for advances based on a percentage of the value of the Debtors' inventory and outstanding accounts receivable, and were guarantied by most of the other Debtors. As of the Petition Date, Wachovia was owed approximately $115 million under the Wachovia Loan Agreement, all under the revolver (the "Wachovia Loan Indebtedness"). The Wachovia Loan Indebtedness is secured by a lien on substantially all of the Debtors' assets, including 100% of the stock held by a Debtor in any of its domestic subsidiaries, and 65% of the stock held by a Debtor in any of its foreign subsidiaries.

19.     As of the Petition Date, the Debtors also maintained a junior secured term loan and revolving line of credit with Madeline LLC, pursuant to that certain Financing Agreement dated as of April 13, 2004 (the "Madeline Loan Agreement"). The Madeline Loan Agreement provided for a revolving credit and term loan facility of up to $210 million to the Operating Debtors and their parent, GHP Operating Company LLC, and was guarantied by most of the Debtors. As of the Petition Date, Madeline was owed approximately $200 million, all of which is under the term loan (the "Madeline Indebtedness"). The Madeline Indebtedness is secured by a lien in substantially all of the Debtors' assets.

20.     In addition to the Wachovia Loan Indebtedness and the Madeline Indebtedness, the Debtors estimate that their unsecured debt, exclusive of potential contract or lease rejection claims, totals approximately $66 million as of the Petition Date. As described below, several of the Debtors' vendors no longer provide the Debtors with trade terms.

were calculated on a formula providing for advances based on a percentage of the value of the Debtors' inventory and outstanding accounts receivable, and were guarantied by most of the other Debtors. As of the Petition Date, Wachovia was owed approximately $111 million under the Wachovia Loan Agreement, all under the revolver (the "Wachovia Loan Indebtedness"). The Wachovia Loan Indebtedness is secured by a lien on substantially all of the Debtors' assets, including 100% of the stock held by a Debtor in any of its domestic subsidiaries, and 65% of the stock held by a Debtor in any of its foreign subsidiaries.

19.     As of the Petition Date, the Debtors also maintained a junior secured term loan and revolving line of credit with Madeline LLC, pursuant to that certain Financing Agreement dated as of April 13, 2004 (the "Madeline Loan Agreement"). The Madeline Loan Agreement provided for a revolving credit and term loan facility of up to $211 million to the Operating Debtors and their parent, GHP Operating Company LLC, and was guarantied by most of the Debtors. As of the Petition Date, Madeline was owed approximately $200 million, all of which is under the term loan (the "Madeline Indebtedness"). The Madeline Indebtedness is secured by a lien in substantially all of the Debtors' assets.

20.     In addition to the Wachovia Loan Indebtedness and the Madeline Indebtedness, the Debtors estimate that their unsecured debt, exclusive of potential contract or lease rejection claims, totals approximately $66 million as of the Petition Date. As described below, several of the Debtors' vendors no longer provide the Debtors with trade terms.

### Events Leading to the Commencement
### of the Debtors' Chapter 11 Cases

21.    The Debtors' businesses have suffered as a result of a number of adverse factors since their acquisition from Newell Rubbermaid. The Anchor Hocking business, which is energy and raw material intensive, has experienced shrinking margins as a result of increasing energy and raw material costs and severe industry-wide competition at the lower-priced end of its product range. The Burnes Group business, which had revenues of approximately $400 million for fiscal year 1999 and currently has projected revenues of $120 - $130 million for fiscal year 2007, has been ravaged by competition from start-up companies which have minimal embedded overhead and by direct sales by overseas manufacturers to the Burnes Group's existing and potential customers. The WearEver business has experienced deep cuts in its profit margins as a result of the rise in the cost of aluminum and competition from overseas.

22.    Over the same period, all three businesses have suffered from high rates of turnover of personnel in key positions, due in significant part to the companies' continuing economic crisis.

23.    These events have reduced the Debtors' cash flow, forcing the Debtors to delay payments to creditors, in response to which creditors have delayed providing or refused to furnish on acceptable terms the products and services necessary to the Debtors' operations. The Debtors' worsening financial condition also reduced availability under the Wachovia revolver, and resulted in defaults under the Wachovia Loan Agreement necessitating the negotiation of a series of forbearances under the Wachovia financing beginning in May, 2005.

24.     In March, 2006, the Debtors engaged the firm of Conway Del Genio Gries & Co., LLC ("CDGG") as their business advisors to assist them and formulate a business plan in an effort to respond to these problems. The Debtors' subsequently engaged Ronald F. Stengel as their Chief Restructuring Officer, effective on Petition Date and subject to Court approval.

25.     By April, 2006, the Debtors determined that commencing chapter 11 cases for the purpose of obtaining relief from the immediate demands of their creditors, with the goal of restructuring the Debtors' businesses and financial affairs, was in the best interests of all parties in interest. The Debtors commenced these chapter 11 cases on the Petition Date.

## PART II

### First Day Motions and Applications

A.     **Motion for Entry of Order Directing**
       **Joint Administration of Related Chapter 11 Cases**

26.     The seventeen Debtors in these cases are affiliated entities. The Debtors' consolidated creditor matrices list approximately 7,000 potential creditors and parties in interest. I am informed by counsel that the joint administration of the Debtors' chapter 11 cases will permit the Clerk of the Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which will result in significant savings to the estates. Accordingly, I believe that the relief requested in the joint administration motion is in the best interests of the Debtors' estates.

**B.** **Application of the Debtors Pursuant to Section 327(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 for Authorization to Employ and Retain Pachulski Stang Ziehl Young Jones & Weintraub LLP as Counsel for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date**

27.     The Debtors seek to employ and retain the firm of Pachulski Stang Ziehl

Young Jones & Weintraub LLP ("PSZYJ&W") as their bankruptcy counsel with regard to the

filing and prosecution of these chapter 11 cases.

28.     The Debtors have chosen PSZYJ&W as their counsel because of

PSZYJ&W's extensive experience and knowledge in the field of debtors' and creditors' rights

and business reorganizations under chapter 11 of the Bankruptcy Code and because of the Firm's

expertise, experience and knowledge practicing before this Court.  In preparing for its

representation of the Debtors in these cases, PSZYJ&W has become familiar with the Debtors'

business affairs and many of the potential legal issues which may arise in the context of these

chapter 11 cases.

29.     Accordingly, I believe that PSZYJ&W is both well-qualified and uniquely

able to represent the Debtors in these cases.

**C.** **Motion of the Debtors Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code for an Order Authorizing the Debtors to Retain, Employ and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business**

30.     In the ordinary course of business, the Debtors retain and employ different

professional firms to perform various services such as attorneys, accountants, and other

professionals.  To minimize any disruption to their operations, the Debtors seek authority to

retain, *nunc pro tunc* to the Petition Date, professionals that the Debtors may require from time

to time, during the pendency of these chapter 11 cases, to render discrete services to the Debtors

in a variety of matters affecting their day-to-day business operations (the "Ordinary Course

Professionals"). The services of the Ordinary Course Professionals will not include the

administration of the Debtors' chapter 11 cases and matters that will be handled by the

professionals being retained by the Debtors through separate application to the Court.

        31.     Accordingly, I believe that the relief requested in the motion authorizing

the Debtors to employ Ordinary Course Professionals is in the best interests of the Debtors'

estates.

**D.    Debtors' Motion for an Administrative Order Under**
**      11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim**
**      Monthly Compensation and Reimbursement of Expenses of**
**      Professionals and Reimbursement of Expenses of Committee Members**

        32.     The Debtors request approval of certain procedures for compensating and

reimbursing court-approved professionals on a monthly basis, which I am informed are

comparable to the procedures established in other similar-sized chapter 11 cases in this district.

        33.     As described above, the Debtors seek approval to employ PSZYJ&W as

their bankruptcy counsel. The Debtors intend to seek the authority to retain CDGG and likely

will retain other professionals in these chapter 11 cases as the need arises. In addition, I am

informed that an official committee of unsecured creditors may be appointed (the "Committee"),

and the Committee also may seek to retain various professionals (the "Committee

Professionals").

34. I am informed that entry of an interim compensation order will streamline the professional compensation process and enable the Court and all other parties to more effectively monitor the professional fees incurred in these chapter 11 cases. Further, it will avoid forcing professionals to finance these bankruptcy cases while awaiting final approval of their fees and expenses. I believe that such relief is in the best interests of the Debtors' estates.

**E.    Motion of the Debtors for an Order Authorizing the Debtors to Continue to Use Their Existing (A) Cash Management System, Bank Accounts, Checks, and Business Forms; (B) Providing Administrative Priority Status to Postpetition Intercompany Claims; and (C) Approving the Waiver of <u>Section 345(b) Deposit and Investment Requirements</u>**

35. Prior to the commencement of these cases, the Debtors, in the ordinary course of their business, maintained bank accounts with Northern Trust Bank ("Northern Trust") and Fifth Third Bank in connection with the Debtors' cash management system (the "Cash Management System"). The Debtors' Cash Management System is an integrated network of bank accounts that facilitates the timely and efficient collection, concentration management and disbursement of funds used by the Debtors. The Debtors have maintained a centralized integrated cash management system since the acquisition of the Debtors' businesses from Newell in 2004. A diagram summarizing the salient features of the Debtors' Cash Management System is attached as <u>Exhibit A</u> to this Motion. A list of the bank accounts maintained by the Debtors (the "Bank Accounts") is attached hereto as <u>Exhibit B</u> to the Motion herein and is further described below. The bank accounts maintained by the Debtors' foreign non-debtor subsidiaries whose operations the Debtors intend to continue to fund in the ordinary course postpetition are shown on <u>Exhibit A.</u>

a.    Collections and Deposits.  The Debtors derive revenues primarily from the payment by customers for products purchased from the Debtors.  All revenues derived from the Debtors' United States operations are directed into a single lockbox account maintained by the Debtors at Northern Trust Bank in Chicago, Illinois ("Northern Trust").  The Northern Trust lockbox has four lockbox "addresses," the purpose of three of which is to distinguish among payments made on account of receivables due the Anchor Hocking, Burnes or WearEver businesses.  The fourth lockbox "address" within the Northern Trust lockbox is primarily used to receive payments from customers that buy merchandise from more than one of the Debtors' three businesses, the receipts from which are manually allocated by the Debtors among the three businesses.  At the end of each business day, all funds deposited into the lockbox account are swept into an account maintained by Wachovia Bank, National Association (the "Wachovia Account") under the Wachovia Loan Agreement.  In addition, revenues from the Debtors' Canadian subsidiaries' operations are paid into a J.P. Morgan Chase lockbox account in Ontario, Canada and swept daily into the Wachovia Account.  The Debtors propose to continue using these Bank Accounts after the Petition Date.

b.    Disbursements.  The funds available to the Debtors under the Wachovia Loan Agreement and requested by the Debtors for the purpose of making disbursements are then advanced by Wachovia under the revolver to the Debtors' main disbursement account (the "Main Disbursement Account") at Fifth Third Bank ("Fifth Third").  Non-check payments (other than for payroll and for bank fees) are made directly from this Main Disbursement Account.  Funds transfers also are made from the Main Disbursement Account to three other disbursement accounts at Fifth Third (the "Sub-Disbursement Accounts" and with the

Main Disbursement Account, the "Disbursement Accounts"): one for payroll, the second for

bank fees and the third for paper check disbursements. The Main Disbursement Account

maintains a minimum balance, and the Sub-Disbursement Accounts maintain zero balances,

meaning that transfers are only in amounts necessary to pay the immediate disbursements, on an

as needed basis in order to fund the Debtors' operations. The Debtors propose to continue using

the Disbursement Accounts, including those used to fund their foreign operations as described

herein, after the Petition Date.

            c.        <u>Disbursement to Fund Foreign Operations</u>. Disbursements also are

made from the Main Disbursement Account to accounts at Banamex, Banorte, and Banco

Nacional de Mexico, each in the name of one of the Debtors' Mexican non-debtor subsidiaries to

fund their operations, and to an account at the Royal Bank of Canada in the name of the Debtors'

Canadian non-debtor subsidiaries to fund their operations, and to an account at Agricultural Bank

of China in the name of Debtors' Hong Kong non-debtor subsidiary to fund its operations. The

cost of operating Debtors' non-debtor subsidiaries' Nuevo Laredo, Mexico and Durango, Mexico

manufacturing facilities is approximately $2,000,000 per month. The cost of operating the

Debtors' non-debtor subsidiaries' Canadian sales office is approximately $500,000 per month.

The cost of operating the Debtors' non-debtor subsidiaries' Hong Kong purchasing office is

approximately $125,000 per month. The Debtors propose to continue to fund those operations in

the ordinary course postpetition, utilizing their existing Cash Management System.

            36.        The Debtors maintain current and accurate accounting records of daily

cash transactions, and submit that maintenance of this Cash Management System will prevent

undue disruption to the Debtors' businesses and operations, while protecting the Debtors' cash

for the benefit of their estates. Additionally, in the ordinary course of business, the Debtors deposit and withdraw funds from the bank accounts routinely by check, wire transfer or other electronic funds transfer method.

