IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GLOBAL HOME PRODUCTS, LLC, *et al.*, | ) | Case No. 06-10340 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | Related Docket: 365 |

**MEMORANDUM OPINION**[1]

The matter before the Court is the Motion of Industria Mexicana del Aluminio, S.A. de C.V. for Allowance and Immediate Payment of Its Section 503(b)(9) Administrative Expense Claim ("the Motion") [D.I. 365]. The Court will deny the Motion, as set forth below.

**I. Background**

On April 10, 2006, the debtors, Global Home Products, LLC, *et al.* ("Debtors"),[2] filed individual voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.[3] The Court

---

[1] This Memorandum Opinion constitutes the findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052, made applicable to contested matters by Bankruptcy Rule 9014.

[2] Debtors comprise the following entities: Global Home Products LLC; GHP Holding Company LLC; GHP Operating Company LLC; Anchor Hocking Acquisition Inc.; AH Acquisition Puerto Rico, Inc.; Anchor Hocking Consumer Glass Corporation; Anchor Hocking CG Operating Company LLC; Anchor Hocking Operating Company LLC; Burnes Acquisition Inc.; Intercraft Company; Burnes Puerto Rico, Inc.; Picture LLC; Burnes Operating Company LLC; Mirro Acquisition Inc.; Mirro Puerto Rico, Inc.; and Mirro Operating Company LLC.

[3] 11 U.S.C. §§ 101 et seq. Hereinafter, references to statutory provisions by section number only are to provisions of the Bankruptcy Code, unless the context requires otherwise.

ordered the cases to be jointly administered [D.I. 39]. Debtors are currently operating and managing their businesses as Debtors in Possession pursuant to §§ 1107 and 1108. On April 27, 2006, the Official Committee of Unsecured Creditors was appointed by the United States Trustee.

Debtors are a leading designer, marketer and manufacturer of well known, branded consumer and speciality products sold to retail and hospitality customers and to original equipment manufacturers. As of the Petition Date, Debtors operated three primary business divisions through its Anchor Hocking businesses ("Anchor Hocking"), WearEver businesses ("WearEver"), and Burnes Group businesses (the "Burnes Group"). Anchor Hocking produces beverageware, cookware, bakeware, home décor items, and glass components for commercial customers. Anchor Hocking's glassware products cross all price points through retail, specialty, business-to business, and hospitality channels. WearEver produces metal bakeware, cookware and accessories and is recognized as a leading marketer and manufacturer of multi-branded metal cookware and bakeware products and accessories. Wearever sold metal cookware, bakeware and related accessories throughout North America, principally in the opening and mid-tier price points through retail channels. The Burnes Group designed and sold ready-made picture frames, photo albums, scrapbooks and related home accessories.

In the course of these cases, Debtors conducted separate auctions to effectuate the sales of the Burnes Group and the WearEver businesses. The Court entered orders approving the sales of the businesses on May 23, 2006 and August 14, 2006, respectively [D.I. 353 and D.I. 664].

Both before and after the Petition Date, Debtors held a senior secured revolving line of credit with Wachovia Bank, N.A. ("Wachovia") pursuant to the June 22, 2004 Loan Agreement. At the commencement of these cases, Debtors owed Wachovia approximately $115 million which was secured by a lien on substantially all of Debtors' assets, including all of Debtors' stock in their domestic subsidiaries, and 65% of Debtors' stock in their foreign subsidiaries. Additionally, Debtors maintained a junior secured term loan and revolving line of credit with Madeline, LLC ("Madeline") pursuant to executing a Financing Agreement on April 13, 2004. Debtors owed Madeline approximately $200 million and the loan was secured by a lien on substantially all of Debtors' assets. The Court entered both interim and final orders authorizing Debtors to obtain post-petition financing from Wachovia, as the DIP Lender, and to use Madeline's cash collateral. On May 4, 2006, the Court entered the final order on the DIP Loan Motion (the "Final Financing Order") [D.I. 184], and a final order authorizing Debtors to use cash collateral [D.I. 185]. The Final Financing Order approved a ratification and Amendment Agreement dated April 1, 2006, by and among Debtors, Wachovia and others. Subsequently, and after the Court took the Motion under submission, the Court extended the DIP financing and use of cash collateral through approving an amendment to the Ratification Agreement. (Order (A) Authorizing Debtors to Obtain Interim Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status (B) Modifying the Automatic Stay Authorizing Debtors to Enter Into Agreements with Wachovia Bank, National Association, as Agent and Lenders and (D) Scheduling a Final Hearing [D.I. 45])

