## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GLOBAL HOME PRODUCTS, LLC, *et al.*, | ) | Case No. 06-10340 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Re Dkt. No. 1043** |

## OPINION

## INTRODUCTION

The following is the Court's decision on the Motion of the Debtors[1] for an Order Authorizing and Approving Management Incentive Plan and Sales Bonus Plan ("the Motion"). Debtors seek approval for debtors Anchor Hocking Glass Operating Company LLC, Anchor Hocking CG Operating Company and GHP Operating Company LLC (collectively, "Anchor Hocking") to implement what they refer to as a "performance and incentive based bonus plan" ("the Management Plan") and an "incentive based sales bonus plan" ("Sales Plan", collectively, "the Plans"). The Court received two objections to the Motion, one of which was subsequently withdrawn. The Court conducted an evidentiary hearing on the Motion on January 24, 2007 (the "Hearing"). At the conclusion of the Hearing, the Court announced that it would grant the Motion with the opinion to follow.

---

[1] The "Debtors" consist of the following entities: Global Home Products LLC; GHP Holding Company LLC; GHP Operating Company LLC; Anchor Hocking Acquisition Inc.; Anchor Hocking Inc.; AH Acquisition Puerto Rico, Inc.; Anchor Hocking Consumer Glass Corporation; Anchor Hocking CG Operating Company LLC; Anchor Hocking Operating Company LLC; Burnes Acquisition Inc.; Intercraft Company; Burnes Puerto Rico, Inc.; Picture LLC; Burnes Operating Company LLC; Mirro Acquisition Inc; Mirro Puerto Rico, Inc.; Mirro Operating Company LLC.

Accordingly, this is the Court's opinion with its factual findings and legal conclusions.[2]

## JURISDICTION

The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (M), (N) and (O). Venue of these proceedings and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are §§ 105(a) and 363(b).[3]

## BACKGROUND OF THE CASE

On April 10, 2006 (the "Petition Date"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code and continue to operate their businesses and manage their properties as debtors in possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code. On April 26, 2006, the United States Trustee appointed an official committee of unsecured creditors (the "Committee").

Global Home Products is a leading designer, manufacturer of well known, branded consumer and specialty products which it markets to retail and hospitality customers and to original equipment manufacturers. On the petition date it operated three primary businesses. Anchor Hocking produces beverageware, cookware, bakeware, home decor items, and glass components for commercial customers. Wearever produced metal bakeware, cookware and

---

[2] This Opinion constitutes the findings of fact and the conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[3] Hereafter, references to section numbers are to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*

accessories and was recognized as a leading marketer and manufacturer of multi-branded

metal cookware and bakeware products and accessories.  The Burnes Group designed and

sold ready-made picture frames, photo albums, scrapbooks and related home accessories.

Debtors have sold the Burnes and Wearever operations pursuant to Court orders in the course

of these cases.

## THE PLANS [4]

A full description of the Plans in this Opinion would be lengthy and unnecessary for

the Court's discussion and ruling.  A summary of the Plans is sufficient and the Court has

attached the Plans as Exhibit A to the Opinion.

### a.  The Management Plan

The Court will describe the Management Plan and later the Sales Plan with liberal and

often unattributed use of the descriptions in the Motion.  This is a summary without

arithmetic detail which is undisputed and better left to the information in Exhibit A to this

Opinion and the illustrative detail Debtors have included in the Motion.  In addition, Debtors

presented extensive testimony at the hearing.

The Debtors' fiscal year began on April 1, 2006 (ten days before Debtors commenced

their cases) and will end on March 31, 2007.  The Management Plan would award each

Eligible Employee, on a quarterly basis and as a percentage of their base salary, up to four

---

[4]  Prior to the Petition Date, Debtors had for fiscal year 2006 ended March 31, 2006, both a management
incentive program and a sales bonus program for certain employees.  Required financial objectives were not
met and no payments to management were made.  Certain employees satisfied the sales requirements for
bonuses and those employees received their sales bonuses pursuant to Court order.