37.     The Debtors by this Motion also seek a waiver of the United States Trustee's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened at depositories authorized by the United States Trustee. If strictly enforced in these cases, the United States Trustee's requirement would cause disruption in the Debtors' activities and would impair the Debtors' ability to reorganize their business for the benefit of their estates and parties in interest.

38.     To guard against improper transfers resulting from the postpetition honoring of prepetition checks, courts have ordered banks, with limited court-approved exceptions, not to honor any checks drawn on a Debtors' accounts before the Petition Date. Subject to a prohibition against honoring prepetition checks or offsets without specific authorization from this Court, the Debtors request that the Bank Accounts be deemed debtor-in-possession accounts and that the Debtors be authorized to maintain and continue the use of these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

39.     If the relief requested herein is granted, the Debtors will not pay, and each of their banks where the Bank Accounts are maintained will be instructed not to pay, any debts incurred before the Petition Date other than as specifically authorized by this Court.

40.     The Debtors by this Motion seek authority to continue to use their Cash Management System, as such system may be modified pursuant to the requirements of any

Court-approved debtor-in-possession financing facility and/or cash collateral usage and related order of this Court.

41.     The Debtors' Cash Management System constitutes a customary and essential business practice and was created and implemented by the management of the Debtors in the exercise of their business judgment. The Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity. The widespread use of this type of Cash Management System, moreover, is attributable to the numerous benefits it provides, including the ability to (a) control and monitor corporate funds, (b) reduce idle cash balances, (c) ensure cash availability and (d) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the Cash Management System, will facilitate and enhance the Debtors' reorganization efforts to maximize their assets for the benefit of their stakeholders. For similar reasons, the Debtors should be authorized to continue to fund their businesses and operations by payments made from the Disbursement Accounts, including the operations of their non-debtor foreign subsidiaries which serve as production and sales facilities for goods that ultimately are sold by the Debtors. Further, the proposed debtor in possession financing facility between Wachovia and the Debtors provides for the continuation and maintenance of the Debtors' existing Cash Management System. Moreover, the Debtors submit that the relief requested is consistent with the relief provided to debtors in a number of other cases pending in this district.

42.     To minimize expense to their estates, the Debtors also request authority to

continue to use all correspondence and business forms (including, but not limited to letterhead, purchase orders, invoices, etc.), as well as checks without reference to their "debtor in possession" status.

43.    Parties doing business with the Debtors undoubtedly will be aware, as a result of the notice that will be sent of the filing of the cases and the publicity of the filing, of each of the Debtor's status as a chapter 11 debtor in possession. Changing correspondence and business forms would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors' reorganization efforts, particularly with respect to programming that would be necessary to alter the Debtors' check drafting practices. For this reason, the Debtors request that they be authorized to use checks and business forms without placing the label "debtor in possession" on each such check or form, provided that the Debtors shall add such designation to any new checks it obtains postpetition.

44.    The Debtors do not maintain any investment accounts as their collection accounts are swept daily, their Main Disbursement Account maintains a minimum balance, and each of their Sub-Disbursement Accounts and other Bank Accounts maintain a zero balance. All of the Bank Accounts are maintained at federally insured institutions. The Debtors seek a waiver of Section 345(b) of the Bankruptcy Code permitting the Debtors to maintain their Bank Accounts without the need to post a bond or other security to the extent that, at any given time, funds are deposited in their depository accounts or have accumulated in the main Disbursement Account that create an excess of the limits of Section 345 temporarily.

45.    I believe that it is necessary for the Debtors to obtain entry of an order by this Court: (a) authorizing the Debtors, in their discretion, to continue to use their integrated

Cash Management System (or a streamlined alternative thereto with fewer accounts) and checks,

correspondence and business forms without alteration or change; (b) granting a limited waiver

under § 345(b) of the Bankruptcy Code permitting the Debtors to maintain their Bank Accounts

without the need to post a bond or other security. The requested relief is appropriate in this case

given the complexity of the Debtors' business. Any disruption of the Debtors' cash management

procedures could adversely impact the Debtors' operations. Therefore, it is important that the

Debtors be permitted to continue using their existing Cash Management System (or a

streamlined alternative thereof) and Bank Accounts, consolidate the management of their cash,

and transfer monies from entity to entity as needed and in the amounts necessary to continue the

operation of the business pursuant to existing cash management procedures.

F.    **Motion of the Debtors Pursuant to Bankruptcy Code
      Sections 105(a), 363, and 507(a) for an Order Authorizing
      the Debtors to: (i) Pay Prepetition Wages, Salaries,
      Commissions, Employee Benefits and Other Compensation;
      (ii) Remit Withholding Obligations; (iii) Maintain Employee
      Benefits Programs and Pay Related Administrative Obligations;
      and (iv) Authorize Applicable Banks and Other Financial Institutions
      to Receive, Process, Honor and Pay Certain Checks Presented
      <u>for Payment and to Honor Certain Fund Transfer Requests</u>**

              46.    The Debtors currently employ approximately 1,950 full and part-time U.S.

employees in hourly, salaried, supervisory, management and administrative positions to perform

the functions necessary to effectively and efficiently operate the Debtors' domestic and

international business (collectively, the "Employees"). The Debtors employ both salaried and

hourly Employees and substantially all of the Debtors' Employees are employed full-time.

Approximately 1,500 Employees are paid hourly and approximately 450 Employees are salaried.

The Debtors' Employees are employed by the following entities: Anchor Hocking CG Operating

Company LLC, Anchor Hocking Operating Company LLC, GHP Operating Company LLC, Burnes Operating Company LLC, and Mirro Puerto Rico, Inc.

47.     Approximately 1,350 of the Employees (the "Union Employees") are members of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy Allied Industrial and Service Workers' International Union the (the "Steelworkers Union"). The Steelworkers Union represents the Union Employees that work at the Debtors' facilities located in Lancaster, Ohio and Monaca, Pennsylvania,[4] where the Debtors' manufacture their beverageware, cookware, bakeware, home décor items, and glass components. The Debtors pay and provide benefits to Union Employees in accordance with the terms of each applicable Union Agreement.[5]

48.     To minimize the personal hardship the Employees will suffer if prepetition employee-related obligations are not paid when due or honored as expected, and to maintain the morale of the Employees during this critical time, the Debtors, by this Motion, seek authority, in their discretion, to pay and/or honor, as the case may be, certain prepetition claims for, among other items, wages, salaries, commissions, management incentive and sales bonus programs, and other compensation (collectively, the "Employee Wages"), vacation, paid time off, fixed holidays, medical benefits, contributions to employee benefit plans and all other employee

---

[4] The Debtors are parties to three agreements (the "Union Agreements") with the Steelworkers' Union, consisting of (i) that certain agreement, dated as of October 1, 2001, by and between Anchor Hocking Company Phoenix Glass Plant and the American Flint Glass Workers Union, AFL-CIO Union and, whose members are now represented by the Steelworkers Union; (ii) that certain agreement dated as of October 14, 2005 by and between the Steelworkers Union and Anchor Hocking CG Operating Company LLC Plant 1 and the Distribution Center Lancaster, Ohio; and (iii) that certain agreement dated as of October 16, 2005 by and between the Steelworkers Union and Anchor Hocking CG Operating Company LLC Lancaster Ohio

[5] In addition to the benefits provided to the Union Employees under the Union Agreements, the Debtors also offer Union Employees certain other benefits described in this Motion, including participation in the Debtors' flexible spending account program and counseling services under the Debtors' employee assistance program.

benefits (collectively, "Employee Benefits") that the Debtors historically have paid in the ordinary course of their business, to reimburse certain reimbursable unpaid employee Reimbursement Obligations (defined below), and to pay all costs incident to the foregoing (collectively, and as more fully described below, the "Employee Wages and Benefits"). The Employee Wages and Benefits for which this relief is sought are set forth in detail below.

## Employee Compensation

### Wages, Salaries and Other Compensation

49.     The Debtors' U.S. Employees are paid in arrears pursuant to different payroll cycles made on a bi-weekly or semi-monthly basis.[6] The Debtors' payroll for U.S. Employees is approximately $3.3 million. The Debtors' last weekly prepetition pay period and the date on which certain of the Debtors' U.S. Employees were last paid was April 7, 2006 (the "Last Pay Date").

50.     All U.S. Employees are paid through direct deposit or by live check. As more fully described in the Debtors' motion to approve, inter alia, the maintenance of existing bank accounts and continued use of existing cash management system (the "Cash Management Motion"), filed concurrently herewith, the Debtors maintain a main operating account (the "Main Operating Account") and a zero-balance payroll account at Fifth Third Bank. Even though U.S. Employees are paid on a bi-weekly basis, that bi-weekly schedule is staggered depending on the work location of the Employees. Thus, the Debtors fund and issue a payroll every Friday.

---

[6] Prior to the Petition Date, U.S. Employees were paid on weekly and bi-weekly payroll schedules. The Debtors are in the process of transitioning their payroll dates to ensure that all U.S. Employees will be paid on a bi-weekly basis, staggered weekly, effective as of the April 21, 2006 payroll. Thus, after one transitional payroll to be made on April 14, 2005 for certain Employees, all U.S. Employees will be paid bi-weekly payroll except for two Employees based in Puerto Rico, who will continue to be paid on a semi-monthly basis.

51.     The Debtors' payroll is administered by ADP.  The Debtors fund their direct deposit U.S. payroll obligations to ADP on the Wednesday and Thursday before the applicable date on which Employees are paid (the "Pay Date").  Employees receive their direct deposits or live checks, as the case may be, on the applicable Pay Date.  The Debtors have funded and paid their payroll obligations for amounts due to Employees paid on a weekly basis through the Last Pay Date, except with respect to certain withholding obligations currently held by the Debtors on behalf of certain Employees as more fully explained below.  As of the Petition Date, the Debtors estimate that they owe approximately $1.7 million in earned but unpaid wages (the "Unpaid Wages") to certain Employees earned prior to the Last Pay Date.  The Debtors seek authority to pay the Unpaid Wages, subject to a maximum aggregate cap of $1.9 million.  As of the Petition Date, no single Employee is owed more than the $10,000 priority limit set forth in section 507(a)(4) of the Bankruptcy Code.

52.     As of the Petition Date, the Debtors estimate that they owe ADP approximately $20,000 in unpaid fees with respect to ADP's processing of the Debtors' U.S. payroll and administration of certain Withholding Obligations.  The Debtors request authority to pay ADP any prepetition expenses and fees that ADP may be owed in connection with foregoing services and to continue to pay ADP postpetition in the ordinary course of the Debtors' business with respect to the same.

### Withholding Obligations

53.     In the ordinary course of business, the Debtors routinely withhold from Wages certain amounts that the Debtors are required to transmit to third parties for such purposes as Social Security and Medicare, federal and state or local income taxes, contributions to the

Debtors' Health and Welfare Plans (defined below), union dues, 401(k) contributions, garnishment, child support, or other similar obligations pursuant to court order (collectively, the "Withholding Obligations"). ADP administers certain Withholding Obligations for the U.S. Employees while the Debtors themselves administer other Withholding Obligations, such as union dues, 401(k) contributions and matches and charitable contributions by Employees.

54.     ADP provides the scheduled U.S. Withholding Obligations to the Debtor on the Wednesday prior to the scheduled Pay Date. The Withholding Obligations administered by ADP are transferred to the appropriate recipients on the Wednesday or Thursday prior to the Pay Date. The Debtors transfer their union dues and charitable contribution U.S. Withholding Obligations to the appropriate recipients one month in arrears. The Debtors' 401(k) Withholding Obligations are transferred by the Debtors to the administrator of the Debtor's 401(k) plan on the Tuesday following the Pay Date.

55.     As described below, the Debtors believe that funds withheld on behalf of their Employees that remain in the Debtors' possession are not property of the Debtors' estates. As of the Petition Date, the Debtors estimate that they are holding approximately $135,000 in Withholding Obligations for the benefit of their U.S. Employees. The Withholding Obligations held by the Debtors include approximately $12,000 in withheld Union Dues, approximately $2,000 for March Employee charitable contributions, and approximately $120,000 in Employee and matching 401(k) contributions from the April 7, 2006 payroll. The Debtors seek authority to transfer the Withholding Obligations in their possession to the appropriate recipients.

**Business Expense Reimbursements**

56.     The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. Such expenses typically include, but are not limited to, business-related travel expenses, including hotel and meal charges, relocation expenses, and business telephone calls, including cell phone charges and per diem payments to certain individuals (the "Reimbursement Obligations"). It is difficult for the Debtors to determine the exact amounts of Reimbursement Obligations that are due and owing for any particular time period since the expenses incurred by Employees on behalf of the Debtors throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and submits the corresponding expense report for processing. Based on historical experience, the Debtors anticipate that, as of the Petition Date, they owe approximately $175,000 of Reimbursement Obligations for all Employees. The Debtors' seek authority to pay any prepetition Reimbursement Obligations, subject to a maximum cap of $225,000.

### Health and Welfare Benefits for United States Employees

57.     The Debtors provide several health and welfare benefit plans (the "Health and Welfare Plans") to full-time U.S. Employees.