Industria Mexicana del Aluminio, S.A. de C.V. ("IMASA") is a creditor and a party in

interest in Debtors' bankruptcy. In the twenty days immediately preceding the Petition Date, Debtors purchased approximately 122,986 pounds of aluminum from IMASA in the ordinary course of Debtors' business.

IMASA filed its Motion for Allowance and Immediate Payment of Its Section 503(b)(9) Administrative Expense Claim (the "Motion") on May 25, 2006. IMASA has requested allowance of its claims for the aluminum as an administrative expense claim in the amount of the full value of the goods and that Debtors make payment within three business days of the Court's entry of an order granting the Motion. Debtors filed an objection to the Motion on May 23, 2006, on the grounds that IMASA did not carry its burden of proving the value of such goods or that it is entitled to allowance or payment of such claim [D.I. 452]. Wachovia filed a limited objection to the Motion on June 23, 2006 [D.I. 457], alleging that without Wachovia's consent, Debtors are not authorized to make payments under the Final Financing Order or the Financing Agreement. Wachovia has not consented to such payments.

The Motion was set for hearing on August 8, 2006. At the hearing, the parties announced that they had resolved the issue regarding the value of the aluminum. The Court subsequently entered an agreed upon order allowing IMASA's claim as an administrative expense in the amount of $206,322.07 [D.I. 704]. The issue that remains for decision is the timing of payment of the allowed administrative expense.

## II. Jurisdiction

This is a core proceeding which invests the Court with jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O).

III. **Parties Contentions**

According to IMASA, Debtors used the aluminum to manufacture their line of cookware, bakeware, and accessories, which generated significant post-petition revenues for Debtors. IMASA argues in support of its Motion that it would be inequitable to delay the payment of the administrative expense claim in light of the administrative expense priority afforded to it by the recent amendments to the Bankruptcy Code.[4] Additionally, IMASA asserts that it is entitled to adequate protection of its interest in cash collateral.

In opposition to the Motion, Debtors contend that the Final Financing Order prohibits the payment of the claims or expenses not otherwise authorized under the DIP financing agreements or the DIP budget. Paragraph 1.2 of the Final Financing Order prohibits Debtors' use of loan proceeds for payment of claims not provided for in the financing agreements and budget without the Court's approval. Section 5.2 of the Ratification Agreement also restricts Debtors' use of DIP Financing proceeds to pay administrative claims. Debtors are authorized to pay only administrative claims that are directly attributable to the operation of the business of any of Debtors in the ordinary course of business and in accordance with the Financing Agreements, unless otherwise authorized by the Court and approved in writing by the DIP Lender. Payment of IMASA's administrative claim could therefore constitute a default under the Financing Agreements and violate the provisions of the Final Financing Order.

Debtors also argue that requiring immediate payment of § 503(b)(9) claims would expose

---

[4] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, S. 256, Pub.L.No. 109-8, 119 Stat. 23 (2005) (the "2005 Act") became law on October 17, 2005. The 2005 Act governs these cases.

Debtors to financial risk by adversely affecting Debtors' borrowing availability. Debtors assert that every creditor with a potential administrative claim could also request immediate allowance and payment of its claims. These payments could potentially affect Debtors ability to obtain the necessary cash to continue their day-to-day operations.