(4) potential incentive payments (each a "Quarterly Payment") payable if the Management Plan's minimum EBITDAR and/or Cash Flow objectives are met at the end of each of the following periods: (i) the first six months of the 2007 fiscal year, which began on April 1, 2006 and ended on September 30, 2006, (ii) the 2007 third fiscal quarter, which period began on October 1, 2006 and ended on December 31, 2006; (iii) the 2007 fourth fiscal quarter, which period began on January 1, 2007 and will end on March 31, 2007, and (iv) the entire 2007 fiscal year, which ends on March 31, 2007 (each of these aforementioned four periods is referred to as a "Quarter").    The Plan is comprised of two components: EBITDAR ("Earnings Before Interest, Taxes, Depreciation and Rent") goal objectives and Cash Flow goal objectives.    The components are both weighted to count for 50% of the potential Quarterly Payment.    In order to remain eligible to receive Quarterly Payments under the Management Incentive Plan for a particular Quarter, Eligible Employees must be employed with the Debtors as of the last day of the particular Quarter on which the requisite EBITDAR and/or Cash Flow objectives are actually achieved.

Mark Eichhorn is Debtors' Interim Chief Executive Officer and President of Anchor Hocking.    In lieu of Quarterly Incentive Payments, the Management Incentive Program provides for an amortization based upon a formula of Mr. Eichhorn's existing obligations owed to Debtors in the amount of $310,000 in respect of a prepetition loan and relocation allowance advanced to him prepetition in connection with expenses incurred pursuant to Mr. Eichhorn's relocation from Illinois to Ohio (the "Relocation Obligation").    Rather than pay

4

Mr. Eichhorn Quarterly Incentive Payments, the Debtors and Mr. Eichhorn have agreed to quarterly amortizations of the Relocation Obligation based upon a formula.

Under no circumstances may the total amortization ever exceed the amount of the Relocation Obligation.  In other words, Mr. Eichhorn bears the risk that the Relocation Obligation may not be fully amortized if the Debtors do not achieve 100% of the projected EBITDAR and Cash Flow objectives for the 2007 fiscal year.  However, unlike other Eligible Employees, Mr. Eichhorn is not entitled to any additional benefit if the Debtors exceed 100% of the EBITDAR and Cash Flow objectives because, as noted above, the full amortization of the Relocation Obligation can never exceed $310,000.

Debtors estimate that the total cost of the Management program will range between $890,000 (if the 75% minimum EBITDAR and Cash Flow objectives are each achieved during each Quarter), up to a maximum of $2,700,000 (if Anchor Hocking achieves 125% or more of its EBITDAR and Cash Flow objectives during each Quarter of the 2007 fiscal year).

### b.  The Sales Bonus Plan

Debtors' Sales Plan covers certain sales managers (the "Eligible Sales Managers"). The Sales Plan is fully set forth in Exhibit A and is an updated version of the sales plan in effect at the Petition Date.  Eligible Sales Managers are entitled to receive up to (i) 30% of their annual salaries based on the annual percentage increase of annual sales for their division calculated at the end of the 2007 fiscal year over the prior year, plus (ii) a 15% Target Bonus

Percentage payment pursuant to the same terms and conditions applicable to the Management Plan.

The Sales Plan also is divided into three categories: (1) the Debtors' sales to Wal-Mart, (2) the Debtors' international sales, and (3) the Debtors' sales to other customers who are not included in (1) and (2) above. Each Eligible Sales Manager participating in the Sales Bonus Program falls into one (and only one) of the above three categories based on their job descriptions and the bonus calculations vary by category.