#### Medical, Dental and Prescription Drug Benefits

58.     Non-Union Employees and Union Employees who have been members of the Union for the mandatory periods provided under the applicable Union Agreement each receive a medical and prescription drug care plan sponsored by UnitedHealthcare (the "UnitedHealthcare Plan"), which is a partially self-insured health plan. The Debtors self-insure claims under the UnitedHealthcare Plan and have stop-loss coverage from UnitedHealthcare for

claim amounts in excess of $250,000 per claim. Amounts in excess of $250,000 per allowed claim are paid by UnitedHealthcare.

59. The Debtors provide Employees with medical, and drug insurance benefits under the UnitedHealthcare Plan. Non-Union Employees may choose between either a "standard plan" or a "buy-up plan" with respect to the health care benefits provided under the UnitedHealthcare Plan. Each plan option provides medical and prescription drug coverage that varies based upon Employee monthly contributions and have different limitations on total out of pocket expenses paid by Employees. Each pay period, Non-Union Employees make contributions for their health for themselves and/or their dependents depending on which plan option they select.

60. Union Employees only receive benefits under the "buy-up plan." Union Employees pay a portion of their health care pursuant to the formulas set forth in their respective Union Agreements, which provide for either a percentage contribution by the Union Employee similar to the contributions paid by the Non-Union Employees, or, alternatively, fixed contribution amounts paid by the Union Employee to partially defray their health care costs.[7]

61. The Debtors provide one dental plan to Employees sponsored by Great West (the "Great West Dental Plan"). Participating Non-Union Employees pay a yearly deductible as well as certain costs associated with basic, restorative and orthodontic care whereas Union Employees contribute to payment of their dental benefits in accordance with the respective terms of each Union Agreement. The Debtors' maximum out of pocket obligation for

---

[7] In addition, Union Employees are entitled to certain health benefits upon retirement. Union Employees who retire from Debtors' plant in Lancaster Ohio may pay higher monthly premiums in order to maintain their health benefits once they retire. Union Employees who retire from the Debtors' plant in Monaca, Pennsylvania receive a one-time lump sum payment of $5,000 to cover future medical costs.

24

most Employees is $2,000.[8]  The Debtors incur average monthly costs of between $70,000 to $80,000 per month with respect to claims and administrative payments made under the Great West Dental Plan.

62.     Because the Debtors are self-insured up to $250,000 per claim under the UnitedHealthcare Plan and self-insured under the Great West Dental Plan, subject to a maximum cap of $2,000 for the majority of their Employees, the Debtors must make payments to physicians, dentists and service providers that provided treatment to Employees through UnitedHealthcare and Great West.  UnitedHealthcare and Great West periodically invoice the Debtors for medical claims incurred on behalf of the Debtors' employees.  The lag time for claims on services performed by physicians, dentists and service providers, but not yet paid by the Debtors is approximately two to three months.  Based on the average monthly amount of claims paid under the UnitedHealthcare Plan and the Great West Dental Plan of approximately $1.2 million, the Debtors estimate that there are approximately $2.4 to $3.6 million in outstanding prepetition health, medical, dental and prescription drug services claims for both Union and Non-Union Employees under both the UnitedHealthcare Plan and Great West Dental Plan, inclusive of administrative costs (the "Prepetition Unreimbursed Health Care Claims").  The Debtors seek authority to pay the Prepetition Unreimbursed Health Care Claims in the ordinary course and to continue to pay claims incurred postpetition under the UnitedHealthcare Plan in the ordinary course of their business.

---

[8] The Debtors' maximum out of pocket dental obligation for Union Employees at the Monaca, Pennsylvania plant is $1,500 per employee.

Disability, Life and Accidental Death
and Dismemberment Insurance

63.     The Debtors offer Employees short and long term disability insurance

("Disability Insurance"), life insurance ("Life Insurance") and accidental death and

dismemberment coverage ("ADD Coverage") through Reliance Standard.

64.     The Debtors provide Non-Union Employees with income protection

through short term disability protection in the event of non-work related injury or illness. Each

Non-Union Employee may receive up to 120 days per 12 month period of 100% of his salary if

such employee needs time away from work to recover from illness or injury. Union Employees

may receive short term disability payments between $215 and $250 (depending on the applicable

Union Agreement) up to 26 weeks per 12 month period.

65.     The Debtors also provide certain Employees with long-term disability

benefits in the event that an employee cannot return to work after 120 days of disability. Non-

Union Employees are eligible to receive up to 60% of their monthly earnings, subject to both a

maximum benefit period and a maximum monthly benefit of $5,000. Union Employees that

work at the Debtors' plant in Lancaster, Ohio are offered the option to purchase long term

disability insurance coverage.

66.     Employees also receive basic life insurance benefits. Each Non-Union

Employees is eligible to receive twice their annual salary, rounded to the next $1,000, subject to

a maximum benefit of $600,000. Non-Union Employees may also purchase additional life

insurance coverage or purchase life insurance dependent coverage at their election. Union

Employees receive basic life insurance coverage of approximately $25,000 and may purchase

supplemental life insurance coverage at their option. Both Union and Non-Union Employees are entitled to receive an amount equal to their life insurance benefit in the event of accidental death, dismemberment and loss of sight.

67. The monthly premium cost due to Reliance Standard is approximately $35,000 per month. As of the Petition Date, the Debtors estimate they owe Reliance Standard approximately $35,000 for unpaid April premium payments for Disability Insurance, Life Insurance and ADD Coverage and unpaid monthly unpaid administrative costs (the "Prepetition Life, ADD and Disability Insurance Premiums"). The Debtors' seek authority to pay the Prepetition Life, ADD and Disability Insurance Premiums, subject to a maximum cap of $70,000 The Debtors also seek authority to continue to pay their share of premiums with respect to Life Insurance, Disability Insurance and ADD Coverage to Reliance Standard postpetition in the ordinary course of the their business.

**Paid Time Off**

68. The Debtors offer two forms of paid time off ("PTO") to Non-Union Employees, consisting of vacation time and paid holidays. Union Employees receive PTO in accordance with the terms of their applicable Union Agreements.

69. Vacation Time. Non-Union Employees who have completed one or more years of service are eligible for paid vacation benefits ("Vacation Time"). Non-Union Employees who have between 1 and 7 years service receive 2 weeks of Vacation Time. Non-Union Employees who have between 8 and 14 years of service receive 3 weeks of Vacation Time while Non-Union Employees with 15 years of service of more receive four weeks of Vacation Time. Vacation Time that is not taken by the end of the calendar year is forfeited and

may not be carried over from year to year. Employees accrue their allotted vacation time effective January 1st of the applicable calendar year. Union Employees receive vacations pursuant to the vacation accrual schedules set forth in their applicable Union Agreement.

70.     Paid Holidays. The Debtors offer ten paid fixed holidays to qualifying full and part-time Non-Union Employees. Union Employees receive paid fixed holidays and time off for funeral leave and personal days pursuant to the terms of their Union Agreements.

71.     The Debtors seek authority to honor their existing PTO policies solely to permit continuing Employees to use their prepetition accrued PTO in the ordinary course of business. The Debtors request authority to honor similar PTO policies regarding vacation benefits provided to Union Employees in the Union Agreements. However, the Debtors do not, at this time, seek authority to pay any claims for accrued PTO.[9]

## Severance Benefits

72.     Prior to the Petition Date, salaried, full-time and active Non-Union Employees were eligible to receive severance benefits under the Debtors' prepetition severance pay plan (the "Severance Plan"). At this time, however, the Debtors do not seek authority to continue the Severance Plan postpetition or to pay any prepetition severance claims of any former Employees. The Debtors reserve the right to request authority to either reinstate the Severance Plan at a later date, or to implement a modified severance program.

---

[9] In addition, the Debtors seek authority to pay accrued and unpaid wages and PTO of approximately $5,000 to an employee who was separated from the Debtors immediately prior to the Petition Date (the "Prepetition Wage and PTO Claim").

**401k Plan, Profit Sharing and Union Pension Plans**

73.     The Debtors offer a 401(k) retirement plan (the "401(k) Plan")
administered by JP Morgan for Non-Union Employees and U.S. Union Employees. The Debtors
match Employee contributions to the 401(k) Plan dollar for dollar up to the first 3% of employee
contributions, and then 50 cents per dollar for the next 2% of employee contributions. The
monthly contributions to the 401(k) Plan, including matching contributions is approximately
$150,000 per month. For the 2005 calendar year, the Debtors transferred approximately $3.4
million in contributions for participating Employees to the 401(k) Plan and approximately $1.8
million in matching contributions made by the Debtors. The Debtors estimate that
approximately $120,000 in Withholding Obligations remain unpaid as of the Petition Date. The
Debtors request authority, in their discretion, to both continue its existing 401(k) Plan, including
the ability, in their sole discretion, to continue to make matching contributions under the 401(k)
Plan in the ordinary course of business.

74.     Full-time Non-Union Employees are eligible to participate in the Debtors'
profit sharing plan (the "Profit Sharing Plan") if they have been employed with the company
through the end of the profit sharing plan year. Part time Non-Union Employees who work at
least 1,000 hours per plan year are also eligible to participate in the Profit Sharing Plan. Under
the Profit Sharing Plan, the Debtors may, in their discretion, contribute up to 2% of their annual
net profits to participants in the Profit Sharing Plan. However, as of the Petition Date, the
Debtors have not accrued any obligations to any Employees with respect to its Profit Sharing
Plan and, consequently, do not request authority to make any contributions to the Profit Sharing

Plan. However, the Debtors request the authority, but not the obligation, to continue the Profit Sharing Plan in the ordinary course of the Debtors' business postpetition.

75.     U.S. Union Employees receive a defined benefit pension pursuant to a plan maintained by the Debtors (the "Pension Plan") in accordance with the terms of the different Union Agreements. The Debtors next annual contribution to the Pension Plan is scheduled to occur in September 2006 in an amount of approximately $2.2 million.

### Tuition Reimbursement and Employee Assistance Program

76.     Full time Employees employed by the Debtors for at least six months are eligible to apply for the Debtor's educational assistance program (the "Tuition Reimbursement Program"), pursuant to which the Debtors, in their discretion, provide approved Employees tuition reimbursement for qualified classes. Tuition reimbursements are made according to the grade received by the participating Employee. In certain cases, a participating Employee may be required to repay any tuition reimbursement if the employee voluntarily terminates his employment with the Debtors within one to two years. The Debtors estimate that they owe approximately $25,000 in prepetition reimbursement and administrative expenses with respect to the Tuition Reimbursement Program (the "Prepetition Tuition Reimbursement Expenses"). The Debtors seek authority to pay the Prepetition Tuition Reimbursement Expenses, subject to a maximum cap of $50,000, and to continue the Tuition Reimbursement Program postpetition in the ordinary course of the Debtors' business.

77.     The Debtors also provide confidential family and substance abuse counseling services for Employees and certain dependents in appropriate circumstances (the "Employee Assistance Program"). The total annual costs for the Employee Assistance Program

averages approximately $43,000 per year. The Debtors estimate that they owe approximately $3,600 in prepetition expenses relating to the Employee Assistance Program. The Debtors request authority to pay any prepetition expenses relating to the Employee Assistance Plan, subject to a cap of $80,000, and to continue to provide the Employee Assistance Program postpetition in the ordinary course of the Debtors' business.

### Flexible Spending Accounts

78.     The Debtors offer Employees flexible spending accounts ("FSAs") to put aside money tax-free to pay for eligible medical and dependent care costs. An Eligible Employee's FSA deduction is taken out of his or her paycheck each pay period and put in an account to be used for eligible expenses through the year. The FSA program is administered by UnitedHealthcare and under applicable IRS guidelines and regulations. The Debtors incur costs of approximately $700 per month with respect to processing and administering claims with respect to the FSAs. The Debtors seek authority to pay, in their discretion, prepetition administrative and processing fees for the FSAs, subject to cap of $1,600, and seek authority to continue to pay such fees postpetition in the ordinary course of the Debtors' business.

### The Debtors' Incentive Plans.

79.     The Debtors previously provided an incentive plan for eligible officers, vice presidents, corporate employees, and senior and key managers for the period of April 1, 2005 through March 31, 2006 (the "Incentive Plan"). The Incentive Plan provided eligible Employees with bonuses to the extent that certain targeted EBITDA, debt reduction, cash flow and net sales growth metrics were achieved (the "Performance Metrics"). The Performance Metrics differed for each of the Burnes, Anchor Hocking/WearEver, and GHP Operating

Company LLC divisions that participate in the Incentive Plan. An eligible Employee was eligible to receive a certain percentage of his salary as an incentive bonus if its division achieved or exceeded the Performance Metrics established under the Plan (the "Incentive Bonus"). The potential Incentive Bonus varies from employee to employee. In addition to the Incentive Bonus, the Debtors' sales managers were eligible to achieve an additional sales bonus (the "Sales Bonus") if they met or exceeded the sales targets fixed by the president and vice presidents of the department.