Debtors assert that there is no need to deviate from the general rule that administrative claims are not payable until the effective date of a confirmed plan of reorganization. Debtors contend that the statute does not require immediate payment and that it is silent on the issue of timing.

## IV. Discussion

IMASA filed its Motion pursuant to § 503(b)(9), which provides:

> After notice and a hearing, there shall be allowed administrative expenses ... including – (9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

11 U.S.C. § 503(b)(9). Section 503(b)(9) is newly created by the 2005 Act. Creditor claims of this type are now given a second priority pursuant to § 507(a)(2) of the Code. Section 503 does not specify a time for payment of these expenses but administrative expenses must be paid in full on the effective date of the plan as provided in § 1129(a)(9).[5]

The parties agree that when a claimant timely files a request for payment of an

---

[5] Section 1129(a)(9) mandates that a court shall confirm a plan of reorganization only if "... the plan provides that—
(A) with respect to a claim of a kind specified in section 507 (a)(1) or 507 (a)(2) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim ...."

administrative expense under § 503(a), the timing of the payment of that administrative expense claim is left to the discretion of the Court. *In re Garden Ridge Corporation*, 323 B.R. 136 (Bankr. D. Del. 2005); *In re Colortex Industries, Inc.*, 19 F.3d 1371, 1348 (11th Cir. 1994); *In re Continental Airlines, Inc.*, 146 B.R. 520, 531 (Bankr. D. Del. 1992). "In making this determination, one of the chief factors courts consider is bankruptcy's goal of an orderly and equal distribution among creditors and the need to prevent a race to a debtor's assets." *In re HQ Global Holdings, Inc.*, 282 B.R. 169 (Bankr. D. Del. 2002). Distributions to administrative claimants are generally disallowed prior to confirmation if there is a showing that the bankruptcy estate may not be able to pay all of the administrative expenses in full. *Id.* Courts will also consider the particular needs of each administrative claimant and the length and expense of the case's administration. *Id.* "To qualify for exceptional immediate payment, a creditor must show that 'there is a necessity to pay and not merely that the Debtor has the ability to pay.'" *In re Continental Airlines, Inc.*, 146 B.R. at 531 (quoting *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 179-79 (Bankr. S.D.N.Y. 1989)); *See also* Alan N. Resnick, *The Future of Chapter 11: A Symposium Cosponsored by the American College of Bankruptcy: The Future of the Doctrine of Necessity and Critical Vendor Payments in Chapter 11 Cases*, 47 B.C.L. Rev 183, 204-205 (2005) (Section 503 (b)(9) "is a rule of priority, rather than payment." The new section does not specify when payment will be made. "Arguably, prepetition vendor claims are never payable in the ordinary course of business because of the intervening bankruptcy and the automatic stay, even if afforded administrative expense priority.").

In *In re Garden Ridge Corp.*, this Court considered three factors in determining how to exercise its discretion on the timing of payment of an administrative expense claim, *viz.*, (1) the

prejudice to the debtors, (2) hardship to claimant, and (3) potential detriment to other creditors. *In re Garden Ridge Corp.*, 323 B.R. at 143.