## THE OBJECTION

The Court has before it the objection (the "Objection") to the Motion of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW").[5] The stated grounds for the Objection are that "the Debtors have proposed a management compensation scheme that runs afoul of the obligations set forth in Sections 503(c)(1) and (3) of the Code, 11 U.S.C. § 503(c)(1), (3), and have elected to do so at a time when management is seeking to extract deep concessions from the employees and retirees represented by the United Steel Workers." (USW Objection at 1) USW is the bargaining agent for approximately 1,300 employees who work at Debtors' facilities in Lancaster, Ohio and Monaca, Pennsylvania. USW also represents retirees and surviving spouses receiving retirees benefits from Debtors. USW complains that the collective bargaining agreement which covers the Pennsylvania Plant, with "significant

---

[5] The Committee filed an objection to the Motion and withdrew it prior to the Hearing. USW is a member of the Committee.

pressure from the Debtors, froze the existing defined benefit pension plan, eliminated an incentive pay program, increased employee health insurance premiums, and reduced other economic benefits paid to the bargaining unit employees." (Id. at 2) USW further states that Debtors are pursuing a similar agreement covering the Ohio plant, including a limitation on future participation in Debtors' retiree benefits program. As discussed further below, USW argues that the Plans are disguised retention programs which fail to meet the requirements of § 503. In addition, USW contends that the Plans are "inimical to the principle of shared sacrifice that is common in chapter 11 cases." (Id. at 7)

## THE HEARING

At the hearing, Debtors presented the live testimony of Mark Eichhorn, Debtors' Interim CEO and President of Anchor Hocking ("the Eichhorn Testimony"), Ronald Stengel, Debtors' Chief Restructuring Officer ("Stengel Testimony"), and Jeff Visithpanich, Debtors' expert witness ("the Expert Testimony").[6]

The testimony of Debtors' witnesses was largely unrefuted.[7] The testimony of Debtors' witnesses established the following pertinent facts.

### a. Eichhorn Testimony

1.      Mr. Eichhorn has worked at Anchor Hocking since 1987, and was its President

---

[6]  Mr Visithpanich is a principal of Johnson Associates, Inc., which specializes in the management and design of executive compensation plans.

[7]  USW cross-examined Debtors' witnesses but did not present its own witnesses or any direct evidence in support of the Objection.

for five years beginning in 1994.  (Hearing Transcript, 8-9, January 24, 2007)

2.    The Plans are nearly identical to management and sales incentive plans previously in effect at Anchor Hocking since his time with Anchor Hocking.  (Hr'g Tr. 9)

3.    Mr. Eichhorn structured the Plans "emulating the prior plans" in existence in prior years.  (Hr'g Tr. 10-11)

4.    Anchor Hocking's Board of Directors and its Compensation Committee approved the Plans unanimously.  (Hr'g Tr. 12)

5.    The 2006 management incentive plan resulted in no payments to management because the targets were not met.  The 2006 sales plan generated bonus payments.  (Hr'g Tr. 13)

6.    The Plans were announced in June - July 2007 to motivate management to work hard to produce.  (Hr'g Tr. 16)

7.    Debtors set aggressive incentive targets for earning bonuses.  (Hr'g Tr. 10, 14-15)

8.    The participants in the Plans occupy the same positions as historically participated in previous plans.  (Hr'g Tr. 21)

9.    The Plans are intended to be self-funded.  "So the financial targets that we establish for the business are net of the cost of any incentive plans associated with the business."  (Hr'g Tr. 23)

10.    Funding for the Plans is incorporated in the Debtors' budget and the actual cost

based upon business results will be only approximately half of the amount budgeted.  (Hr'g Tr. 26)

### b.  Stengel Testimony

11.    The Chief Restructuring Officer reviewed all aspects of the Plans and found them to be reasonable and in Debtors' best interests.  (Hr'g Tr. 53-54)

12.    The Management Plan terms applicable to Mr. Eichhorn are debt forgiveness (costs of moving which Debtors advanced) in lieu of cash payments relating to relocation costs.  The debt forgiveness rather than cash payments benefits Debtors because Debtors "live on limited liquidity, and to the degree that we wouldn't have to pay that cash, the company's liquidity would be enhanced by it. (Hr'g Tr. 55)

### c.  Expert Testimony

13.    Jeff Visithpanich was retained to render an expert opinion "regarding whether the debtors [Plans] are reasonable because the payments thereunder are within market norms."  (Hr'g Tr. 58)