80.     During the 2005/2006 fiscal year, none of the Debtors' divisions achieved the required Performance Metrics established pursuant to the Incentive Plan. However, certain sales managers were able to meet or exceed their targeted sales levels thereby entitled them to a Sales Bonus under the Incentive Plan. Because the Incentive Plan terminated on March 31, 2006, the Debtors have not fully completed their calculation of Sales Bonuses owed to certain sales managers. However, the Debtors estimate that they owe approximately $235,000 in Sales Bonuses to approximately 25 sales managers. Due to the Debtors' dependence on their sales managers to maintain and manage the Debtors' relationships with their vendors and oversee the sale of the Debtors' products, the Debtors believe that it is critical to pay the Sales Bonuses. The Debtors believe that if the Sales Bonuses are not paid, they may lose valuable Employees and suffer a decline in employee morale. The Debtors therefore seek authority to pay the Sales Bonuses to the eligible sales managers in accordance with the provisions of the Incentive Plan.

**Employee and Third Party Commissions.**

81.     Two of the Debtors' Canadian Employees are paid, commission based, on the level of sales made by these Employees (the "Commissioned Employees"). The

Commissioned Employees do not receive any salaries except for any commissions they may earn. The total commissions for the Commissioned Employees averages approximately $10,000 per month. As of the Petition Date, the Debtors believe that they are current on payment of the commissions of the Commissioned Employees, but seek authority to pay any unpaid commissions up to, but not exceeding, $10,000 per Commissioned Employee and to continue to pay commissions earned postpetition by the Commissioned Employees in the ordinary course of the Debtors' business.

82. The Debtors also pay commissions to third party non-Employees as a percentage of the amount of sales of the Debtors' products (the "Commissioned Non-Employees"). The Debtors rely on the Commissioned Non-Employees to market and sell the Debtors' products to the Debtors' customers and negotiate trade terms with the Debtors' various vendors. The Debtors believe that they have incurred approximately $750,000 in unpaid prepetition commissions for Commissioned Non-Employees earned primarily during the months of February and March, 2006 (the "Third Party Prepetition Commissions"). It is critical that the Commissioned Non-Employees are paid the Third Party Prepetition Commissions. If the Third Party Prepetition Commissions are not paid, the Debtors believe that many, if not all, of the Commissioned Non-Employees will stop marketing and selling the Debtors' products to vendors and may work to market the Debtors' competitors' products to the Debtors' current vendors. Thus, the Debtors seek authority to pay the Third Party Prepetition Commissions and to continue to pay commissions to Commissioned Non-Employees earned postpetition in the ordinary course of the Debtors' business.

**Workers' Compensation Insurance**

83.     Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising from or related to their employment with the Debtors. To meet their workers' compensation insurance obligations, the Debtors currently maintain an annual workers' compensation policy the ("AIG Workers' Compensation Insurance Policy") with American Home Assurance – AIG ("AIG") pursuant to which AIG provides workers' compensation insurance coverage in excess of $250,000 per allowed claim up to $1,000,000 per occurrence in all of the states in which the Debtors conduct business, except in the State of Ohio.[10] The 2005/2006 premium for the AIG Workers' Compensation Insurance Policy was approximately $220,000 has been fully paid.[11] The current term of the Workers' Compensation Policy runs through April 13, 2006. Prior to the Petition Date, the Debtors and AIG bound the AIG Workers' Compensation Insurance Policy through April 13, 2007. The premium for the new AIG Workers' Compensation Insurance Policy is $185,000 and will be paid by the Debtors in the ordinary course of their business.

84.     Safety National provides the Debtors with excess workers' compensation insurance coverage in excess of $500,000 per allowed claim in the State of Ohio (the "Ohio

---

[10] As of June 1, 2005, the Debtors became self-insured with respect to workers' compensation claims in Ohio in accordance with that state's laws regarding the allowance and payment of workers' compensation claims. Prior to becoming self insured in Ohio, the Debtors maintained a "state funded" policy in Ohio for workers' compensation claims arising from April 13, 2004 through June 1, 2005 (the "State Funded Workers' Compensation Claims"),which claims are administered and processed by the State of Ohio.

[11] Prior to the Debtors' current workers' compensation policy with AIG, Zurich North American ("Zurich") provided the Debtors' workers' compensation insurance for claims arising from April 13, 2004 through April 13, 2005, except for claims arising in Ohio ("Zurich Claims Period"). Zurich continues to administer and process Claims that arose during the Zurich Claims Period, except for the State Funded Workers' Compensation Claims, which are administered and processed by the State of Ohio. The Debtors previously issued Zurich a letter of credit in the amount of $855,000 (which amount has since been reduced to $100,000) and have also deposited $60,000 in an escrow account to ensure payment of any allowed claims that arose during the Zurich Claims Period.

Workers Compensation Policy"). The current term of the Ohio Workers' Compensation Claims Policy is April 13, 2005 through April 13, 2006. The 2005/2006 premium for the Ohio Workers' Compensation Insurance Policy of approximately $80,000 has been fully paid. Prior to the Petition Date, the Debtors bound the Ohio Workers' Compensation Policy for the 2006/2007 policy year will pay the annual premium amount of approximately $85,000 to be paid to Safety National in the ordinary course of the Debtors' business.

85.     The Debtor also has an agreement (the "SRS Agreement") with Specialty Risk Services, a division of Hartford Insurance Company ("SRS") pursuant to which SRS administrates and processes workers compensation claims asserted against the Debtors, except for the State Funded Workers' Compensation Claims. The annual administrative fee for the SRS Agreement for the last fiscal year totaled $2,000 and was previously paid by the Debtors. Prior to the Petition Date, the Debtors renewed the SRS Agreement for the 2006/2007 policy year. As part of the renewal of the SRS Agreement, the Debtors agreed to escrow approximately $33,000 as a deposit to cover any workers' compensation claim losses (the "Claims Loss Escrow"). The Debtors seek to fund the Claims Loss Escrow pursuant to the terms of their renewed SRS Agreement and to pay any administrative costs to SRS in the ordinary course of the Debtors' business.

86.     As set forth above, the Debtors are responsible for payment of workers' compensation claims up to a deductible limit of $250,000 per incident (the "Workers' Compensation Claims") except in the State of Ohio, and for which Safety National provides excess coverage for claims exceeding $500,000 up to $1,000,000 per occurrence. Wachovia Bank issued a standby letter of credit (the "Letter of Credit") in favor of AIG (which provides

coverage on claims over $250,000) in the amount of $750,000 to cover any unpaid Workers'

Compensation Claims that arose during the current period as well as claims that arose in prior

periods during which AIG provided the Debtors' with workers' compensation insurance. The

Debtors are responsible for reporting any Workers' Compensation Claims and AIG manages and

processes the Workers' Compensation Claims. The Debtors estimate that a total of

approximately $515,000 of outstanding claims were submitted between April 13, 2005 and the

Petition Date under the Workers' Compensation Policy and of which approximately $295,000

have been paid. In order to potentially avoid AIG and Zurich drawing down on their respective

letters of credit to satisfy any allowed prepetition Workers' Compensation Claims, the Debtors

seek, in their sole discretion, the authority, but not the obligation, to pay such prepetition

workers' compensation claims in the ordinary course of the Debtors' business.

### The Debtors' Foreign Subsidiaries

87.     The Debtors maintain various foreign subsidiaries that operate in Canada,

Mexico and Asia (the "Foreign Subsidiaries"). The Debtors' Asian Foreign Subsidiary serves as

a purchasing office to purchase goods that are then re-sold by the Debtors. The Debtors'

Canadian Foreign Subsidiaries market and sell the Debtors' products throughout Canada. The

Debtors' Mexican Foreign Subsidiaries serve as production facilities for goods that ultimately

resold by the Debtors. The Debtors fund the Foreign Subsidiaries based on the projected

operating expenses and funding needs for company. Generally, the Debtors either transfer or

fund approximately $2.65 million per month to fund the Foreign Subsidiaries to pay for payroll

and other operating expenses incurred by the subsidiaries. [12] Because the Foreign Subsidiaries
are dependent on the Debtors to fund their operations, it is imperative that the Debtors continue
to provide funding to the Foreign Subsidiaries in the ordinary course of the Debtors' business in
order to preserve and maintain the Foreign Subsidiaries. In connection with their Cash
Management Motion filed concurrently herewith, the Debtors seek authority to continue to fund
the Foreign Subsidiaries in the ordinary course of business.

88.     To minimize the personal hardship the Employees will suffer if prepetition
employee-related obligations are not paid when due or honored as expected, and to maintain the
morale of the Employees during this critical time, the Debtors, by this Motion, seek authority, in
their discretion,[13] to:

    a.    pay or honor, in their sole discretion:

> the outstanding Wages accrued prior to the Petition Date as they
> become payable including associated payroll processing
> obligations, and any uncashed checks that were issued prior to
> the Petition Date with respect thereto;
>
> the Withholding Obligations attributable to the period prior to the
> Petition Date and to remit the same to applicable taxing
> authorities or other appropriate third-parties;
>
> the Reimbursement Obligations that were incurred by Employees
> prior to the Petition Date and to continue such payments on a
> postpetition basis;

---

[12] Of this total amount, the Debtors estimate that they fund approximately $500,000 per month to maintain the
operations of their Canadian subsidiaries. The Debtors directly pay certain expenses incurred by their Canadian
subsidiaries, including certain health and welfare benefits and payroll requirements for Canadian employees. To the
extent that any of these expenses accrued prepetition, the Debtors request authority to continue to pay such expenses
in the ordinary course of their businesses and in accordance with the normal funding of their Canadian subsidiaries.

[13] Nothing in this Motion is intended to or shall convert any prepetition claim into an administrative claim.

the obligations under the Health and Welfare Plans that accrued but remain unpaid as of the Petition Date, including associated administrative processing fees and premiums;

the outstanding maintenance fees that are required to continue to operate the 401(k) Plan ;

any Prepetition Tuition Reimbursement Expenses; Employee Assistance Program claims and any prepetition administrative costs associated with the FSAs;

the Sales Bonuses that are due and owing pursuant to the Debtors' Incentive Plan;

any unpaid pre-petition commissions owed to Commissioned Employee or Commissioned Non-Employee;

the funding of the Claims Loss Escrow to SRS;

to honor (but not pay) accrued and unused PTO for continuing Employees as authorized by the Debtors' prepetition policies and in the Debtors' sole discretion and to the extent as may be legally required under non-bankruptcy law, and to pay the Prepetition Wage and PTO Claim; and

b.     continue, in their sole discretion, on a postpetition basis:

the Health and Welfare Plans and the Workers' Compensation Policy described herein as such programs were in effect immediately prior to the Petition Date;

the 401(k) Plan ;

the PTO policy, except that the Debtors do not seek authority to pay any pre or postpetition PTO claims; and

the Debtors' other benefit programs as described in this Motion.[14]

---

[14] As set forth herein, the Debtors do not seek authority to continue their Severance Program and do not seek authority to implement a new Incentive Plan for the 2006/2007 year pursuant to this Motion.

**G. Motion for Entry of Order Pursuant to Sections 105(a),
363(c), 1107(a), and 1108 of the Bankruptcy Code
Authorizing the Debtors to Honor Prepetition Obligations
to Customers and to Otherwise Continue Customer Practices
and Programs in the Ordinary Course of Business**

89.     Prior to the Petition Date, and in the ordinary course of business, the

Debtors offered and engaged in certain customer and other programs and practices to develop

and sustain a positive reputation in the marketplace for their services and to engender customer

loyalty (the "Customer Programs"). The Customer Programs create incentives for continuing

and increased sales to the Debtors' customers. The Customer Programs, which are

commonplace among manufacturers similar to the Debtors, are described in detail below. The

common goals of the Customer Programs have been to meet competitive pressures, ensure

customer satisfaction, and generate brand loyalty and goodwill for the Debtors, thereby retaining

current customers, attracting new ones, and ultimately enhancing net revenue.

90.     In essence, during the postpetition period the Debtors need to continue

those Customer Programs that have been cost-effective and beneficial to their business. Such

relief is necessary to preserve their critical business relationships and goodwill for the benefit of

their estates. For the reasons set forth herein, it is in the best interests of the Debtors, their

estates and creditors, to honor, in the Debtors' discretion, their prepetition obligations in

connection with the Customer Programs, and to continue the Customer Programs in the ordinary

course of business.

91.     The Debtors' Customer Programs are described below.

**Advertising and Promotions**

92.     Pursuant to the Debtors' Advertising and Promotion Program, the
Debtors' pay for in-store and trade show promotions and advertising of the Debtors' products,
and in-store markdowns, mostly to big box retailers and supermarkets, by giving the customer
credits against the customer's purchases of merchandise purchased from the Debtors. Under this
program, retailers who promote the sales of the Debtors' products to retail customers, or who
advertise the Debtors' products in electronic or print media, receive credits that range from 1% to
5% of a customer's annual purchases with respect to Anchor Hocking and WearEver, and up to
about 4% of a customer's annual purchases with respect to Burnes. In addition, the Debtors from
time to time will give a customer a post-purchase credit to mark down to a retail "sale" price
merchandise purchased from the Debtors. The Debtors also will give a retailer a "buy-back"
credit against the purchase price for the Debtors' merchandise that will replace a competitor's
merchandise in the retailer's store. Credits under the Advertising and Promotion Program are
made throughout the calendar year. The Debtors estimate that their customers are entitled to take
approximately $1,400,000 credits under the Advertising and Promotion program as of the
Petition Date, and an additional $300,000 has accrued but is not yet subject to being credited to
those customers.