### a. <u>Prejudice to Debtors</u>

During the course of the August 8th hearing, Debtors presented the testimony of Mr. Ronald F. Stengel, the Chief Restructuring Officer of Debtors. Mr. Stengel testified that: (1) the payment of § 503(b)(9) claims would adversely effect Debtors' borrowing ability under the DIP Financing Agreement because the aggregate § 503(b)(9) claims far exceed the company's availability to borrow, (2) that Debtors did not then have funds available to make payments for administrative claims, (3) Debtors' availability under the <u>current</u> financing arrangement was approximately $1.7 million and those funds were needed to provide for continuing operations, including current operating costs, payroll, purchase of inventory, etc., and (4) as of the hearing date there were nine other § 503(b)(9) claims seeking in the aggregate approximately $2.1 million in Debtors' bankruptcy cases, and others were expected to be filed in the future.[6] Mr. Stengel opined that if Debtors had to pay the administrative claims immediately and in full, their reorganization efforts would collapse. Furthermore, Mr. Stengel testified that under Section 1.2 of the DIP Financing Order, Debtors are precluded from using any proceeds of any loans to pay claims or expenses that are not included in Debtors' budget without the consent of Wachovia. Mr. Stengel testified that he did not know whether or not Wachovia had given its consent to such expenditures and § 502(b)(9) administrative claims were not included in Debtors' budget. Therefore, the uncontroverted testimony is that Debtors would be prejudiced if the Court were

---

[6] The docket reflects that more than twenty creditors have filed motions seeking immediate payment of administrative claims.

to grant the motions for administrative expense claims.

### b. Hardship to Claimant

IMASA claims that the prejudice or hardship to them from non-payment of the administrative expense claim is self-evident. IMASA contends that it has been singled out of a class of claimants that have been given priority under the Code because Debtors are denying payment to IMASA until confirmation of a plan. IMASA did not present testimony to support its claim of prejudice, instead relying on various documents filed in Debtors' bankruptcy cases of which this Court took judicial notice. At the hearing on the Motion, the Court asked IMASA what evidence was before the Court of hardship to IMASA of later payment. IMASA responded:

> The only evidence I would submit, Your Honor, is sort of the self-evident hardship. That we're discriminating between five-o - - between 503(b) claimants. That is to say, some of them are going to be paid now, and others are being deferred.

(Hearing Transcript, 26, August 8, 2006).

The discrimination in payment to which IMASA refers is Debtors' payment of the pre-petition claims of certain critical vendors, which Debtors were entitled to make pursuant to the Order Authorizing, But Not Requiring the Payment of Prepetition Claims of Critical Trade Vendors ("Critical Vendor Order") [D.I. 42]. The Critical Vendor Order enabled Debtors to obtain favorable trade terms from those vendors whose products Debtors needed to be able to reorganize. The decision on which vendors are critical to Debtors' reorganized was left to Debtors' business judgment.

Debtors argue however, that the case law in this area does not focus on the alleged

discrimination between post-petition trade creditors and pre-petition creditors, rather, it focuses on the individual hardship to the individual claimant. Debtors point out that there is no evidence that immediate payment is necessary to keep IMASA in business. According to IMASA's web site, they produce in excess of 70 million pounds of aluminum each year with company sales in excess of $400 million.

## V. Decision

Debtors presented the testimony of Mr. Stengel which the Court found to be credible and decisively relevant to the issue of the relative hardships to the parties. In balancing these hardships, the Court finds that IMASA will suffer little prejudice or hardship if payment of its allowed administrative claim is deferred until after confirmation of a plan. Conversely, given the tenuous financial position of Debtors and the requirements of the DIP Financing Agreement, Debtors will suffer a substantial hardship if immediate payment on IMASA's § 503(b)(9) claim is allowed at this time in Debtors' reorganization efforts. Accordingly, the Court has determined that the proper exercise of discretion requires the Court to deny the motion. The prejudice to Debtors of requiring immediate payment far outweighs the prejudice, if any, to IMASA and Debtors' other creditors are benefitted by the ruling to the extent that by denying immediate payment, the Court preserves a later equitable distribution to other administrative claimants.

## VI. Conclusion

Based upon the forgoing, the Motion of Industria Mexicana del Aluminio, S.A. de C.V. for Allowance and Immediate Payment of Its Section 503(b)(9) Administrative Expense Claim will be **DENIED** to the extent that the Motion seeks immediate payment of the administrative expense claim.

An appropriate order follows.

DATED: December 21, 2006
         Wilmington, Delaware

                                        KEVIN GROSS
                                        UNITED STATES BANKRUPTCY JUDGE

11