14.    Mr. Visithpanich is a principal at Johnson Associates Incorporated, a compensation consulting firm.  Such work involves evaluating, structuring and implementing compensation plans.  (Hr'g Tr. 59)

15.    USW did not object after *voir dire* to the Debtors' use of expert testimony or Mr. Visithpanich's competency to render an expert opinion.  (Hr'g Tr. 64)

16.    Mr. Visithpanich concluded that the Plans are reasonable, typical and common.

They are within market norms based upon comparison with numerous companies of similar size and which, like Anchor Hocking, manufacture durable goods.  (Hr'g Tr. 64-75)

17.    Without the additional compensation the Plans could make possible, Anchor Hocking's key employees' compensation would fall approximately 35 percent short of the median compensation for similar companies.  A shortfall of such an amount would be "a pretty significant business risk for key professionals, in this case."  (Hr'g Tr. 68)

18.    Visithpanich concluded that:

> If we were to have a plan that was intended to motivate, to drive performance, to incentivize professionals, this is a very common plan we see very, very often.

(Hr'g Tr. 74-75)

## DISCUSSION

The Court's decision turns on whether the Plans constitute a Key Employee Retention Plan ("KERP"), also known as a "pay to stay" compensation plan, or are intended to create incentive for management and key employees, or a "pay for value" compensation plan.  If the Court finds the Plans are a KERP, they are subject to the bright light and restrictions of § 503(c).  If they are plans intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363.

Compensation issues are normally governed by the business judgment standards, i.e., proof that there is a broad business purpose for an action.  *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147,

153 (D. Del. 1999) (affirming bankruptcy court approval of KERP on basis that debtors showed a "sound business purpose" justifying such approval); *Cf. Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (courts defer to a trustee's judgment concerning use of property under § 363(b) when there is a legitimate business justification). The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment. *In re U.S. Airways, Inc.*, 329 B.R. 793, 795 (Bankr.E.D.Va. 2005) (debtor carried its burden of showing use of sound business judgment in adopting business plan).

In 2005, Congress made significant changes to the Bankruptcy Code. BAPCA, as the Act amending the Code is now called, took specific aim at Congressional concern over what it viewed as KERP abuses. The import of the BAPCA provisions dealing with KERPs was Congress's effort "to eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process. BAPCA imposed a set of challenging standards debtors must meet to have 'stay' bonuses approved." Karen Lee Turner & Ronald S. Gellert, *Dana Hits a Roadblock: Why Post-BAPCPA Laws May Impose Stricter KERP Standards*, 3 No. 14 Andrews Bankr. Litig. Rep. 2, 2 (2006). The question remains, however, whether or not the Plans are a KERP thereby triggering the Court's post-BAPCA obligation to apply greater scrutiny under § 503(c). BAPCA requires the Court to apply specific standards if a bankruptcy court is asked to authorize payments to insiders [8] for

---

[8] The Court is not deciding which of the Plans' participants are "insiders"under the Bankruptcy Code, since the Plans are not governed by § 503 and the determination is not relevant to the holding.

the purpose of inducing insiders to remain in a debtor's employ, or payments made on

account of severance.

Section 503(c)(1) - (3) provides, in part,

> (c)  Notwithstanding subsection (b), there shall neither be allowed, nor
> paid–
> (1)  a transfer made to, or an obligation  incurred for the benefit of,
> an insider of the debtor for the purpose of inducing such person to
> remain with the debtor's business, absent a  finding by the court
> based on evidence in the record that–
>> (A) the transfer or obligation is essential to retention  of the
>> person because the individual has a bona fide job offer from
>> another business at the same or greater rate of compensation;
>> (B) the services provided by the person are essential to the
>> survival of the business; and
>>
>> \*    \*    \*
>
> (2) a severance payment to an insider of the debtor, unless–
>> (A) the payment is part of a program that is generally applicable
>> to all full-time employees; and
>> (B) the amount of the payment is not greater than 10  times the
>> amount of the mean severance pay given to nonmanagement
>> employees during the calendar year in which the payment is
>> made; or
> (3) other transfers of obligations that are outside the ordinary course of
> business and not justified by the facts and circumstances of the case,
> including transfers made to, or obligations incurred for the benefit of,
> officers, managers, or consultants hired after the date of the filing of the
> petition.