93.     The Debtors seek authority, on the exercise of their business judgment and
in their discretion, to honor prepetition obligations related to the Advertising and Promotion
Program and to continue to honor postpetition obligations related to the Advertising and
Promotion Program. The Advertising and Promotion Program is an integral part of the Debtors'
business strategy to remain price-competitive. The Debtors' failure to honor and maintain this
program will substantially harm the Debtors' competitive standing in the marketplace.

**Rebate Program**

94.    The Debtors offer their larger volume customers rebates under the Rebate Program. The Rebate Program provides a cash or credit rebate to certain of the Debtors' customers once those customers have exceeded certain thresholds of purchases of merchandise from the Debtors. These rebates are taken as credits by the customer against future purchases, or in some instances are paid by check or wire transfer by the Debtors to the customers. The purchase volume thresholds that trigger payment or credit of rebates under the Rebate Program, and the percentage amounts of the rebates, are intensively negotiated with the Debtors' customers who are in the Rebate Program, mostly bigbox retailers, other manufacturers, and food service dealers, and vary depending on the customer. The Debtors estimate that $920,000 is payable at this time either in cash or by a credit under the Rebate Program with respect to 2006 sales, and that an additional $500,000 has accrued on account of 2006 sales and will become payable after the Petition Date assuming that historic sales volumes to their customers continue through calendar 2006.

95.    Programs such as the Rebate Program are common in the marketplace, and are an essential component of a wholesaler's competitive pricing. Customer confidence and goodwill, and the Debtors' ability to remain competitive, will be severely harmed and the Debtors' revenues will decline if the Debtors are prevented from honoring the prepetition Rebate Program or failing to continue the Rebate Program after the Petition Date.

**Merchandise Credit Program**

96.    Pursuant to the Debtors' prepetition customer practices, the Debtors under their Merchandise Credit Program provide customers with billing credits for damaged or

defective merchandise purchased from the Debtors. No cash outlays are made to customers

pursuant to the Merchandise Credit Program. In order to receive a credit, the customer must alert

the Debtors about the damaged or defective merchandise, and the amount of the credit either is

reconciled by, or negotiated between, the Debtors and the customer. Based both on credits

reconciled but not yet credited, and on historic activity, the Debtors estimate that their customers

have prepetition accrued but uncredited credits pursuant to the Merchandise Credit Program, in

the approximate amount of $1,250,000.

97.     The Debtors seek authority, on the exercise of their business judgment and

in their discretion, to honor prepetition obligations related to the Merchandise Credit Program

and to continue to honor prepetition obligations related to the Merchandise Credit Program. The

Merchandise Credit Program is an integral part of the Debtors' business strategy and is designed

to ensure customer confidence in the Debtors' merchandise and the Debtors' ability to deliver

merchantable products to their customers for sale at retail

98.     For the reasons set forth above and in this Motion, the Debtors should be

permitted to continue to honor and continue the Customer Programs in the ordinary course of

their business.

**H.      Motion of the Debtors for an Order (I) Authorizing the
         Debtors to Pay Prepetition Sales, Use and Similar Taxes
         and Regulatory Fees in the Ordinary Course of Business
         and (II) Authorizing Banks and Financial Institutions to
         Honor and Process Checks and Transfers Related Thereto**

99.     In connection with the normal operation of its business, the Debtors pay

an assortment of sales and use, business and occupations, gross receipts, business privilege and

similar taxes (the "Taxes") to various federal, state, and local taxing authorities (collectively, the

"Taxing Authorities") and pay various regulatory fees ("Regulatory Fees") to federal, state, and local regulatory authorities (collectively, the "Regulatory Authorities," and together with the Taxing Authorities, the "Taxing and Regulatory Authorities"), including, but not limited to, those Taxing and Regulatory Authorities listed on Exhibit A to the Motion. These taxes and fees include, without limitation, the following.

100. <u>Sales Taxes</u>: In the normal course of their business, the Debtors manufacture, purchase at wholesale, and sell their branded consumer and specialty merchandise to retail distributors. In connection with such sales, the Debtors collect and remit or otherwise pay an assortment of sales and use, business and occupation taxes (collectively, the "Sales Taxes") to the Taxing Authorities. Sales Taxes are paid in the ordinary course of the Debtors' business, and are calculated based upon statutorily mandated percentages. Generally, the Debtors remit the Sales Taxes quarterly or monthly to the applicable Taxing Authority. Such Sales Taxes could include both amounts not yet due and amounts paid by checks sent prior to the Petition Date that have not cleared the Debtors' bank accounts on the Petition Date, though the Debtors are not aware of any such checks that have not cleared. The Debtors estimate that the aggregate prepetition Sales Taxes unpaid as of the Petition Date is approximately $15,000.

101. <u>Franchise Taxes</u>: The Debtors also pay in the ordinary course of their business franchise excise and similar taxes required to maintain their existence or continue to do business in various jurisdictions (the "Franchise Taxes"). Such Franchise Taxes could include both amounts not yet due and amounts paid by checks sent prior to the Petition Date that have not cleared the Debtors' bank accounts on the Petition Date, though the Debtors are not aware of any such checks that have not cleared. The Debtors estimate that on the Petition Date they owed

approximately $21,000 in Franchise Taxes that currently are due. In addition, the Debtors estimate that they owe approximately $200,000 in Franchise Taxes for each of their fiscal years ending March 31, 2006, which will become due and payable after the Petition Date.[15]

102.    Regulatory Fees: Many municipal and county governments require the Debtors to obtain a business license and to pay corresponding business license fees and business operating taxes (the "Regulatory Fees"). The requirements for a company to obtain a business license and the manner that the Regulatory Fees are computed vary greatly according to the local tax laws. The Debtors estimate that they owe no Regulatory Fees that are due or that have accrued but remain unpaid as of the Petition Date. The Debtors nonetheless seek authority to pay any such unpaid Regulatory Fees, provided that any such payment falls within any aggregate cap contained in the order entered by this Court.

103.    By this Motion, the Debtors seek authority to pay, in the Debtors' sole discretion, prepetition Taxes and Regulatory Fees owed to the Taxing and Regulatory Authorities, including, without limitation, Taxes and Regulatory Fees subsequently determined upon audit to be owed for periods prior to the Petition Date, in an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared on the Petition Date) not to exceed $275,000, which is the aggregate maximum sum that the Debtors currently believe will be due on account of prepetition Taxes and Regulatory Fees.

---

[15] These amounts, not yet due and payable, arguably are not prepetition obligations, and this Motion is filed with respect to these amounts in an abundance of caution. Other franchise taxes will become payable with respect to fiscal years that have not ended, and the Debtors assert that payment of these amounts can be made postpetition in ordinary course of business.

104. To the extent any check issued or electronic transfer initiated prior to the Petition Date to satisfy any prepetition obligation on account of Taxes or Regulatory Fees has not cleared the Banks as of the Petition Date, the Debtors request the Court to authorize the Banks, when requested by the Debtors in their sole discretion, to receive, process, honor, and pay such checks or electronic transfers, provided that there are sufficient funds available in the applicable accounts to make such payments. The Debtors also seek authorization to issue replacement checks, or to provide for other means of payment to the Taxing and Regulatory Authorities, to the extent necessary to pay such outstanding Taxes and Regulatory Fees owing for periods prior to the Petition Date.[16]

105. The payment of prepetition Taxes and Regulatory Fees will help the Debtors avoid serious disruption to its operations and reorganization efforts that would result from the nonpayment of such taxes and fees, including the distraction and adverse affect on morale that could result from liability for nonpayment imposed upon the Debtors' directors and officers.

I.    **Motion of the Debtors for an Order
      Authorizing, But Not Directing, Payment
      of Certain Prepetition Shipping Charges,
      <u>Warehousing Charges and Related Possessory Liens</u>**

106. By this Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors, in their business judgment, to pay prepetition obligations owed to common carriers ("Shippers") (a) for ground transportation, air freight, ocean freight, and similar charges and freight forwarding charges (which freight forwarding charges may include in the

---

[16] Because each of the checks or electronic transfers is readily identified as relating directly to an authorized payment of prepetition Sales Taxes and Regulatory Fees, the Debtors believe that checks and electronic transfers for payments that are not authorized will not be honored inadvertently.

amount payable to the freight forwarder for charges for customs duties and dock facilities) incurred by the Debtors, including those (b) that give rise (or legitimately may give rise) to any statutory or common-law possessory liens on account of unpaid charges owing from the Debtors to such Shippers (collectively, "Shipping Obligations"), as further described in this Motion. The Debtors also seek authority to pay, in the exercise of their business judgment, third party warehousing and port facility charges (the "Warehousing Obligations") to third party warehouse operators (the "Warehouse Operators") as further described in this Motion.

107.    Anchor Hocking and WearEver Distribution System:  With respect to the Anchor Hocking and WearEver business, raw materials are shipped to the Debtors' Monaca, Pennsylvania and Lancaster, Ohio manufacturing facilities by Cass Information Systems Inc. ("Cass")[17] which is paid by the Debtors, or by shippers paid by the suppliers themselves. Finished goods are shipped from those facilities by the Debtors to their Lancaster, Ohio distribution center (the "Lancaster DC") by the Shippers (through Cass) or by rail paid by the Debtor on a rail spur that connects the Lancaster plant to the Lancaster DC.  Some finished goods from the Monaca plant are shipped to a Monaca third party warehouse, the warehousing charges for which also are paid by the Debtors.  Other finished or semi-finished goods are shipped by Shippers (through Cass) from the Debtors' plants or the Lancaster DC to or from other Warehouse Operators' warehouses in various locations, some of whom also perform converting or finishing and/or are Shippers, from which the goods may be shipped back to the

---

[17] Cass is the freight administrator used by the Debtors with respect to the substantial part of their shipping. Under the arrangement with Cass for such shipments handled by Cass, the Shippers are engaged by the Debtors but send their invoices to Cass. Cass then notifies the Debtors of the amount of the invoice, and the Debtors pay the undisputed portion of the invoice prior to any payment of that invoice by Cass to the Shipper. The Debtors also seek authority by this Motion to pay Cass's charges and Cass is a "Shipper" for the purposes of this Motion.

Debtors plants or the Lancaster DC or picked up by, or shipped directly to, the Debtors' customers. Raw materials, primarily aluminum, are shipped from Brazil to Houston, Texas, with freight and customers paid by the supplier. The aluminum is then transported by Shippers (through Cass) to the Nuevo, Laredo plant that is operated by certain of the Debtors' non-debtor Mexican subsidiaries and the finished goods are shipped by Shippers (through Cass) from Nuevo Laredo to the Lancaster DC. Finished goods from overseas, primarily from Asia, are shipped by freight forwarders, primarily Morrison Express Corp. or Hellman Worldwide-Atlanta, to the Lancaster DC. The freight forwarders' charges include the forwarders' fees as well as the amounts payable by the freight forwarders for transportation, storage, port facility usage, and customs. Finished goods are shipped by Shippers (through Cass) from the Lancaster DC and the Warehouse Operators' warehouses to the Debtors' customers.

108. <u>Burnes Distribution System</u>. The Burnes Debtors currently use freight forwarders, primarily Morrison Express Corporation, to ship goods from overseas through the ports of Long Beach, California, Savannah, Georgia, or Charleston, South Carolina, to their Statesville, North Carolina and Covington, Tennessee warehouses, which are owned by the Debtors (the "Burnes Warehouses"). Those Shippers' charges to the Debtors include customs duties through the ports and any demurrage or port storage charges at the ports with respect to those goods. The Burnes Debtors primarily use Texas Forwarding Services as their freight forwarder to deliver materials from the United States to, and obtain delivery to the United States of finished goods from, their non-debtor subsidiary's Durango, Mexico facility, and Texas

Forwarding Services' charges to the Debtors includes the customs charges on those goods.[18]
Domestic goods are shipped to the Burnes Warehouses by Shippers through Cass. Goods in the
Burnes Warehouses are distributed to the Debtors' customers in Canada by UniCity.

109. The Shippers used by the Debtors are compensated, through Cass, based
on corporate rates charged by each individual carrier. The Debtors estimate that, as of the
Petition Date, and excluding amounts paid prepetition by checks that have not yet cleared on the
Petition Date, the Shippers (including Cass) are owed approximately $4,350,000 in Shipping
Obligations, and the Warehouse Operators are owed approximately $810,000 in Warehousing
Obligations. The Debtors, by this Motion, seek authority, in the exercise of their business
judgment and in their discretion, to pay these amounts up to a total of $5,160,000 in the ordinary
course.

110. The Debtors believe that failure to pay these Shipping Obligations will
result in certain Shippers discontinuing shipments of essential supplies and Debtors' finished
goods, thereby adversely affecting Debtors' distribution system and manufacturing and sales and
operations. The Debtors believe that certain Shippers will withhold essential supplies and
finished goods in their possession pending payment. Payment of some or all of these charges
will prevent the disruption to the Debtors' businesses that will result from such actions.
Moreover, the Debtors believe that some of these Shippers may contend that they are entitled to
possessory liens in any goods they hold as of the Petition Date, pursuant to state or other
applicable law, and will refuse to deliver or release such goods until their claims have been

---

[18] The Debtors' non-debtor Mexican subsidiary also employs shippers to transport goods between the U.S. and its
Durango, Mexico facility, and the subsidiary pays that shipper.

satisfied and their liens redeemed. Pursuant to section 363(e) of the Bankruptcy Code, a Shipper might be entitled to adequate protection of such lien, increasing the cost and administrative burden to the Debtors of administering these chapter 11 cases. The Debtors' payment, on the exercise of their business judgment and in their discretion, of the amounts owing to Shippers as requested herein, will eliminate the need to provide such adequate protection and reduce the amount of potential secured claims against the Debtors' estates, which would take priority over any general unsecured claims.