11 U.S.C. § 503(c)(1)-(3).

The statute makes it abundantly clear that in a post-BAPCA bankruptcy case, KERPs

and severance arrangements subject to review under § 503(c) – those whose purpose is to

12

retain employees – are severely restricted.  *See, e.g.*, *In re U.S. Airways*, 329 B.R. at 797-98

("Congressional concern over KERP excesses is clearly reflected in changes to the

Bankruptcy Code . . . .  Those changes will severely limit both the circumstances under

which severance and retention payments may be made to insiders as well as the amount of

such payments . . . ").  Section 503(c)(1) prohibits payments to "insiders" to induce them to

remain with the debtor unless a court finds that the evidence establishes that the payment is

"essential" because the individual has a "bona fide" offer from another entity at the same or

greater rate of compensation, and the individual's services are "essential" to the debtor's

survival.  The retention bonuses are also limited in amount.  Section 503(c)(2) permits

severance payments to "insiders" only if they are part of a program which is applicable to all

employees and are less than ten times the mean of severance payments given to non-

management employees.  Sections 503(c)(1) and (2) are plainly high hurdles to clear if

payments are primarily designed for retention.

The entire analysis changes if a bonus plan is not primarily motivated to retain

personnel or is not in the nature of severance.

In the Objection, USW relies largely upon *In re Dana Corp.*, 351 B.R. 96 (Bankr.

S.D.N.Y 2006) ("Dana I"),[9] in which the learned Judge Lifland held that debtors'

compensation packages at issue did not satisfy either the business judgment rule or § 503(c)

limitations.  The Court observed that the bonus plan "walks like a duck (KERP), quacks like

---

[9] *Dana I* was a bench ruling.

a duck (KERP), it's a duck (KERP)." *In re Dana Corp.*, 351 B.R. 96, 102 n. 3 (Bankr. S.D.N.Y 2006).  Finding that debtors failed to meet their burden of establishing that the bonus plan was not severance for purposes of  § 503(c), the court also noted, even while rejecting the bonus program under § 503(c), that "it may be possible to formulate a compensation package that passes muster under the section 363 business management rule or section 503(c) limitations, or both . . . ."  *Id.* at 103.

*Dana I* is not the end of the story in this Court's analysis.  In *In re Dana Corporation*, 2006 WL 3479406 (Bankr.S.D.N.Y. 2006) ("*Dana II*"), the court encountered as a motion for reconsideration "Debtors' second effort to obtain approval of an execution compensation package . . .".  *In re Dana Corporation*, 2006 WL 3479406, *1 (Bankr.S.D.N.Y. 2006). Debtors proposed that the revised plan was a true incentivizing package and a wholly different plan from the proposal the Court rejected in *Dana I*.

Judge Lifland posited that:

> [S]ection 503(c) was not intended to foreclose a chapter 11 debtor from *reasonably* compensating employees, including "insiders," for their contribution to the debtors' reorganization.  *In re Nobex Corp.,* 2006 Bankr.LEXIS 417 (Bankr. D. Del. Jan. 19, 2006); *see also In re Werner Holding Co., Inc.*, Case No. 06-10578 (Bankr. D. Del. 2006).

*In re Dana Corporation*, 2006 WL 3479406, *5 (emphasis in original).

In arriving at its conclusion that Dana's compensation plan was meant to incentivize, the court focused on the fact, as is present here, that:

> [A] short term incentive plan has been a common component of compensation  plans at Dana for the past fifty years and does not differ

14

significantly from Dana's prepetition practice. Accordingly, it is within the ordinary course of Debtors' business.

*In re Dana Corporation*, 2006 WL 3479406, *10. The *Dana II* court then focused on whether the compensation proposal was a proper exercise of Debtors' business judgment.