111.    In addition, the value of the goods in the possession of the Shippers, together with the potential injury to the Debtors from disruption of their businesses if the goods are not released, far exceeds the amount of unpaid Shipping Obligations that the Debtors seek to pay by this Motion. The Debtors therefore believe that it is necessary and important to their continued business operations and to its successful reorganization that they be able to pay these Shipping Charges.

112.    Moreover, if the Debtors are not able to make payments sought herein to those Shippers whose services the Debtors utilized prepetition, it is likely that many of such Shippers will cease to do business with the Debtors, forcing the Debtors to obtain substitute freight carriers with little or no warning. Such an arrangement would almost certainly obligate the Debtors to pay premium charges to the replacement carriers in order to obtain timely delivery of their inventory and other goods essential to its operations.

113.    The Debtors further believe that a failure to pay the prepetition Warehousing obligations will result in delayed delivery of the goods to and from the Warehouse Operators' warehouses, causing significant damage to the Debtors' operations, sales and

revenues. Moreover, payment of such amounts also does not prejudice the Debtors' unsecured

creditors, to the extent that the Warehouse Operators would be able to credibly assert a

possessory lien for any unpaid amounts for their services. Accordingly, the Debtors submit that

payment of prepetition amounts owing to the Warehouse Operators subject to the Debtors'

exercise of their business judgment and in the Debtors' discretion is warranted to the extent

sought in this Motion.

**J.**     **Motion of the Debtors Pursuant to Section 105(a)**
       **of the Bankruptcy Code for an Order Authorizing**
       <u>**the Payment of Prepetition Claims of Critical Trade Vendors**</u>

114.     By this Motion, the Debtors seek entry of an order authorizing them to

pay, in the reasonable exercise of their business judgment and in their sole discretion, the

prepetition claims, or a portion thereof, of certain Critical Vendors (defined below) that are

essential to the uninterrupted functioning of the Debtors' various manufacturing and business

operations. Payment of Critical Vendor Claims (defined below) is vital to the Debtors'

reorganization efforts as the Critical Vendors (i) are often the sole source from which the

Debtors can procure certain goods or services, (ii) consist of certain vendors who cannot be

easily replaced in a commercially reasonable manner, or (iii) consist of vendors who provide the

Debtors with goods and services at a substantially reduced cost than other vendors. The Debtors

believe that the failure to pay certain prepetition claims of Critical Vendor Claims may very

likely result in the Critical Vendors terminating their provision of goods and/or services to the

Debtors.

115.     As set forth in the Rombeiro Affidavit, Global Home, through its Anchor

Hocking, The Burnes Group and WearEver businesses, markets and manufactures branded

consumer and specialty products to retail and hospitality customers and to original equipment manufacturers. Anchor Hocking produces beverageware, cookware, bakeware, home décor items, and glass components for commercial customers. The Burnes Group designs and sells ready-made picture frames, photo albums, scrapbooks and related home accessories. WearEver produces metal bakeware, cookware and accessories.

116.    Certain services, products and other materials used in the Debtors' business are supplied to the Debtors by specific vendors (collectively, the "Critical Vendors"). Certain Critical Vendors supply the Debtors with finished products or raw materials at a reduced cost compared to other potential sources. If these Critical Vendors stopped supplying the Debtors with goods, the Debtors would have to purchase such goods from more expensive vendors, which would negatively impact the Debtors' revenue. Other Critical Vendors supply the Debtors with goods and services that the Debtors cannot obtain from alternative sources within a geographic marketplace. Still another category of Critical Vendors supply the Debtors with goods and services that, for economic reasons, cannot be replaced in a commercially reasonable manner. In addition, the Debtors operations at certain facilities would need to be retooled in order to accommodate goods provided from alternative vendors. Thus, if the Debtors lose the relationship with their Critical Vendors, the Debtors' ability to generate future revenue would be severely harmed.

117.    Certain Critical Vendors may not be familiar with the bankruptcy process and/or unwilling to continue to do business with the Debtors if their prepetition claims are not paid, at least in part. If Critical Vendors discontinue their supply of goods and services as a result of the Debtors' bankruptcy cases, the impact on the Debtors' operations would be severe.

The Debtors' manufacturing process would be compromised and deliveries to customers would be halted. In order to maintain going concern value and allow the Debtors' reorganization to proceed, the Debtors request the authority, but not the obligation, to pay the prepetition claims (or a portion thereof) of certain Critical Vendors (the "Critical Vendor Claims") subject to the terms and conditions outlined below.

### Proposed Terms and Conditions of Payment of Critical Vendor Claims

118.    The Debtors request the authority, but not the obligation, to pay Critical Vendor Claims up to $8,000,000 in the aggregate as determined by the Debtors in their sole discretion and in the exercise of their reasonable business judgment in order to continue receiving the vital goods and services provided by the Critical Vendors. The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to supply goods and services to the Debtors credit terms agreed to by the Debtors in their reasonable business judgment (the "Required Trade Terms").

119.    To ensure that Critical Vendors deal with the Debtors on the Required Trade Terms, the Debtors propose (a) to send a letter substantially in the form of the letter attached hereto as **Exhibit A** to the Motion to the Critical Vendors (the "Critical Trade Agreement") along with a copy of the Order, and (b) that any checks used to pay Critical Vendors contain a legend substantially in the following form:

> Acceptance of this check is subject to the Order
> Authorizing Payment of Prepetition Critical Vendor
> Claims, dated _____ __, 2006, Case No. 06-_____
> (____) (Jointly Administered).

120.    The Debtors further propose that they be authorized to reserve their rights to obtain written acknowledgment of the Required Trade Terms of a Critical Vendor before paying any prepetition amounts to such vendor, substantially in the form of **Exhibit B** to the Motion. If the Debtors request such an acknowledgment, they may rely upon a confirming memorandum setting forth the Required Trade Terms, whether received by facsimile, electronic mail, express mail, or by other customary modes of delivery. The Debtors also reserve their right to contest any invoice of any Critical Vendor under applicable non-bankruptcy law.

121.    Some of the Critical Vendors may have obtained mechanics' liens, possessory liens, or similar state law trade liens (the "Trade Liens") on the Debtors' assets. As a further condition of receiving payment on account of Critical Vendor Claims, the Debtors propose that a Critical Vendor must agree to take whatever action is necessary to remove the Trade Lien at such Critical Vendor's sole cost and expense.

122.    If a Critical Vendor refuses to supply goods and/or services to the Debtors on Required Trade Terms following receipt of payment on its Critical Vendor Claim, or fails to comply with any Critical Trade Agreement entered into between such Critical Vendor and the Debtors, then the Debtors may seek authority, in their discretion and without further order of the Court, to declare that provisional payments made to Critical Vendors on account of Critical Vendor claims be deemed to have been in payment of then-outstanding postpetition claims of such vendors and require that the Critical Vendor immediately repay to the Debtors any payment made to it on account of its Critical Vendor Claims without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or otherwise.

123.     The relief requested in this Motion is necessary to continue the Debtors' operations by ensuring the steady and uninterrupted supply of finished and unfinished goods and other key materials and services used in the Debtors' businesses.  Delay or interruption in the Debtors' ability to obtain these critical goods and services would have a significant adverse effect on the Debtors' estates.  Accordingly, under the circumstances, the Court should authorize the Debtors to pay the Critical Vendor Claims, in part or in full, as determined by the Debtors in their sole discretion and in a reasonable exercise of their business judgment.

## K.    Motion of the Debtors for an Order Providing that Creditors' Committees are Not Authorized or Required to Provide Access to Confidential Information of the Debtors or to Privileged Information

124.     The Debtors seek entry of an order of the Court confirming that the Committee in this case will not be authorized or required to provide access to the Debtors' Confidential Information or Privileged Information to any creditor that the Committee represents.  I understand that the relief requested in this motion will help ensure that confidential, privileged, proprietary and/or material non-public information will not be disseminated to the detriment of the Debtors' estates and will aid the Committee in performing its statutory function.

125.     The Debtors are in a competitive industry.  The dissemination of the Debtors' Confidential Information or Privileged Information to parties who are not bound by any confidentiality agreement or privilege directly with the Debtors could be disastrous for the estates.  Among other things, the Debtors' business strategies and intended initiatives would become known to the Debtors' competitors, thereby allowing such competitors to adjust to the Debtors' plans and reduce or eliminate value of such initiatives to the estate.  Certain Confidential Information of the Debtors, such as compensation levels or other employee

information, is of a sensitive nature, and public disclosure of such information would cause morale and similar problems for the Debtors, as well as potentially violate federal and state privacy laws. In addition, if the Debtors believed that there could be a risk that Privileged Information would need to be turned over to creditors, with the possible loss of the relevant privilege as that time, the entire purpose of such privilege would be eviscerated.

126.    The disclosure of nonpublic or privileged information to creditors will not foster a reorganization of the Debtors, but will likely cause serious harm to the Debtors' estates. Therefore, I believe that this motion is in the best interests of the Debtors' estates and creditors.

127.    I believe that approval to continue to honor and pay the employee-related obligations outlined above and in the motion is crucial to sustaining the Debtors' going concern value and is in the best interests of the estates.

## L.    Motion for Order Under Section 365(a) of the Bankruptcy Code Authorizing the Debtors to Reject Certain Executory Contracts and Leases and Fixing a Bar Date for Claims of Counterparties to the Rejected Contracts

128.    The Debtors, after consideration of their current and expected future business objectives, an

129.    d in connection with their efforts to reduce costs, have determined that the Rejected Contracts as identified in this Motion are burdensome and should be rejected. The Rejected Contracts consist of prepetition severance and separation agreements between the Debtors and certain of their former employees and officers, including the Debtors' former chief-executive-officer (collectively, the "Separated Employees"). The Separated Employees no

longer work for the Debtors or otherwise provide them with services. Consequently, the Debtors believe that the Debtors' estates derive no benefit from maintaining the Rejected Contracts.

130. Accordingly, the Debtors seek authority to reject the Rejected Contracts, effective as of the Petition Date. The Debtors propose that, within 3 business days after entry of the Court's Order on this Motion, the Debtors will serve the Order and this Motion on all contract counter-parties affected by the rejection of the Rejected Contracts (collectively, the "Notice Parties"), and that the Notice Parties shall have 20 calendar days from the date of service of the Order to file an objection to the relief granted. For all Rejected Contracts for which no objection is timely filed and served, the Debtors shall file with the Court a Certificate of No Objection, together with a schedule of those Rejected Contracts for which no objection was timely filed, and the Order shall be deemed a final order with respect to such Rejected Contracts. For those Rejected Contracts for which an objection has been timely filed and served, the objection would be heard by the Court at the next scheduled omnibus hearing date.

131. The counterparties to the Rejected Contracts may have rejection damage claims under section 502 of the Bankruptcy Code or other claims in connection with such Rejected Contracts or the rejection or termination of the Rejected Contracts. The Debtors further seek by this Motion that this Court fix a claims bar date of (i) forty (40) days from the Petition Date for the filing by the counterparty of any such claims,[19] or (ii) to the extent that a counterparty to a Rejected Contract files a timely objection to the relief requested herein, thirty (30) days from entry of an order granting relief with respect to such Rejected Contracts.

---

[19] The Debtors seek the rejections set forth in this Motion insofar Rejected Agreements constitute executory contracts pursuant to section 365 of the Bankruptcy Code. The Debtors reserve all rights with respect to the characterization of the Rejected Contracts and any rejection or other damages that may be asserted including, but not limited to, that some or all of the Rejected Agreements terminated prior to the Petition Date.

132.     The Debtors seek to reject the Rejected Contracts effective on the Petition

Date, in order to avoid the possibility of incurring administrative expenses related to the Rejected

Contracts.  As set forth above, the Debtors believe that they derive no benefit from the Rejected

Contacts as the Separated Employees no longer provide services to the Debtors or their estates.

Thus, the Debtors believe that it is an exercise of their sound business judgment to authorize the

rejection of the Rejected Agreements, effective as of the Petition Date.

133.     The Debtors may have claims against a contract counter-party arising

under, or independently of, the Rejected Contracts.  The Debtors do not waive such claims by the

filing of this Motion or the rejection of any such Rejected Contract.

134.     As set forth above, the counterparties to the Rejected Contracts may have

rejection damage claims under section 502 of the Bankruptcy Code or other claims in connection

with such Rejected Contracts or the rejection or termination of the Rejected Contracts.  The

Debtors further seeks by this Motion that this Court fix a claims bar date of (i) forty (40) days

from the Petition Date for the filing by the counterparty of any such claims, or (ii) to the extent

that a counterparty to a Rejected Contract files a timely objection to the relief requested herein,

thirty (30) days from entry of an order granting relief.