The court, citing numerous cases, listed the factors courts use to determine,

. . . if the structure of a compensation proposal and the process for developing the proposal meet the 'sound business judgment' test:

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, *is the plan calculated to achieve the desired performance*? (emphasis added)

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*In re Dana Corporation*, 2006 WL 3479406, * 6 (citations omitted).

All of the evidence before the Court satisfies the foregoing factors sufficient to mandate the Court's conclusion that the terms and adoption of the Plans satisfy the business

15

judgment test. The only factor which Debtors do not squarely satisfy is whether Debtor used independent counsel in performing due diligence and authorizing the Plans. While the evidence indicates that Debtors did not use independent counsel, these are not "new" compensation programs but, instead, are nearly identical to plans previously used, and approved by a compensation committee and board of directors. In other words, the Plans have satisfied the independent "test of time."

The Plans are clearly in the ordinary course of Debtors' businesses. The Court is wholly satisfied, and so finds, that the Plans are primarily incentivizing and only coincidentally retentive because Debtors employed virtually identical plans prepetition when retention was not the motive. The fact, as Debtors pointed out, that all compensation has a retention element does not reduce the Court's conviction that Debtors' primary goal to create value by motivating performance. All companies seek to retain employees they value by fairly compensating them.

USW argues pointedly that because the Plans include two plus Quarters of Debtors' fiscal year 2007 which have already occurred (April through June and July through September) and a portion of the third quarter,[10] there can be no incentive. The testimony revealed, however, that the Plan's beneficiaries relied upon Debtors' historical practice of providing performance bonuses and that Debtors told the beneficiaries that they would ask the Court to approve the Plans. Thus, the beneficiaries were *performing* in response to a

---

[10]  The Debtors filed the Motion on December 8, 2006. [D.I. 1043].

financial incentive and not merely to remain with Debtors.  Moreover, the Plan's beneficiaries are not required to remain with Debtors through the emergence from bankruptcy to benefit from the Plans.

The Court is fully satisfied on the basis of the facts presented that Debtors are asking it to approve incentive, not retention plans and, therefore, § 503(c) does not come into play. Instead, the Court must determine if the Plans satisfy the business judgment and reasonableness standards.  The Court finds, based upon the evidence which USW did not successfully challenge, that the Plans meet the standards for approval under § 363.

1.    The Plans are calculated to achieve performance for Debtor's benefit.

2.    The cost is reasonable.

3.    The Plans are consistent with industry standards.

4.    The Plans are virtually identical to plans Debtors used consistently in the past.

5.    The Plans are part of Debtors' budget which the DIP lenders, whose money is at risk and whose financial accumen is apparent, approved.  Wachovia Bank, the pre-petition and DIP Lenders supports the Motion.  (Hr'g Tr. 86-88)  In supporting the Motion, the Lender argued:

> This is not a situation where management has come and by virtue of bankruptcy filing maybe perhaps holding the creditor constituencies hostage to the fact that they have the history and familiarity with the company, have asked for large bonuses to simply stay around and be retained.

(Hr'g Tr. 87)

The Court agrees with Wachovia Bank's point that "[Section] 503 is really inapplicable to the plan, in that it is a incentive plan consistent with ordinary course of business." (Hr'g Tr. 87-88)

Finally, USW importunes the Court to reject the Plans because its constituency has been asked to sacrifice benefits while the Plan beneficiaries receive bonuses. However, USW did not provide the Court with any evidence of "sacrifice." In contrast, to the extent the Plans motivate management and sales people to create additional value, all creditors will benefit.

Accordingly, Debtors have established that the Plans are not KERP's but, instead, were reasonably intended to incentivize management and senior level sales managers to produce and increase the value of Debtors' estate and are therefore consistent with Debtors' proper exercise of their business judgment. The Court will issue an Order consistent with this opinion approving the Plans.

Dated: March 6, 2007

Kevin Gross, United States Bankruptcy Judge

cc: Laura Davis Jones, Esquire
    Joseph H. Huston, Jr., Esquire
    David M. Fournier, Esquire
    Susan Kaufman, Esquire
    Mark Kenney, Esquire