135.     The Debtors request that the Court, in accordance with Bankruptcy Rule

3003(c)(3) establish a bar date that is (i) forty (40) days after the Petition Date by which

counterparties to the Rejected Contracts must file proofs of claim on account of prepetition

claims, rejection damage claims, and any other claims with respect to the Rejected Contracts or

the rejection or termination of the Rejected Contracts ("Claims"), or (ii) to the extent that a

counterparty to a Rejected Contract files a timely objection to the relief requested herein, thirty

(30) days from an order granting relief by which the counterparty to such Rejected Contract must file its Claim.

136.     The Debtors will give notice of such bar date to each counterparty to a Rejected Contract, by service of the Order approving the Motion and fixing such bar date. The Debtors will serve such order within 3 business days of its entry, thereby satisfying the requirements of Bankruptcy Rule 2002(a)(7).

137.     The Debtors' estates derive no benefit from the Rejected Contracts, which are burdensome. The Rejected Contracts should be rejected and the bar date established.

**M.     Motion of Debtors for Interim Order (1) Authorizing Debtors to Incur Post-Petition Secured Indebtedness and to Use Cash Collateral, (2) Granting Security Interests and Priority Claims Pursuant to 11 U.S.C. § 364, (3) Granting Adequate Protection, (4) Modifying Automatic Stay and (5) Setting Final Hearing**

138.     By this Motion the Debtors seek authority:

(1) to obtain post-petition loans, advances and other financial accommodations on an interim basis for a period through and including the date of the Final Hearing (as hereinafter defined) from Wachovia Bank, National Association, in its capacity as "Agent" pursuant to the Loan Agreement (as hereinafter defined) acting for the financial institutions party thereto as Lenders (in such capacity, together with its successors and assigns, "Agent"), inclusive of the amount of all pre-petition indebtedness owed by Debtors to Agent and Lenders, in accordance with all of the lending formulae, sublimits, terms and conditions set forth in the Existing Loan Agreement (as hereinafter defined), as amended and ratified by the Ratification Agreement (as hereinafter defined) and, in accordance with this Interim Order, secured by security interests in

and liens upon all of the Collateral (as hereinafter defined) pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code;

(2) the Debtors to enter into the Ratification and Amendment Agreement, dated of even date herewith (the "Ratification Agreement", a copy of which is annexed hereto as Exhibit "D" to the Motion, by and among Debtors, Agent and Lenders, which ratifies, extends, adopts and amends the Existing Loan Agreement and all other Existing Financing Agreements (as hereinafter defined);

(3) modification of the automatic stay to the extent hereinafter set forth;

(4) granting to Agent and Lenders, a super-priority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all Post-Petition Obligations (as defined in the Ratification Agreement);

(5) granting similar adequate protection for the use of Cash Collateral (as defined below) to the holders of the Junior Term Loan Debt (as defined below) (the "Junior Debt Holders") subordinate in priority to the adequate protection granted to the Lenders; and

(6) setting a final hearing on the Motion.

### The Debtors' Secured Obligations

139. Prior to the commencement of these cases, Agent and Lenders made loans, advances and provided other credit accommodations to Borrowers pursuant to and/or in accordance with the Loan and Security Agreement, dated as of June 22, 2004, by and among Agent, Lenders, Borrowers and Guarantors, as amended and the guaranties, security agreements and other loan documents and instruments entered into in connection with the Loan and Security Agreement (collectively, the "Existing Financing Agreements").

## Pre-Petition Secured Obligations.

140.    As of April 9, 2006, the aggregate principal amount of all obligations owed by Debtors to Agent and Lenders under and in connection with the Existing Financing Agreements was approximately $110,813,000.

## The Lenders' Pre-Petition Collateral.

141.    The Agent and Lender assert that the Pre-Petition Obligations are secured pursuant to the Existing Financing Agreements by valid, perfected, enforceable and non-avoidable first priority security interests and liens granted by Debtors to Agent, for itself and on behalf of Lenders, upon all of the Pre-Petition Collateral (as defined in the Ratification Agreement) existing as of the Petition Date and all issues, profits, proceeds, and products thereof (collectively, together with any other property of the Debtors' bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "Estates") in which a security interest or lien was granted to Agent, for itself and on behalf of Lenders, prior to the Petition Date, the "Pre-Petition Collateral", as such term is more fully defined in the Ratification Agreement), subject only to certain permitted encumbrances (the "Permitted Encumbrances"). The Pre-Petition collateral extends to essentially our all of the Debtors' estates as of the Petition Date other then 35% of the Debtors' equity interest in their foreign subsidiaries (the "Excluded Equity").

## The Junior Secured Debt

142.    As of the Petition Date, the Debtors also maintained a junior secured term loan and revolving line of credit with Madeline L.L.C., (the "Junior Secured Lender") pursuant to that certain Financing Agreement dated as of April 13, 2004 (the "Madeline Loan Agreement"). The Madeline Loan Agreement provided for a revolving credit and term loan

facility of up to $210 million to the Operating Debtors and their parent, GHP Operating Company LLC, and was guarantied by most of the Debtors. As of the Petition Date, the Junior Secured Lender was owed approximately $200 million, all of which is under the term loan (the "Junior Term Loan Debt"). The Junior Term Loan Debt is secured by a lien on substantially all of the Debtors' assets, other than the Excluded Equity. The lien of the Junior Secured Lender extends to the "cash collateral" of the Debtors, as that term is defined under the Bankruptcy Code (the "Quote Collateral").

**Other Indebtedness**

143.    In addition to the Wachovia Loan Indebtedness and the Junior Term Loan Debts, the Debtors estimate that their unsecured debt, exclusive of potential contract or lease rejection claims, totals approximately $66 million as of the Petition Date. As described below, several of the Debtors' vendors no longer provide the Debtors with trade terms.

**Need for Financing and Use of Cash Collateral**

144.    The Debtors have requested from Agent and Lenders, and Agent and Lenders are willing to extend, certain loans, advances and other financial accommodations, as more particularly described, and on the terms and conditions set forth, in this Order and the Ratification Agreement and any agreements ancillary thereto (the "Financing Agreements" and the "DIP Facility").

145.    The Debtors do not have sufficient available sources of working capital to operate their businesses in the ordinary course of their business without the DIP Facility requested under the Motion. The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations

is essential to the Debtors' continued viability. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed DIP Facility with Agent and Lenders as set forth in this Order and the Financing Agreements is vital to the preservation and maintenance of the going concern values of the Debtors. Accordingly, the Debtors have an immediate need to obtain the post-petition financing in order to permit, among other things, the orderly continuation of the operation of their businesses, to minimize the disruption of their business operations, and to manage and preserve the assets of their estates in order to maximize the recovery to all estate creditors.

146.    The Debtors are unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code without the grant of liens on assets. The Debtors believe that the aggregate amount of the Pre-Petition Obligations and Junior Long Term Debt is in excess of the value of the assets in Debtors' estates. Debtors have been advised that, as such, it wholly unrealistic to expect any third party lender to provide Debtors with financing on an unsecured or junior lien basis. The Junior Secured Lender has also declined to extend additional financing on a junior lien basis. In short, the Debtors have been unable to procure the necessary financing on terms more favorable than the DIP Facility.

147.    The Debtors have prepared and delivered to Agent an initial budget in the form attached as Exhibit "C" to this Motion (the "Budget", as such term is more fully defined in the Ratification Agreement). Such Budget has been thoroughly reviewed by the Debtors and

their management and sets forth, among other things, the Projected Information (as defined in the Ratification Agreement) for the periods covered thereby.

148.    The DIP Facility has been negotiated in good faith on an arms' length basis with Agent.

### Summary of Financing

149.    By this Motion, the Debtors request: (a) authority for it to obtain post-petition secured financing pursuant to section 364 of the Bankruptcy Code by entering into the Ratification Agreement; (b) authority to grant the Lenders, pursuant to sections 364(c) and (d) of the Bankruptcy Code, security interests and a super-priority administrative expense claim as set forth in the Ratification Agreement; (c) approving the use of cash collateral and the provision of adequate protection to the Junior Secured Lender for the use, sale, or lease of the Prepetition Collateral and for the imposition of the automatic stay; (d) authority to modify the automatic stay in certain respects in connection with the DIP Facility as more particularly set forth in the proposed Interim Order; and (e) the setting of a the Final Hearing pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure, all as more fully described in the Interim Orders.

150.    Pursuant to the Ratification Agreement, the principal terms of the DIP Facility generally are:[20]

a.    <u>Borrower and Guarantors</u>:  Debtors and certain non-debtors subsidiaries.

b.    <u>Agent</u>.  Wachovia Bank N.A.

---

[20] In case of any inconsistency between the terms of the DIP Facility as described in this Motion and the Ratification Agreement, the Ratification Agreement shall control.

c.    Commitment/Availability.  A total revolving credit commitment of up to an incremental $15 million,[21] subject to borrowing base restrictions.  During the period commencing on the Petition Date and ending on the date the Bankruptcy Court enters the Final Approval Order, up to $50 million in advances under the DIP Facility (resulting in a net debt increase of $13 million) shall be available to the Debtors.

d.    Term.  All loans under the DIP Facility shall be due and payable on the earliest to occur of (i) October 31, 2006; (ii) the occurrence of an Event of Default (the "Loan Termination Date").

e.    Priority.  All obligations of Debtors to the Agent and the DIP Lenders under the DIP Facility (the "Post-Petition Obligations") would have superpriority administrative expense status subject to the Carve-Out Expenses (as defined below) and any Permitted Encumbrances.  The Pre-Petition Obligations are also deemed to be "rolled" into administrative obligations holding the same super-priority status as of the entry of the Final Order (as defined below).

f.    Liens.  The Agent will receive security interests in and liens and mortgages upon all prepetition and post-petition assets of Debtors (collectively, the "DIP Liens"), including, without limitation, all capital stock of Debtors' subsidiaries (other than the Excluded Equity) and all intercompany notes held by Debtors, whether now existing or hereafter acquired or arising (collectively, the "DIP Collateral").  The DIP Liens will secure both the Post-

---

[21] The post-petition loans will be made pursuant to the Ratification Agreement as part of the "Additional $20,000,000 Facility".  Prior to the Petition Date, Lenders were providing funding to Debtors on an overadvance basis.  Such due overadvance loans were designated "Additional $5,000,000 Loans" pursuant to the Existing Loan Agreements.  The Ratification Agreement amends the Existing Loan Agreements to increase the available potential overadvance from $5,000,000 to $20,000,000.

Petition Obligations and the existing Pre-petition Loan Obligations. The DIP Liens will not extend to any avoidance actions recovered or avoided under Chapter 5 of the Bankruptcy Code (collectively, "Avoidance Actions") or any proceeds thereof until entry of the Final Order (as defined below). Subject to the Carve Out Expenses, the DIP Liens (a) will constitute first priority liens in and to all Collateral to the extent such assets of Debtors are not subject to any valid, perfected, enforceable and non-avoidable lien in existence as of the Petition Date other than the Agent's Lien, and (b) would be immediately junior in priority to any and all other valid, perfected, enforceable and non-avoidable liens on the assets of Debtors in existence as of the Petition Date other than statutory and governmental liens filed or otherwise perfected prior to the Petition Date.

        g.     <u>Use of Proceeds</u>. In accordance with the Budget.

        h.     <u>Carve Out Expenses</u>. Carve-Out Expenses described with more particularly in the Interim Order.

        i.     Fees and Expenses.
                *Facility Fee*:           $650,000

        j.     <u>Interest</u>.     All outstanding advances under the DIP Facility shall bear interest at a floating rate per annum equal to a current rate of 9%.

        k.     <u>Events of Default</u>. Events of Default generally include a breach of any obligation or Event of Default under the Existing Loan Agreements (limited by the Interim Order to "Post-Petition Events of Default" so as to exclude existing events of default and events of default that would be an unavoidable result of the filing of the Cases), the Ratification Agreement and the Interim Order. These Events of Default include as follows:

(1) Any representation or warranty shall prove incorrect or misleading in any material respect when made or deemed to have been made;

(2) The Debtors default in the payment of any interest, fees and other non-principal amounts payable to the Lenders;

(3) Any Borrower or Guarantor suspends or discontinues or is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business, or if a trustee, receiver or custodian is appointed for any Borrower or Guarantor, or any of its properties;

(4) Any act, condition or event occurring after the date of the commencement of the Chapter 11 Cases that has or would reasonably expect to have a Material Adverse Effect upon the assets of any Borrower or Guarantor, or the Collateral or the rights and remedies of Agent under the Loan Agreement or any other Financing Agreements or the Financing Order;

(5) Conversion of any Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code;

(6) Dismissal of any Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(7) The grant of a lien on or other interest in any property of any Borrower or Guarantor other than a lien or encumbrance permitted by Section 10.8 hereof or by the Financing Order or an administrative expense claim other than such administrative expense claim permitted by the Financing Order or this Ratification Agreement by the grant of or allowance by the Bankruptcy Court which is superior to or ranks in parity with Agent's security interest in or lien upon the Collateral or Agent's Superpriority Claim (as defined in the Financing Order);

(8) The Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Agent (and no such consent shall be implied from any other authorization or acquiescence by Agent);

(9) The appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(10)     The appointment of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code;

(11)     The filing of a plan of reorganization by or on behalf of any Borrower or Guarantor which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein; or

(12)     The confirmation of any plan of reorganization in the Chapter 11 Case of any Borrower or Guarantor which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein.

(13)     Debtors fail to comply with an extremely expedited timetable for the sale of the assets of the Burnes Group.

(14)     The Interim Order and Final Approval Order must be in form and substance acceptable in all respects to the Agent and the Lenders. Among other things, the Interim Order must provide that (a) any statutory committee of unsecured creditors shall have 60 days from the date of its appointment to commence any adversary proceeding or other proper action against the Agent or the Lenders, after which date, if no such objection or adversary proceeding or other action has been timely filed, the claims, liens and security interests of the Agent and the Lenders shall, without further order of the bankruptcy court, be deemed to be finally allowed and not be subject to challenge by any party in interest as to validity, priority or otherwise and (b) Debtors and the estates shall be deemed to have released any and all claims or causes of action against the Agent and the Lenders with respect to the Existing Loan Agreement or the related documents or transactions, without further order of the bankruptcy court.

151.    The Interim Order also incorporates this Court's authorization under

sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy

Code:

(a)     granting to the Lenders in order to secure the Debtors' obligations under the DIP Facility (subject in each case only to the Carve-Out Expenses:

(i)     priority in payment, pursuant to section 364(c)(1) of the Bankruptcy Code, with respect to such obligations over any and all administrative expenses of the kinds specified in Bankruptcy Code sections 503(b) and 507(b) (to the extent permitted by law and subject to the Carve-Out Expenses);

(ii)     perfected first priority liens, pursuant to section 364(c)(2) of the Bankruptcy Code, on any unencumbered property of the Debtors and any direct investments of the funds, other than Avoidance Actions;

(iii)     perfected junior liens, pursuant to section 364(c)(3) of the Bankruptcy Code, on all property of the Debtors that is subject to valid and perfected Liens in existence on the Petition Date or that is subject to valid Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; and

(b)     the borrowing of up to $50 million in aggregate advances under the Ratification Agreement on an interim basis pending a final hearing on this Motion;

(c)     cross-collateralizing the Pre-Petition Obligations and amounts owing under the DIP Facility;

(d)     granting the Agents and Lenders relief from the automatic stay of Bankruptcy Code § 362 to exercise remedies (upon three days notice to the Debtors and any Creditors Committee and the Office of the United States Trustee);

(e)     waiving any right the Debtors may have (i) to seek authority to use cash collateral of Agent and/or any Lender under section 363 of the Bankruptcy Code, (ii) to obtain post-petition loans or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code other than from Agent and Lenders pursuant to the terms of the Financing Agreements, (iii) to challenge the application of any payments authorized by this Interim Order as pursuant to section 506(b) of the Bankruptcy Code, or to assert that the value of the Pre-Petition Collateral is less than the Pre-Petition Obligations, (iv) to propose or support a plan of reorganization that does not provide for the indefeasible payment in full and satisfaction of all Obligations upon consummation of such plan on terms and conditions acceptable to Agent, and (v) to seek relief under the Bankruptcy Code, including without limitation, under section 105, to the extent any such relief would in any way restrict or impair the rights and remedies of Agent or any Lender as provided in this Interim Order and the

Financing Agreements or Agent's or any Lender's exercise of such rights or remedies (provided, however, that Agent and Lenders may otherwise consent in writing in accordance with the Financing Agreements, but no such consent shall be implied from any other action, inaction, or acquiescence by Agent and Lenders); and

(f)     scheduling, under Bankruptcy Rule 4001, a final hearing on this Motion (the "Final Hearing") and establishing notice procedures in respect of the Final Hearing, by this Court to consider entry of a Final Approval Order authorizing the DIP Facility.

152.    Pursuant to a Final Hearing, the Debtors request that the Court enter a Final Approval Order approving the DIP Facility on a final basis and authorizing the Debtors to enter into the Ratification Agreement.

### Junior Secured Lender Interim Order

153.    At the initial hearing, the Debtors also seek (a) entry of the Junior Secured Lender Interim Order attached to the Motion, and (b) the scheduling of the Final Hearing on the Motion, at which the Debtors intend to seek entry of a final order authorizing and approving the use of Junior Secured Lender's Cash Collateral on a final basis pursuant to the Junior Secured Lender Final Order.

154.    As reflected therein, the Junior Secured Lender Interim Order generally provides for the use of the Junior Secured Lender's Cash Collateral on a basis similar to that permitted under the Interim Order, with the adequate protection granted to Junior Secured Lender being subordinate in priority to the same rights and benefits granted to the Lenders.

### The Need for The DIP Facility

155.    If the DIP Facility is not approved, Debtors' going concern value may be devastated.  Debtors may be unable to provide their customers with product.  Customers will

take their business elsewhere. Debtors' efforts to restructure will be completely derailed. Hundreds of jobs may be lost.

156.     Further, by this Motion, pursuant to the proposed Interim Orders, the Debtors seek the granting to the Lenders and Junior Secured Lender of additional, valid and perfected liens for their benefit ("Additional Liens"), generally having with respect to the Lenders a first priority (and with respect to the Junior Secured Lender, a second priority) on the Debtors' assets. Additionally, the Debtors seek if and to the extent that such Additional Liens are insufficient to satisfy any diminution in value of the Pre-Petition Collateral resulting from the use of Cash Collateral, the granting to the Lenders and the Junior Secured Lender a superpriority administrative expense claims with respect to any such diminution in the value of the Cash Collateral.

157.     Based upon the foregoing and the applicable legal standards, this Court should grant to the Lenders and the Junior Secured Lender the Additional Liens and conditional superpriority administrative expense status, and authorize the Debtors to use Cash Collateral to the extent set forth in the proposed Interim Junior Secured Lender Order.

**Interim Authorization**

158.     The authorization to obtain the DIP Facility and use Cash Collateral pending a final hearing will preserve the value of the Debtors' business only if authorization is granted immediately on short notice.

**Deviations from Delaware Local Rule 4001-2**

159.     Delaware Local Rule 4001-2 requires a debtor in possession to affirmatively advise the Court of any deviations from certain proscribed provisions to be

included in interim and final financing orders. The Interim Order includes the following such provisions:

a. <u>Surcharge Prohibition</u>. The Interim Order at § 4.3 prohibits any surcharge on the collateral of the DIP Agent or the Prepetition Agent pursuant to § 506(c), (but only upon entry of the final order approving the DIP Facility (the "Final Order")).

b. <u>Lien on Avoidance Actions</u>. The Interim Order provides for liens on avoidance actions at § 2.1, (but only upon entry of the Final Order).

c. <u>Cross Collateralization</u>. The DIP Facility provides for cross-collateralization at Interim Order § 2.1.1.

d. <u>Rollover</u>. The DIP Facility provides for a "roll-over" of pre-petition debt to post-petition debt at Interim Order § 2.1.1, (but only upon entry of the Final Order).

### Interim Approval Should Be Granted

160. The Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the financing to the extent necessary to avoid immediate and irreparable harm to the Debtors' estate.

161. Debtors request that the Court conduct an expedited preliminary hearing on the Motion and authorize Debtors from and after the entry of the Interim Order until the Final Hearing to utilize the cash collateral and borrow fund as provided in the Interim Order. This will enable the Debtors to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to the estate and all parties in interest pending finalization of the debtor in possession financing documents.

162. Inasmuch as the Debtors require financing and use of cash collateral to operate their business and the financing and cash collateral orders provide the Debtors with cash on terms and conditions that the Debtors believe are reasonable under the circumstances and not unduly burdensome, the Debtors respectfully request that the Court approve this Motion.

**N. Motion of the Debtors for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment**

163. In the normal course of their business, the Debtors have relationships with approximately twenty utility companies and other providers (each "Utility Provider" and, collectively, the "Utility Providers") for the provision of natural gas, electricity, telephone and sanitation services (the "Utility Services"). The Utility Providers service the Debtors' corporate headquarters in Westerville, Ohio and the Debtors' operations throughout the United States. The Debtors estimate that their average monthly payments to their Utility Providers aggregate approximately $2,150,000.

164. The Debtors anticipate that the cash flow from their ongoing operations and the proceeds of postpetition financing will be sufficient to allow them to satisfy all administrative expenses, including postpetition utility bills, on a current and ongoing basis.

165. Because uninterrupted Utility Services are critical to the Debtors' ongoing operations, the Debtors, by this Motion and pursuant to sections 105(a) and 366 of the Bankruptcy Code, seek the entry of an order: (a) prohibiting their Utility Providers from altering, refusing or discontinuing services; (b) deeming Utility Providers adequately assured of

future performance; and (c) establishing procedures for determining adequate assurance of future payment.

166.    In order to provide adequate assurance of payment for future services to their Utility Providers, the Debtors propose to make a deposit (a "Utility Deposit") equal to 50% of the Debtors' estimated cost of their monthly utility consumption to each Utility, which totals approximately $1,075,000 in aggregate deposits for the Utility Providers listed on Exhibit A hereto. The Debtors propose to make Utility Deposits to each of the Utility Providers within 10 days after the entry of an interim order granting this Motion, pending further order of the Court, for the purpose of providing each Utility Provider with adequate assurance of payment of its postpetition date services to the Debtors.

167.    In addition, the Debtors seek to establish reasonable procedures (the "Procedures") by which a Utility Provider may request additional adequate assurance of future payment, in the event that such Utility Provider believes that its Utility Deposit does not provide it with satisfactory adequate assurances. Such Procedures, in particular, would provide that:

a.    If a Utility Provider is not satisfied with the assurance of future payment provided by the Debtors, the Utility Provider must serve a written request (the "Request") upon the Debtors setting forth the location(s) for which Utility Services are provided, the account number(s) for such location(s), the outstanding balance for each account, a summary of the Debtors' payment history on each account, and an explanation of why the Utility Deposit is inadequate assurance of payment;

b.    The Request must be actually received by Debtors' counsel, Laura Davis Jones, Esquire, Pachulski Stang Ziehl Young Jones & Weintraub LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Courier 19801) within forty-five (45) days of the date of the order granting this Motion (the "Request Deadline");

c.   Without further order of the Court, the Debtors may enter into agreements granting additional adequate assurance to a Utility Provider serving a timely Request, if the Debtors, in their discretion, determine that the Request is reasonable;

d.   If the Debtors believe that a Request is unreasonable, then they shall, within thirty (30) days after the Request Deadline date, file a motion pursuant to section 366(c)(2) of the Bankruptcy Code (a "Determination Motion"), seeking a determination from the Court that the Utility Deposit, plus any additional consideration offered by the Debtors, constitutes adequate assurance of payment. Pending notice and a hearing on the Determination Motion, the Utility Provider that is the subject of the unresolved Request may not alter, refuse, or discontinue services to the Debtors nor recover or setoff against a pre-Petition Date deposit; and

e.   Any Utility Provider that fails to make a timely Request shall be deemed to be satisfied that the Utility Deposit provided to it supplies adequate assurance of payment.

168.   In addition, the proposed form of Order also allows the Debtors to supplement the list of Utility Providers. The Debtors reserve the right, without further order of the Court, to supplement the list if any Utility Provider has been inadvertently omitted. If the Debtors supplement the list subsequent to the filing of this Motion, the Debtors will serve a copy of this Motion, and the signed order granting the Motion (the "Order"), on any Utility Provider that is added to the list by such a supplement (the "Supplemental Service"). In addition, the Debtors will also provide a Utility Deposit in the amount of 50% of the estimated cost of monthly utility consumption for the added Utility Provider. Concurrently with the Supplemental Service, the Debtors will file with the Court a supplement to Exhibit A adding the name of the Utility Provider so served. The added Utility Provider shall have thirty (30) days from the date of service of this Motion and the Order to make a Request.

169. Finally, the Debtors request that the Order provide that Utility Providers must immediately refund any Utility Deposit in the event that the Debtors terminate the services of any Utility Provider. The Debtors believe that the immediate refund of a Utility Deposit by a Utility Provider whose services are terminated is fair and appropriate under the circumstances because the Utility Provider would no longer require adequate assurances of future performance by the Debtors.

170. For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Motions and applications filed concurrently herewith.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _10_ day of

April 2006.

> Global Home Products LLC; GHP Holding
> Company LLC; GHP Operating Company LLC;
> Anchor Hocking Acquisition Inc.; Anchor Hocking
> Inc.; AH Acquisition Puerto Rico, Inc.; Anchor
> Hocking Consumer Glass Corporation; Anchor
> Hocking CG Operating Company LLC; Anchor
> Hocking Operating Company LLC; Burnes
> Acquisition Inc.; Intercraft Company; Burnes
> Puerto Rico, Inc.; Picture LLC; Burnes Operating
> Company LLC; Mirro Acquisition Inc.; Mirro
> Puerto Rico, Inc.; Mirro Operating Company LLC

By: _____

    Randal Rombeiro
    Chief Financial Officer

Sworn to and subscribed before me
this _____ day of April, 2006

_____
    Notary Public

My Commission Expires: _____

        (SEAL)



AMANDA K. JACOBS
NOTARY PUBLIC-STATE OF OHIO
My Commission Expires
November 23, 2009