IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Global Home Products LLC, *et al.*,[1] | ) | Case No. 06-10340 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF
REORGANIZATION OF GLOBAL HOME PRODUCTS,
LLC, ET AL., UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**Important Dates**

| | |
|---|---|
| Date by which Ballots must be received: | TBD |
| Date by which objections to Confirmation of the Plan must be filed and served: | TBD |
| Hearing on Confirmation of the Plan: | TBD |

**THIS IS NOT A SOLICITATION FOR ACCEPTANCE OR
REJECTION OF THE PLAN.  ACCEPTANCES OR
REJECTIONS MAY NOT BE SOLICITED UNTIL A
DISCLOSURE STATEMENT HAS BEEN APPROVED BY
THE BANKRUPTCY COURT**

**THIS DISCLOSURE
STATEMENT IS BEING SUBMITTED FOR APPROVAL
BUT HAS NOT BEEN APPROVED BY THE COURT**

---

[1] The Debtors are the following entities:  Global Home Products LLC; GHP Holding Company LLC; GHP Operating Company LLC; Anchor Hocking Acquisition Inc.; Anchor Hocking Inc.; AH Acquisition Puerto Rico, Inc.; Anchor Hocking Consumer Glass Corporation; Anchor Hocking CG Operating Company LLC; Anchor Hocking Operating Company LLC; Burnes Acquisition Inc.; Intercraft Company; Burnes Puerto Rico, Inc.; Picture LLC; Burnes Operating Company LLC; Mirro Acquisition Inc.; Mirro Puerto Rico, Inc.; Mirro Operating Company LLC.

## TABLE OF CONTENTS

Page

I.     PRELIMINARY STATEMENT AND DEFINITIONS ....................................................1

II.    INTRODUCTION AND PLAN OVERVIEW ..................................................................1

       A.     INTRODUCTION ..........................................................................................1
       B.     INFORMATION REGARDING THE PLAN ..................................................5
              1.     Plan Governing Document. .................................................................5
              2.     Source of Information. ........................................................................5
              3.     Warning Regarding Federal and State Income Tax Consequences
                     of the Plan. ..........................................................................................6
              4.     Bankruptcy Court Approval. ...............................................................7
       C.     VOTING INSTRUCTIONS .............................................................................7
              1.     Who May Vote. ....................................................................................7
              2.     How to Vote. ........................................................................................8
       D.     CONFIRMATION ..........................................................................................10
       E.     HEARING ON CONFIRMATION ................................................................10
       F.     OBJECTIONS TO CONFIRMATION..........................................................11
       G.     CREDITORS' COMMITTEE'S SUPPORT OF PLAN...............................13
       H.     CRAMDOWN ................................................................................................13
       I.     DISCLAIMERS .............................................................................................14
       J.     AN OVERVIEW OF THE CHAPTER 11 PROCESS ..................................17
       K.     PLAN OVERVIEW ........................................................................................18
              1.     Description of Property to be Distributed Under the Plan.................18
              2.     Summary of Classification and Treatment of Claims and Equity
                     Interests Under the Plan.....................................................................22
              3.     Projected Distributions Under the Plan..............................................27

III.   HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS ....................29

       A.     DESCRIPTION OF THE DEBTORS .............................................................29
       B.     EVENTS PRECEDING THE CHAPTER 11 FILING....................................31
       C.     THE DEBTORS' CORPORATE STRUCTURE.............................................32
       D.     EQUITY AND SIGNIFICANT INDEBTEDNESS .........................................33
              1.     The Wachovia Indebtedness ...............................................................34
              2.     The Madeleine Indebtedness...............................................................34
              3.     General Unsecured Claims...................................................................35

IV.    THE REORGANIZATION CASE ................................................................................35

       A.     THE VOLUNTARY PETITION AND NOTICE OF COMMENCEMENT
              OF CASE ........................................................................................................35
       B.     PROFESSIONALS EMPLOYED BY THE DEBTORS ...................................36
       C.     APPOINTMENT OF COMMITTEE ..............................................................36
       D.     FIRST DAY MOTIONS AND OTHER RELATED RELIEF ...........................37

| | | |
|---|---|---|
| 1. | Joint Administration | 38 |
| 2. | Cash Management | 38 |
| 3. | Employee Wages | 39 |
| 4. | Utility Services | 41 |
| 5. | Rejection of Certain Executory Contracts | 42 |
| 6. | Critical Vendors | 42 |
| 7. | Financing | 43 |
| E. | THE SALE OF THE BURNES GROUP | 44 |
| F. | THE SALE OF THE WEAREVER DEBTORS' BUSINESS | 48 |
| G. | EXTENSION OF THE DIP FINANCING AND USE OF CASH COLLATERAL | 51 |
| H. | THE SALE OF THE ANCHOR HOCKING DEBTORS' BUSINESS | 52 |
| I. | OTHER SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES | 54 |
| 1. | Filing of Schedules and Statements | 54 |
| 2. | Meeting of Creditors | 54 |
| 3. | Establishment of Claim Bar Dates | 54 |
| 4. | Extensions of Exclusivity | 56 |
| 5. | Extension of Removal Deadlines | 57 |
| 6. | Extension of Deadline to Assume or Reject Unexpired Leases of Non-Residential Real Property Under Section 365(d)(4) of the Bankruptcy Code | 58 |
| V. | DESCRIPTION OF THE PLAN | 59 |
| A. | DESCRIPTION OF CLASSES | 59 |
| B. | TREATMENT OF CLASSIFIED CLAIMS | 60 |
| C. | TREATMENT OF UNCLASSIFIED CLAIMS | 64 |
| D. | SETTLEMENT AND COMPROMISE OF PBGC CLAIMS | 67 |
| E. | SETTLEMENT AND COMPROMISE OF ALLOWED 503(B)(9) CLAIMS | 70 |
| F. | IMPLEMENTATION OF THE PLAN | 71 |
| 1. | Available Cash | 71 |
| 2. | Handling of Plan Assets and Collection of Plan Proceeds and Revesting of Property of the Debtors Free and Clear | 72 |
| 3. | Non-Chapter 5 Claims Litigation | 73 |
| 4. | Chapter 5 Claims | 73 |
| 5. | Payment of Plan Expenses | 74 |
| 6. | Distribution of Effective Date Cash | 75 |
| 7. | Post-Confirmation Operations of the Reorganized Debtors | 75 |
| 8. | Full and Final Satisfaction | 76 |
| 9. | Discharge of the Debtors | 76 |
| 10. | Distribution Procedures | 77 |
| 11. | Disbursing Agent | 77 |
| 12. | Claims Reserve Account and Segregated Claims Reserve Account | 78 |
| 13. | Resolution of Disputed Claims | 78 |
| 14. | Reserve Provisions for Disputed Claims | 79 |
| 15. | Allocation of Distributions | 80 |

|  |  |  |  |
|---|---|---|---|
|  | 16. | Rounding. | 81 |
|  | 17. | Disputed Payments. | 81 |
|  | 18. | Unclaimed Property. | 81 |
|  | 19. | Setoffs. | 81 |
|  | 20. | Withholding Taxes. | 82 |
|  | 21. | United States Trustee Fees. | 82 |
| G. | | EXECUTORY CONTRACTS | 82 |
|  | 1. | Rejection of Executory Contracts and Unexpired Leases | 82 |
|  | 2. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 84 |
| H. | | SUBSTANTIVE CONSOLIDATION | 86 |
| I. | | CONDITIONS TO CONFIRMATION OF THE PLAN | 87 |
| J. | | CONDITIONS TO THE EFFECTIVENESS OF THE PLAN | 88 |
| K. | | EFFECTIVE DATE | 89 |
| L. | | EFFECTS OF CONFIRMATION | 89 |
|  | 1. | Binding Effect of Plan. | 89 |
|  | 2. | Limitation of Liability. | 90 |
|  | 3. | Releases. | 90 |
|  | 4. | PBGC Settlement Agreement | 92 |
|  | 5. | Injunction. | 92 |
|  | 6. | Post-Confirmation Liability of the Reorganized Debtors and Disbursing Agent. | 94 |
| M. | | MANAGEMENT OF REORGANIZED DEBTORS | 94 |

| VI. | OTHER CRITICAL INFORMATION REGARDING THE PLAN | 95 |
|---|---|---|
| A. | CHAPTER 5 CLAIMS | 95 |
| B. | DISSOLUTION OF COMMITTEE | 95 |
| C. | TAX IMPLICATIONS | 96 |
|  | 1. Holders of Claims. | 97 |
|  | 2. Non-United States Persons. | 98 |
|  | 3. Importance of Obtaining Professional Tax Assistance. | 98 |
| D. | RISKS UNDER THE PLAN | 99 |
| E. | ABSOLUTE PRIORITY RULE AND LIQUIDATION ANALYSIS | 99 |

| VII. | CONFIRMATION OF THE PLAN | 102 |
|---|---|---|
| A. | CONFIRMATION HEARING. | 102 |
| B. | REQUIREMENTS FOR CONFIRMATION | 102 |
| C. | CLASSIFICATION OF CLAIMS AND INTERESTS | 103 |
| D. | ACCEPTANCE | 103 |
| E. | FEASIBILITY | 104 |
| F. | ALTERNATIVES TO CONFIRMATION OF PLAN | 105 |

| VIII. | CONCLUSION | 104 |
|---|---|---|

I.

## PRELIMINARY STATEMENT AND DEFINITIONS

Global Home Products, LLC, and its related debtor affiliates (the "Debtors") in the above-captioned cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), submit this disclosure statement (the "Disclosure Statement") in support of the *First Amended Joint Plan of Reorganization of Global Home Products, LLC, et al., under Chapter 11 of the Bankruptcy Code*, as may be further amended (the "Plan"). **For the reasons set forth herein, if the Plan is not confirmed, and if all Creditors holding claims under section 503(b)(9) of the Bankruptcy Code do not vote to accept or otherwise object to their treatment under the Plan, the Debtors do not believe that Creditors will receive any distributions on account of their Claims. Consequently, the Debtors and the Committee urge all Creditors to vote for the Plan.**

Unless otherwise noted, the definitions contained in the Bankruptcy Code are incorporated herein by this reference, provided that the definitions set forth in Article 1 of the Plan shall apply to capitalized terms that are not defined, or otherwise provided for, herein.

II.

## INTRODUCTION AND PLAN OVERVIEW

A.    Introduction

On April 10, 2006 (the "Petition Date"), each of the Debtors commenced their respective chapter 11 cases (collectively, the "Chapter 11 Cases") by filing voluntary petitions for relief under the Bankruptcy Code. The Chapter 11 Cases are being administered in the

United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors are also collectively referred to herein as the "Company."

The Plan was filed with the Bankruptcy Court on _____, 2007 [Docket No. ___]. This Disclosure Statement contains information with respect to the Debtors and the Plan proposed by the Debtors. A copy of the Plan accompanies this Disclosure Statement.

Pursuant to section 1125 of the Bankruptcy Code, this Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan. The Debtors have examined various alternatives and, based on information contained in this Disclosure Statement, have concluded that the Plan provides the best recovery possible to Creditors. As discussed further below, the Plan is the product of extensive negotiations with the Debtors' key creditor constituencies, including the Official Committee of Creditors appointed in the Debtors' chapter 11 cases (the "Committee"). The Committee supports the Plan and urges all Creditors to vote in favor of the Plan. Attached hereto as **Exhibit A** is a letter from the Committee supporting the Plan and explaining the reasons why it believes all creditors should vote in favor in the Plan.

The Plan is predicated on the contribution of (i) Cash by Global Home Products Investors, LLC ("GHPI"), the entity that holds 97.75% of the equity security interests of Global Home Products, LLC, for distribution to Creditors (the "GHPI Cash Contribution"), and (ii) any Cash held by the Reorganized Debtors that constitutes collateral for Madeleine's Secured Claim (the "Madeleine Collateral Carve Out"), as of the date on which the Plan becomes effective (the "Effective Date"). The sum of the GHPI Cash Contribution and the amount of the Madeleine Collateral Carve Out constitutes "Effective Date Cash". Pursuant to the Plan, GHPI would

contribute $8,500,000 in Effective Date Cash for Pro Rata distributions to applicable Creditors as follows: (a) $1,000,000 to Holders of Class 5 General Unsecured Claims, after payment of any Allowed Reclamation Claims,[2] plus a percentage of certain net proceeds, if any, obtained by the Reorganized Debtors from any recoveries pursuant to section 547 of the Bankruptcy Code (the "Net Chapter 5 Claims Recoveries") and (b) $3,500,000 to Holders of Allowed Class 4 503(b)(9) Claims. The remainder of the $4,000,000 of Effective Date Cash would be used to satisfy Allowed Administrative Claims, Allowed Priority Claims, and, to the extent applicable under the Plan, any Allowed Class 3 Claims. The Effective Date Cash will be the sole source of distributions to the Holders of Allowed Class 5 Unsecured Claims, Allowed Class 4 503(b)(9) Claims, Allowed Administrative and Priority Claims, and Allowed Class 3 Claims, provided that the Holders of Class 5 Claims shall also receive a portion of Net Chapter 5 Claims Recoveries as provided under the Plan. The Plan is also subject to the satisfaction of several conditions, including each of the following:

- There must be sufficient Effective Date Cash to pay Holders of Allowed Administrative Claims and Priority Claims in full, unless alternative treatment is otherwise agreed to by such holders. The Debtors will determine, in their reasonable discretion, whether this condition has been satisfied.

- A further condition of GHPI's agreement to contribute the Effective Date Cash necessary to fund the distributions contemplated under the Plan is that with respect to the equity security interests in Global Home Products, LLC (the "Equity Interests"), all Equity Interests held by GHPI (the "GHPI Equity Interests") shall remain unimpaired. In addition, all equity security interests in the remaining Debtors (i.e. the equity security interests in all of the Debtors except for Global Home Products LLC) (the "Subsidiary Equity Interests") shall remain unimpaired. Thus, the Plan

---

[2] As set forth herein, the Debtors do not believe any valid Reclamation Claims can or do exist pursuant to, among other things, applicable law. Accordingly, the Debtors believe that the full $1,000,000 of Effective Date Cash to be distributed to Class 5 is attributable to Class 5 Unsecured Claims and will be available to the Holders of such Claims.

contemplates that all GHPI Equity Interests and Subsidiary Equity
Interests will remain unimpaired.

- All Holders of Equity Interests that are not held by GHPI (the "Non-GHPI
Equity Interests") will be given an opportunity to subscribe to a rights
offering to retain their respective Non-GHPI Equity Interests if they
(i) agree, in writing on or before three (3) days prior to the Confirmation
Hearing to subscribe to the rights offering and commit pay the dollar
amount of the percentage of Effective Date Cash that is equal to
ownership percentage of the subscribing Holder's Non-GHPI Equity
Interests in order to retain such Holder's Non-GHPI Equity Interests (the
"Rights Offering Payment"), and (ii) pay the Rights Offering Payment to
the Reorganized Debtors no later than one (1) day prior to the expected
Effective Date. The Debtors shall notify all Holders of Non-GHPI Equity
Interests of the expected Effective Date no later than five (5) days prior to
the occurrence of such expected Effective Date. Thus, for illustrative
purposes only, a Holder of a Non-GHPI Equity Interest who currently
owns 1% of the equity in Global Home Products LLC would have to
subscribe to the rights offering no later than three (3) days prior to the
Confirmation Hearing and would have to pay $85,000 in cash (i.e., 1% of
$8,500,000) to the Reorganized Debtors on the Effective Date no later
than one (1) day prior to the expected Effective Date, or such Non-GHPI
Equity Interest will be cancelled.

- All options, warrants and any other contract rights to purchase or acquire
any Equity Interests (the "Cancelled Options and Warrants") will be
cancelled as of the Effective Date without the requirement of further
action by the Debtors, the Bankruptcy Court or any party in interest.

The Disclosure Statement describes the Plan and contains information concerning,
among other matters: (1) the history, business, results of operations, management, properties and
liabilities of and pending litigation of and against the Debtors; (2) the sale which closed on May
26, 2006, of substantially all assets of the Burnes Group Debtors (defined below) to C.R. Gibson,
Inc. free and clear of liens, claims or interests; (3) the sale which closed on August 16, 2006, of
substantially all assets of the WearEver Debtors (defined below) to SEB S.A. and Groupe SEB
USA free and clear of liens, claims or interests; (4) the sale which closed on April 19, 2007, of
substantially all of the assets of the Anchor Hocking Debtors (defined below) to Anchor

Acquisition, LLC, free and clear of liens, claims or interests; and (5) the amounts that will be available for distribution to Creditors under the Plan. The Debtors strongly urge you to carefully review the contents of this Disclosure Statement and Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor or as a Non-GHPI Equity Interest Holder.

Your vote on the Plan is important. In order for the Plan to be accepted by a Class of Claims, the Holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Allowed Claims in such Class who vote on the Plan must vote for acceptance. Because Holders of Non-GHPI Equity Interests are Impaired (defined below) under the Plan, the Holders of such interests are also entitled to vote on the Plan.

Non-acceptance of the Plan will likely lead to liquidation under chapter 7 of the Bankruptcy Code. The Debtors believe that a liquidation under chapter 7 will not provide for any distribution to Unsecured Creditors. Accordingly, the Debtors urge you to accept the Plan by completing and returning the enclosed Ballot by no later than the Ballot Deadline.

**B.    Information Regarding The Plan**

1.    **Plan Governing Document.**

Although the Debtors believe that this Disclosure Statement accurately describes the Plan, all summaries of the Plan contained in this Disclosure Statement are qualified by the Plan itself and the documents described therein which are controlling.

2.    **Source of Information.**

Factual information contained in this Disclosure Statement has been provided by the Debtors or has been obtained from the Debtors' records, except where otherwise specifically noted. All financial information contained in this Disclosure Statement has been prepared by the Debtors or has been obtained from their records. None of the Debtors' attorneys, accountants, or other professionals makes any representation regarding such information. The Debtors do not represent or warrant that the information contained in this Disclosure Statement is free from any inaccuracy. The Debtors have, however, attempted to present the information accurately and fairly and believe that the information is substantially accurate. The assumptions underlying the projections contained in this Disclosure Statement concerning sources and amounts of payments to Creditors represent the best estimate of the Debtors as to what they expect will happen. Because these are only assumptions about or predictions of future events, many of which are beyond the Debtors' control, there can be no assurances that the assumptions will in fact materialize or that the projected realizations will in fact be met. Except as otherwise provided herein, this Disclosure Statement will not reflect any events which occurred subsequent to the date that the Debtors submitted the Disclosure Statement to the Bankruptcy Court for approval.

3.    **Warning Regarding Federal and State Income Tax Consequences of the Plan.**

The tax consequences of the Plan will vary based on the individual circumstances of each Holder of a Claim or Equity Interest. Accordingly, each Creditor and Equity Interest Holder is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan and to carefully read Article VI of this Disclosure Statement.

4.    **Bankruptcy Court Approval.**

Following a hearing held on _____, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor to make an informed judgment about the Plan.  Under section 1125 of the Bankruptcy Code, this approval enabled the Debtors to send you this Disclosure Statement and, if applicable, solicit your acceptance or rejection of the Plan.  The Bankruptcy Court has not, however, passed on the Plan itself, nor has it conducted a detailed investigation into the contents of this Disclosure Statement.

C.    **Voting Instructions**

1.    **Who May Vote.**

The Plan divides Allowed Claims and Equity Interests into multiple Classes.  Under the Bankruptcy Code, only Classes that are "impaired" by the Plan are entitled to vote (unless the Class receives no compensation or payment, in which event the Bankruptcy Code provides that the Class is conclusively deemed not to have accepted the Plan).  A Class is "impaired" if the legal, equitable or contractual rights attaching to the Claims or Equity Interests of the Class are modified, other than by curing defaults and reinstating maturities.

Under the Plan, Administrative Claims, including Professional Fee Claims and Priority Tax Claims, are unclassified and are not entitled to vote.

Except for Class 6(A) (GHPI Equity Interests) and Class 6(C) (Subsidiary Equity Interests), no Classes are unimpaired under the Plan.  Class 6(A) (GHPI Equity Interests) and Class 6(C) (Subsidiary Equity Interests) are unimpaired under the Plan and are each conclusively deemed to have accepted the Plan.  Accordingly, only the Holders of Claims in Classes 1 (Non-

Tax Priority Claims), Class 2 (Madeleine Secured Claim), Class 3 (Other Secured Claims), Class 4 (503(b)(9) Claims), and Class 5 (Unsecured Claims and Reclamation Claims) and Class 6(B) (Non-GHPI Equity Interests) are entitled to vote to accept or reject the Plan.

Class 7 (Cancelled Options and Warrants) is Impaired, but the members of this class will not receive or retain any property or other distributions under the Plan. Therefore, Class 7 (Cancelled Options and Warrants) has conclusively been deemed to reject the Plan and is not entitled to vote thereon.

2.      **How to Vote.**

A form of Ballot is being provided to Creditors in Classes 1, 2, 3, 4, 5 and 6(B) by which Creditors in such Classes may vote their acceptance or rejection of the Plan. The Ballot for voting on the Plan gives you the choice to vote for or against the Plan. To vote on the Plan, please complete the Ballot, as indicated thereon, (1) by indicating on the enclosed Ballot that (a) you accept the Plan or (b) reject the Plan, and (2) by signing your name and mailing the Ballot in the envelope provided for this purpose. Epiq Bankruptcy Solutions, LLC, as the claims, notice and balloting agent (the "Claims Agent") appointed by the Bankruptcy Court in these Chapter 11 Cases, will count the votes on the Ballots.

**IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED BY THE CLAIMS AGENT BY NO LATER THAN _____ __.M. EASTERN TIME ON _____, 2007 AT THE FOLLOWING ADDRESS:**

**If by overnight courier or hand delivery:**

Global Home Products LLC et al., Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd floor
New York, NY 10017
Attention: Laura Campbell


**If by standard mail (including U.S. Express Mail):**

Global Home Products LLC et al., Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station
P.O. Box 5014
New York, NY 10150-5014
Attention: Laura Campbell

## DO NOT SEND YOUR BALLOT VIA FACSIMILE OR E-MAIL.

In determining acceptances of the Plan, the vote of a Creditor will only be counted if submitted by a Creditor whose Claim is an Allowed Claim. Generally speaking, a Creditor holds an Allowed Claim if such Claim is duly scheduled by the Debtors as other than disputed, contingent or unliquidated, or the Creditor has timely filed with the Bankruptcy Court a Proof of Claim which has not been objected to or disallowed prior to computation of the votes on the Plan. The Ballot form which you received does not constitute a Proof of Claim.

**IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED AND RECEIVED AS DESCRIBED ABOVE, IT WILL NOT BE COUNTED. IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY ADDRESSING A WRITTEN REQUEST TO THE ADDRESS SHOWN ABOVE.**

FACSIMILE OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE COUNTED.

### D.    Confirmation

"Confirmation" is the technical phrase for the Bankruptcy Court's approval of a plan under chapter 11 of the Bankruptcy Code. At the hearing on Confirmation of the Plan (the "Confirmation Hearing"), the Debtors must demonstrate that they have met the requirements of section 1129 of the Bankruptcy Code in order to confirm the Plan. If the Bankruptcy Court determines that all of the requirements of section 1129 have been satisfied, the Bankruptcy Court will enter an order confirming the Plan.

Voting is tabulated by Class. As discussed above, a Class of Creditors has accepted a Plan if the Plan has been accepted by two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Creditors holding Allowed Claims in that Class who actually vote to accept or reject the Plan. With respect to Class 6(B) Non-GHPI Equity Interest Holders, Class 6(B) is deemed to have accepted the Plan if the Plan has been accepted by Holders of at least two-thirds (2/3) of the amount of the voting Non-GHPI Equity Interests.

### E.    Hearing on Confirmation

The Bankruptcy Court has scheduled the Confirmation Hearing to occur on _____ at _____ _.m., to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied. The Confirmation Hearing will be held at the United States Bankruptcy Court for the District of Delaware, located at 844 King Street, Courtroom No. 2B, Wilmington, Delaware 19801 before the Honorable Kevin Gross. The Confirmation Hearing may be continued from

time to time and day to day by announcement in open court without further notice. If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order.

Even if Class 1 Priority Claims, Class 3 Secured Claims, or Class 6(B) of Non-GHPI Equity Interests vote against the Plan, the Plan may nevertheless be confirmed by the Bankruptcy Court, notwithstanding the negative vote of those Classes and the deemed negative vote of Class 7 Cancelled Options and Warrants, so long as certain statutory requirements are met by the Plan and certain Classes of Claims vote to accept the Plan. This is called a "cram down" and is further explained below. Because Class 7 is deemed to have rejected the Plan, the Debtors will seek confirmation of the Plan through a cram down.

F.    **Objections to Confirmation**

Any objections to Confirmation of the Plan ("Confirmation Objections") must be in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the District of Delaware and be filed with the United States Bankruptcy Court on or before _____, 2007 at 4:00 p.m. (the "Confirmation Objection Deadline"), which is the date set forth in the notice of the Confirmation Hearing sent to you with this Disclosure Statement and the Plan.

Counsel on whom Confirmation Objections must be served are:

Counsel for the Debtors

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Attn:  Laura Davis Jones, Esquire
Attn:  David Bertenthal, Esquire
Attn:  Bruce Grohsgal, Esquire
Attn:  Joshua Fried, Esquire

<u>Counsel for the Unsecured Creditors Committee</u>

Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey 07068
Attn:  Sharon Levine, Esquire
Attn:  Bruce Buechler, Esquire

       and

Pepper Hamilton LLP
1313 Market Street, Suite 5100
Wilmington, Delaware 19801
Attn:  David M. Fournier, Esquire


<u>Counsel for Madeleine L.L.C.</u>

Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, N.E., Suite 2400
Atlanta, Georgia 30308
Attn:  Jesse H. Austin, III, Esquire

       and

Morris, Nichols, Arsht & Tunnell LLP
Chase Manhattan Centre
1201 North Market Street, 18th Floor
Wilmington, Delaware 19801
Attn:   Robert J. Dehney, Esquire

       and

<u>Counsel for Global Home Products Investors LLC, Cerberus Partners, L.P. and
Cerberus Capital Management, L.P.</u>

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY  10022
Attn:  Lawrence V. Gelber, Esquire
Attn:  Sophie S. Kim, Esquire

       and

Landis Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, Delaware 19801
Attn:  Adam G. Landis, Esquire
Attn:  Kerri Mumford, Esquire

and

Office of the United States Trustee

Office of the United States Trustee
  for the District of Delaware
844 King Street, Suite 2207, Lockbox 35
Wilmington, Delaware 19801
Attn: Mark Kenney, Esquire

**G.**     **Creditors' Committee's Support of Plan**

On April 27, 2006, the Official Committee of Unsecured Creditors (the

"Committee") was appointed in these Chapter 11 Cases by the U.S. Trustee.  The Committee

represents the collective interests of general unsecured creditors.  As discussed further below, the

Plan is the product of extensive negotiations with the Debtors' creditor constituencies, including

the Committee.  **PURSUANT TO THE LETTER FROM THE COMMITTEE ATTACHED**

**HERETO AS EXHIBIT A, THE COMMITTEE URGES ALL CREDITORS TO VOTE IN**

**FAVOR OF THE PLAN.**

**H.**     **Cramdown**

A court may confirm a plan, even if it is not accepted by all Impaired classes, if

the plan has been accepted by at least one Impaired class of claims and the plan meets the

"cram down" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b)

of the Bankruptcy Code requires that the court find that a plan is "fair and equitable" and does

not "discriminate unfairly" with respect to each nonaccepting Impaired class of claims or

interests. With respect to a dissenting class of unsecured claims, the "fair and equitable" standard requires, among other things, that a plan contain one of two elements. It must provide either that (a) each Holder of an unsecured claim in such class receive or retain property having a value, as of the effective date of the plan, equal to the allowed amount of its claim, or (b) no Holder of allowed claims or interests in any junior class will receive or retain any property on account of such claims or interests. With respect to a dissenting class of interests, the "fair and equitable" standard requires that the plan contain one of two elements. It must provide either that (i) each holder of an interest in the class receive or retain property having a value, as of the Effective Date, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, or the value of such interests, or (ii) no holder of an interest in any junior class will receive or retain any property on account of such interests. The strict requirement of the allocation of full value to dissenting classes before junior classes can receive a distribution is known as the "absolute priority rule."

The Debtors will request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to Class 7 (Cancelled Options and Warrants) and, if and to the extent necessary (i.e., if one or more of them vote to reject the Plan), with respect to Class 1 (Non-Tax Priority Claims), Class 3 (Other Secured Claims), and/or Class 6(B) (Non-GHPI Equity Interests).

## I.    Disclaimers

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION WHICH MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF

31604-001\DOCS_SF:52523.13                    14

THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. **IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN AND THE DOCUMENTS DESCRIBED THEREIN ARE CONTROLLING.**

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION TO ACCEPT OR REJECT THE PLAN.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE

DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE. REASONABLE EFFORT HAS BEEN MADE, HOWEVER, TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZJ"), COMMENCED REPRESENTING THE COMPANY ON OR ABOUT MARCH 27, 2006, AS GENERAL BANKRUPTCY COUNSEL. PSZJ AND ALL COUNSEL TO THE DEBTORS HAVE RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT. ALTHOUGH COUNSEL FOR THE DEBTORS HAVE PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, COUNSEL HAVE NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.

A COPY OF THE DISCLOSURE STATEMENT HAS BEEN SERVED ON THE SECURITIES AND EXCHANGE COMMISSION ("SEC") AND THE SEC HAS BEEN GIVEN AN OPPORTUNITY TO OBJECT TO THE ADEQUACY OF THE DISCLOSURE STATEMENT. HOWEVER, THIS DISCLOSURE STATEMENT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR APPLICABLE STATE SECURITIES LAWS. NEITHER THE SEC NOR ANY STATE REGULATORY AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT, THE EXHIBITS HERETO OR THE STATEMENTS CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

**J.**     **An Overview Of The Chapter 11 Process**

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which are to provide the debtor with "breathing space" within which to propose a restructuring of its obligations to third parties. The filing of a chapter 11 bankruptcy petition creates a bankruptcy "estate" comprised of all of the property interests of the debtor. Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in the Chapter 11 Cases), a debtor remains in possession and control of all its assets as a "debtor in possession." The debtor may continue to operate its business in the ordinary course on a day-to-day basis without Bankruptcy Court approval. Bankruptcy Court approval is only required for various enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of the debtor's business. The filing of the bankruptcy petition also gives rise to what is known as the "automatic stay" which is a federal injunction that, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a chapter 11 case. The Bankruptcy Court, however, can grant relief from the automatic stay, under certain specified conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or equity security interest holders. The fees and

expenses of counsel and other professionals employed by such official committees and approved by the Bankruptcy Court are generally borne by a bankruptcy estate. The Committee was appointed in these Chapter 11 Cases to represent the collective interests of general unsecured creditors.

A chapter 11 debtor emerges from bankruptcy as a reorganized debtor by successfully confirming a plan of reorganization. A plan may either be consensual or non-consensual and provides, among other things, for the treatment of the claims of creditors and interests of shareholders. The provisions of the Plan are summarized below.

K.    **Plan Overview**

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Section V below, entitled "Description of the Plan." The Plan represents the product of negotiations among the Debtors and key parties in interest in the Chapter 11 Cases, including the Committee.

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtors. The Plan designates 7 (seven) Classes, plus certain subclasses, which classify all Claims, Equity Interests, and Subsidiary Equity Interests in the Debtors as well as all Cancelled Options and Warrants.

1.    **Description of Property to be Distributed Under the Plan**

Subject to the conditions set forth in the Plan, the Debtors' senior secured creditor, Madeleine, has agreed to the Madeleine Collateral Carve Out from its perfected liens of any Cash on hand held by the Reorganized Debtors as of the Effective Date and GHPI has

agreed to make the GHPI Cash Contribution in order to fund the $8,500,000 of Effective Date Cash required for distribution to Holders of Allowed Claims in these Chapter 11 cases in accordance with the treatment afforded to such Holders and pursuant to the other terms of the Plan. Subject to the terms and conditions set forth in the Plan, the $8,500,000 of Effective Date Cash shall be distributed as follows: (i) $4,000,000 of Effective Date Cash will be used to pay, in full, Allowed Administrative Claims (exclusive of Allowed 503(b)(9) Claims and Allowed Reclamation Claims, if any), Allowed Priority Tax Claims, Allowed Class 1 Allowed Non-Tax Priority Claims, and, to the extent applicable, Allowed Class 3 Other Secured Claims; (ii) $3,500,000 of Effective Date Cash shall be distributed, Pro Rata, to Holders of Allowed Class 4 503(b)(9) Claims in full and final satisfaction of such Claims and pursuant to the treatment of such Claims as provided under the Plan; and (iii)) the remaining $1,000,000 of Effective Date Cash will be distributed, first to Holders of any Allowed Reclamation Claims,[3] with the remainder of such $1,000,000 of Effective Date Cash to be distributed, Pro Rata, to Holders of Allowed Class 5 Unsecured Claims. In addition to receiving their Pro Rata distribution of Effective Date Cash, Holders of Allowed Class 5 Unsecured Claims shall also receive eighteen (18%) of any Net Chapter 5 Claims Recoveries. The Effective Date Cash will be the sole source of distributions to the Holders of Allowed Class 5 Unsecured Claims, Allowed Class 4 503(b)(9) Claims, Allowed Administrative and Priority Claims, and Allowed Class 3 Other Secured

---

[3] As set forth in Section V below, the Debtors do not believe that there are any Allowed Reclamation Claims and that the entire amount of the $1 million of Effective Date Cash allocated to Class 5 would be entirely distributed, Pro Rata, to Holders of Allowed Class 5 Unsecured Claims. However, to the extent that any holder of a Reclamation Claim successfully obtains an Allowed Claim, such claim would be satisfied exclusively from the $1 million of Effective Date Cash prior to any distributions to Class 5 Unsecured Claims.

Claims, provided that the Holders of Allowed Class 5 Unsecured Claims shall also receive a

portion of Net Chapter 5 Claims Recoveries as provided under the Plan.

In addition to the Effective Date Cash, GHPI shall also contribute an additional

$50,000 (the "Litigation Consultant Contribution"), which will be deposited into the Segregated

Claims Reserve Account.[4]  The Segregated Claims Reserve Account will be a segregated,

interest bearing bank account or money market account, held in trust by the Reorganized

Debtors, or such other entity designated by the Reorganized Debtors, for the purpose of (i)

holding the Litigation Consultant Contribution to fund the initial operations of the Litigation

Consultant[5], (ii) holding the $4,500,000 of Effective Date Cash to be distributed to Holders of

Allowed Class 4 503(b)(9) Claims and Allowed Class 5 Claims, (iii) holding deposits with

respect to the portion of Net Chapter 5 Claims Recoveries for distribution to Holders of Allowed

Class 5 Unsecured Claims; and (iv) paying any Plan Expenses in connection with the foregoing,

including related costs of distributions.

In addition to the Segregated Claims Reserve Account, the Reorganized Debtors,

or such other entity designated to serve as the Disbursing Agent, shall establish the Claims

Reserve Account.  The Claims Reserve Account will be a segregated, interest-bearing account or

money market account held in trust for the purpose of holding and distributing the $4,000,000 of

Effective Date Cash to Holders of Allowed Administrative Claims, Allowed Priority Tax Claims,

---

[4] For avoidance of doubt, the Litigation Consultant Contribution shall be in addition to the $8,500,000 of Effective Date Cash for distribution to Creditors as set forth in the Plan and summarized above.

[5] As set forth in the Plan, the "Litigation Consultant" will be the entity or person retained by the Reorganized Debtors, after consultation with Committee, as of the Effective Date, to oversee and make recommendations to the Reorganized Debtors' Board of Directors with respect to the prosecution of Chapter 5 Claims and, in addition, may also serve as the Disbursing Agent to make distributions to Holders of Allowed Class 3, Class 4 and Class 5 Claims in accordance with the provisions of the Plan.

Allowed Class 1 Priority Claims and Allowed Class 3 Other Secured Claims (if any, and only to the extent applicable under the Plan), and paying any Plan Expenses in connection with the foregoing, including related costs of distribution.

The GHPI Equity Interests shall remain unimpaired under the Plan and GHPI shall retain its GHPI Equity Interests in Global Home Products LLC as existed prior to the Effective Date.  In addition, the Subsidiary Equity Interests shall remain unimpaired under the Plan and such Holders shall retain such Subsidiary Equity Interests as existed prior to the Effective Date.  All Holders of Non-GHPI Equity Interests shall be offered the right to subscribe to a rights offering to purchase and retain their existing Non-GHPI Equity Interests.  In order to participate in the rights offering, each Holder of Non-GHPI Equity Interests must satisfy the following conditions: (i) no later than three (3) days prior to the Confirmation Hearing each Holder of Non-GHPI Equity Interests must commit in writing to purchase their respective non-GHPI Equity Interests and agree in writing to pay to the Reorganized Debtors in Cash on the Effective Date the Rights Offering Payment, and (ii) pay the Rights Offering Payment to the Reorganized Debtors in exchange for retaining their respective Non-GHPI Equity Interests.  The Debtors shall notify all Holders of Non-GHPI Equity Interests of the expected Effective Date no later than five (5) days prior to the occurrence of such expected Effective Date.  If a Holder of a Non-GHPI Equity Interest fails to satisfy all of the conditions set forth in this paragraph, then such Non-GHPI Equity Interest shall automatically be cancelled as of the Effective Date without the requirement of further action by the Debtors, the Bankruptcy Court or any party in interest.  Additional documentation regarding the aforementioned rights offering will be set forth and filed in the Plan Supplement.  Finally, all options, warrants and contract rights to purchase or acquire

any equity interests in Global Home Products, LLC shall be cancelled on the Effective Date.

Except with respect to the treatment provided for Claims under the Plan, the Reorganized

Debtors and Holders of Equity Interests shall retain all rights and property of the Reorganized

Debtors.

### 2.    Summary of Classification and Treatment of Claims and Equity Interests under the Plan

The following chart briefly summarizes the treatment of Creditors and Equity

Interest Holders under the Plan.[6]  Amounts listed below are estimated.  Actual Claims and

distributions will vary depending upon the outcome of objections to Claims.

| CLASS | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES[7] | TREATMENT |
|---|---|---|---|
| N/A | ADMINISTRATIVE CLAIMS (excluding 503(b)(9) Claims, Reclamation Claims and Professional Fee Claims) | Amount:  $1,000,000 Estimated Recovery:  100% | CASH EQUAL TO THE ALLOWED AMOUNT OF SUCH CLAIM, UNLESS SUCH HOLDER SHALL HAVE AGREED TO DIFFERENT TREATMENT OF SUCH CLAIM, AT THE SOLE OPTION OF THE DEBTORS OR THE REORGANIZED DEBTORS, AS THE CASE MAY BE: (A) ON OR AS SOON AS PRACTICABLE AFTER THE LATER OF (I) THE EFFECTIVE DATE, OR (II) THE DATE UPON WHICH THE BANKRUPTCY COURT ENTERS A FINAL ORDER DETERMINING OR APPROVING SUCH CLAIM; (B) IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF AGREEMENTS BETWEEN THE HOLDERS OF SUCH CLAIMS AND THE DEBTORS OR THE REORGANIZED DEBTORS, AS THE CASE MAY BE; (C) WITH RESPECT TO ADMINISTRATIVE CLAIMS REPRESENTING OBLIGATIONS INCURRED IN |

---

[6]  This chart is only a summary of the classification and treatment of Claims, Equity Interests and Subsidiary Equity Interests under the Plan.  References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims, Equity Interests and Subsidiary Equity Interests.

[7]  The foregoing estimates are provided solely for information purposes and shall not constitute an admission as to the Debtors' liability on any Claims asserted against any of their Estates and shall not be binding on the Debtors. The Debtors reserve all rights to object to any Claim on any and all available grounds.  The estimated recovery amounts may change based on the actual amount of Claims in each Class that become Allowed Claims.

| CLASS | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES [7] | TREATMENT |
|---|---|---|---|
| | | | THE ORDINARY COURSE OF THE DEBTORS' BUSINESS, UPON SUCH REGULAR AND CUSTOMARY PAYMENT OR PERFORMANCE TERMS AS MAY EXIST IN THE ORDINARY COURSE OF THE DEBTORS' BUSINESS OR AS OTHERWISE PROVIDED IN THE PLAN; OR (D) WITH RESPECT TO STATUTORY FEES DUE PURSUANT TO 28 U.S.C. § 1930(A)(6), AT ALL APPROPRIATE TIMES, UNTIL THE ENTRY OF A FINAL DECREE OR AN ORDER CONVERTING OR DISMISSING THE CASE. |
| N/A | PROFESSIONAL FEE CLAIMS | Estimated Recovery: 100% | UNLESS DIFFERENT TREATMENT IS AGREED UPON BY THE APPLICABLE PROFESSIONAL AND THE DEBTORS, THE DEBTORS SHALL PAY PROFESSIONALS FOR ALL OF THEIR RESPECTIVE ACCRUED AND ALLOWED FEES AND REIMBURSEMENT OF EXPENSES ARISING PRIOR TO THE EFFECTIVE DATE AFTER APPROVAL BY THE BANKRUPTCY COURT, PLUS ANY POST-EFFECTIVE DATE FEES. |
| N/A | PRIORITY TAX CLAIMS | Amount: $900,000<br><br>Estimated Recovery: 100% | ONE OF THE FOLLOWING TREATMENTS: (I) PAYMENT IN FULL WITHOUT INTEREST FROM THE PETITION DATE, ON THE LATER TO OCCUR OF (A) THE EFFECTIVE DATE, OR AS SOON AS PRACTICABLE THEREAFTER, OR (B) THE DATE ON WHICH SUCH CLAIM SHALL HAVE BECOME AN ALLOWED CLAIM; OR (II) DEFERRED CASH PAYMENTS TO THE EXTENT PERMITTED BY SECTION 1129(A)(9) OF THE BANKRUPTCY CODE WITH INTEREST ON THE UNPAID PORTION OF SUCH CLAIM AT THE RATE OF FIVE PERCENT (5%) PER ANNUM, OR SUCH OTHER RATE AS MAY BE DETERMINED BY THE BANKRUPTCY COURT OR AGREED UPON BY THE REORGANIZED DEBTOR(S) AND SUCH HOLDER PROVIDED THAT, IN THE EVENT THE REORGANIZED DEBTORS CHOOSE PAYMENT OPTION (II), THE REORGANIZED DEBTORS MAY PREPAY ANY SUCH CLAIMS AT ANY TIME WITHOUT PREMIUM OR PENALTY. |
| 1 | NON-TAX PRIORITY CLAIMS | Amount: $100,000<br><br>Estimated Recovery: 100% | PAYMENT IN FULL, ON THE LATER TO OCCUR OF (I) THE EFFECTIVE DATE, OR AS SOON AS PRACTICABLE THEREAFTER, OR (II) THE DATE ON WHICH SUCH CLAIM SHALL BECOME AN ALLOWED CLAIM, UNLESS OTHERWISE AGREED BY THE PARTIES |

31604-001\DOCS_SF:52523.13

| CLASS | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES [7] | TREATMENT |
|---|---|---|---|
| 2 | MADELEINE SECURED CLAIM | Amount: $201,824,678.57<br><br>Estimated Recovery: Unknown | THE MADELEINE SECURED CLAIM SHALL BE DEEMED AN ALLOWED CLAIM AS OF THE EFFECTIVE DATE AND REMAIN SECURED BY SUBSTANTIALLY ALL OF THE REORGANIZED DEBTORS' ASSETS TO THE SAME EXTENT AND VALIDITY AS EXISTED PRIOR TO THE EFFECTIVE DATE. SATISFACTION AND REPAYMENT OF THE MADELEINE SECURED CLAIM BY THE REORGANIZED DEBTORS WILL BE ON SUCH TERMS AS MAY BE AGREED BY MADELEINE AND THE REORGANIZED DEBTORS AND SHALL BE SUBORDINATED FOR DISTRIBUTION PURPOSES TO THE TREATMENTS PROVIDED FOR ALLOWED CLAIMS UNDER THE PLAN, FOR PAYMENTS MADE FROM THE CLAIMS RESERVE ACCOUNT AND SEGREGATED CLAIMS RESERVE ACCOUNT, BUT SOLELY TO THE EXTENT THEREOF. |
| 3 | OTHER SECURED CLAIMS | $0<br><br>Estimated Recovery: 100% | AT THE SOLE OPTION OF THE REORGANIZED DEBTORS, ONE OF THE FOLLOWING TREATMENTS: (I) THE HOLDER OF SUCH CLAIM SHALL RETAIN ITS LIEN ON ITS COLLATERAL UNTIL SUCH COLLATERAL IS SOLD, AND THE PROCEEDS OF SUCH SALE, LESS COSTS AND EXPENSES OF DISPOSING OF SUCH COLLATERAL, SHALL BE PAID TO SUCH HOLDER IN FULL SATISFACTION, RELEASE, AND DISCHARGE OF SUCH ALLOWED SECURED CLAIM; (II) ON OR AS SOON AS PRACTICABLE AFTER THE LATER OF THE (A) THE EFFECTIVE DATE, OR (B) THE DATE UPON WHICH THE BANKRUPTCY COURT ENTERS A FINAL ORDER DETERMINING OR ALLOWING SUCH CLAIM, OR AS OTHERWISE AGREED BETWEEN THE HOLDER OF SUCH CLAIM AND THE REORGANIZED DEBTORS, THE HOLDER OF SUCH SECURED CLAIM WILL RECEIVE A CASH PAYMENT EQUAL TO THE AMOUNT OF ITS ALLOWED SECURED CLAIM IN FULL SATISFACTION, RELEASE, AND DISCHARGE OF SUCH SECURED CLAIM; OR (III) THE COLLATERAL SECURING THE CREDITOR'S SECURED CLAIM SHALL BE ABANDONED TO SUCH CREDITOR, IN FULL AND COMPLETE SATISFACTION, RELEASE, AND DISCHARGE OF SUCH SECURED CLAIM. |
| 4 | 503(b)(9) CLAIMS | Amount: $10,000,000 | THE REORGANIZED DEBTORS SHALL PAY TO EACH HOLDER OF AN ALLOWED CLASS 4 |

| CLASS | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES [7] | TREATMENT |
|---|---|---|---|
| | | Estimated Recovery: 35% | 503(B)(9) CLAIM ITS PRO RATA SHARE OF THE $3.5 MILLION OF EFFECTIVE DATE CASH ALLOCATED FOR DISTRIBUTION TO ALL HOLDERS OF ALLOWED 503(B)(9) CLAIMS IN FULL SATISFACTION, RELEASE AND DISCHARGE OF SUCH CLAIMS (A) AS SOON AS PRACTICAL AFTER THE LATER OF (I) THE EFFECTIVE DATE, OR (II) THE DATE ON WHICH THE BANKRUPTCY COURT ENTERS A FINAL ORDER DETERMINING OR APPROVING ALL SUCH ALLOWED CLASS 4 503(B)(9) CLAIMS; OR (B) IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF ANY AGREEMENT BETWEEN THE HOLDER OF AN ALLOWED CLASS 4 503(B)(9) CLAIM AND THE DEBTORS OR THE REORGANIZED DEBTORS, AS THE CASE MAY BE.  THE $3.5 MILLION OF EFFECTIVE DATE CASH ALLOCATED FOR DISTRIBUTION TO ALLOWED CLASS 4 503(B)(9) CLAIMS SHALL BE THE SOLE AND EXCLUSIVE SOURCE OF PAYMENT OF ALL ALLOWED CLASS 4 503(B)(9) CLAIMS.  IN THE EVENT THAT THE HOLDER OF AN ALLOWED CLASS 4 503(B)(9) CLAIM DOES NOT OBJECT TO CONFIRMATION OF THE PLAN, THEN SUCH HOLDER SHALL BE DEEMED TO HAVE ACCEPTED THE TREATMENT PROVIDED FOR IN THE PLAN, WHICH IS DIFFERENT FROM THAT SET FORTH IN 11 U.S.C. § 1129(A)(9). ANY UNPAID AMOUNT OF AN ALLOWED CLASS 4 503(B)(9) CLAIM SHALL BE AVAILABLE TO THE HOLDER AS A SETOFF, ON A DOLLAR FOR DOLLAR BASIS AND AFTER APPLICATION OF ANY DEFENSES AVAILABLE TO SUCH HOLDER, AGAINST THE TOTAL DOLLAR AMOUNT OF ANY LITIGATION THAT MAY BE ASSERTED BY THE REORGANIZED DEBTORS AGAINST SUCH HOLDER OF AN ALLOWED CLASS 4 503(B)(9) CLAIM. |
| 5 | UNSECURED CLAIMS | Amount:  $80,000,000 – $100,000,000<br><br>Estimated Recovery: 1 – 1.5% | ON THE EFFECTIVE DATE OR AS SOON AS PRACTICABLE THEREAFTER, EACH HOLDER OF AN ALLOWED CLASS 5 UNSECURED CLAIM SHALL RECEIVE IN FULL SATISFACTION, RELEASE, AND DISCHARGE OF ITS ALLOWED CLAIM (I) ITS PRO RATA DISTRIBUTION OF REMAINING PROCEEDS FROM THE $1 MILLION OF EFFECTIVE DATE CASH ALLOCATED TO HOLDERS OF ALLOWED CLASS 5 UNSECURED CLAIMS AFTER PAYMENT OF ANY ALLOWED RECLAMATION CLAIMS, AND (II) ITS PRO |

| CLASS | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES [7] | TREATMENT |
|---|---|---|---|
| | | | RATA SHARE OF EIGHTEEN PERCENT (18%) OF ANY NET CHAPTER 5 CLAIMS RECOVERIES RECOVERED BY THE REORGANIZED DEBTORS PURSUANT TO THE TERMS OF THE PLAN AS ADDITIONAL DISTRIBUTIONS AT SUCH TIMES AFTER THE EFFECTIVE DATE AS DEEMED APPROPRIATE BY THE REORGANIZED DEBTORS IN THEIR SOLE DISCRETION.  THE REMAINING EIGHTY-TWO PERCENT (82%) OF ANY NET CHAPTER 5 CLAIMS RECOVERIES SHALL BE RETAINED BY THE REORGANIZED DEBTORS. |
| 5 | RECLAMATION CLAIMS | **Amount:** None<br><br>**Estimated Recovery:** 0% | ALL CLASS 5 RECLAMATION CLAIMS, IF ANY, ARE DISPUTED CLAIMS.  SOLELY TO THE EXTENT THAT A RECLAMATION CLAIM BECOMES AN ALLOWED CLAIM, THE HOLDER OF SUCH ALLOWED RECLAMATION CLAIM SHALL RECEIVE EFFECTIVE DATE CASH EQUAL TO THE ALLOWED AMOUNT OF SUCH RECLAMATION CLAIM FROM THE $1 MILLION OF EFFECTIVE DATE CASH ALLOCATED FOR DISTRIBUTION TO HOLDERS OF CLASS 5 UNSECURED CLAIMS (A) ON OR AS SOON AS PRACTICABLE AFTER THE LATER OF (I) THE EFFECTIVE DATE, OR (II) THE DATE UPON WHICH THE BANKRUPTCY COURT ENTERS A FINAL ORDER DETERMINING OR APPROVING SUCH ALLOWED RECLAMATION CLAIM; OR (B) IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF ANY AGREEMENT BETWEEN THE HOLDER OF SUCH AN ALLOWED RECLAMATION CLAIM AND THE DEBTORS OR THE REORGANIZED DEBTORS, AS THE CASE MAY BE. |
| 6(A) | GHPI EQUITY INTERESTS | **Amount:** N/A<br><br>**Estimated Recovery:** 100% | THE PLAN SHALL NOT ALTER THE LEGAL OR EQUITABLE RIGHTS TO WHICH GHPI EQUITY INTEREST HOLDERS ARE ENTITLED PURSUANT TO THEIR GHPI EQUITY INTERESTS. |
| 6(B) | NON-GHPI EQUITY INTERESTS | **Amount:** N/A<br><br>**Estimated Recovery:** Unknown (Subject to rights offering) | ALL NON-GHPI EQUITY INTERESTS SHALL BE OFFERED THE RIGHT TO SUBSCRIBE TO A RIGHTS OFFERING TO PURCHASE AND RETAIN THEIR EXISTING NON-GHPI EQUITY INTERESTS.  IN ORDER TO PARTICIPATE IN THE RIGHTS OFFERING, EACH HOLDER OF A NON-GHPI EQUITY INTEREST MUST SATISFY THE FOLLOWING CONDITIONS: (I) NO LATER THAN THREE (3) DAYS PRIOR TO THE CONFIRMATION HEARING EACH HOLDER OF |

| CLASS | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES [7] | TREATMENT |
|---|---|---|---|
| | | | A NON-GHPI EQUITY INTEREST MUST COMMIT IN WRITING TO PURCHASE ITS RESPECTIVE NON-GHPI EQUITY INTEREST AND AGREE IN WRITING TO PAY TO THE REORGANIZED DEBTORS THE RIGHTS OFFERING PAYMENT, AND (II) PAY THE RIGHTS OFFERING PAYMENT TO THE REORGANIZED DEBTORS NO LATER THAN ONE (1) DAY PRIOR TO THE EXPECTED EFFECTIVE DATE.  THE DEBTORS SHALL NOTIFY ALL HOLDERS OF NON-GHPI EQUITY INTEREST OF THE EXPECTED EFFECTIVE DATE NO LATER THAN FIVE (5) DAYS PRIOR TO THE OCCURRENCE OF SUCH EXPECTED EFFECTIVE DATE.    IF A HOLDER OF A NON-GHPI EQUITY INTEREST FAILS TO SATISFY ALL OF THE CONDITIONS SET FORTH IN THIS PARAGRAPH, THEN SUCH NON-GHPI EQUITY INTEREST SHALL BE  CANCELLED AS OF THE EFFECTIVE DATE WITHOUT THE REQUIREMENT OF FURTHER ACTION BY THE DEBTORS, THE BANKRUPTCY COURT OR ANY PARTY IN INTEREST.  ADDITIONAL DOCUMENTATION REGARDING THE AFOREMENTIONED RIGHTS OFFERING WILL BE SET FORTH AND FILED IN THE PLAN SUPPLEMENT. |
| 6(C) | SUBSIDIARY EQUITY INTEREST | Amount:  N/A  Estimated Recovery: 100% | ALL SUBSIDIARY EQUITY INTERESTS SHALL REMAIN UNIMPAIRED PURSUANT TO THE PLAN. |
| 7 | CANCELLED OPTIONS AND WARRANTS | Amount:  N/A  Estimated Recovery: 0% | HOLDERS OF CANCELLED OPTIONS AND WARRANTS WILL NEITHER RECEIVE NOR RETAIN ANY DISTRIBUTION OR PROPERTY UNDER THE PLAN.  SUCH HOLDERS ARE DEEMED TO REJECT THE PLAN AND ARE THEREFORE NOT ENTITLED TO VOTE ON THE PLAN. |

3.      **Projected Distributions Under the Plan**

a.      **Distributions to Holders of Secured Claims**

As stated above, the Plan creates two (2) Classes of Secured Claims: Class 2

(Madeleine Secured Claim), and Class 3 (Other Secured Claims).  The Debtors estimate that

Madeleine is owed $201,824,678.57 as of the Petition Date and has an undersecured Claim.  The

Plan provides that the satisfaction and repayment of Madeleine's secured claim shall be subordinated for distribution purposes to the treatment provided for Allowed Claims under the Plan for payments made from the Claims Reserve Account and Segregated Claims Reserve Account, but solely to the extent thereof.

The Debtors do not believe that there are any Class 3 Other Secured Claims and have valued such claims at $0.

        **b.**      **Distributions To Holders of Class 1 Priority Claims, Class 4 503(b)(9) Claims and Class 5 Unsecured Claims and Reclamation Claims**

The Debtors estimate that the amounts of the prepetition Claims in Class 1 (Non-Tax Priority Claims); Class 4 (503(b)(9) Claims); and Class 5 (Unsecured Claims and Reclamation Claims) are as follows:  Class 1 – approximately $100,000; Class 4 – approximately $3,500,000; and Class 5 – approximately $80,000,000 to $100,000,000 (exclusive of potential claims arising from any rejection of executory contracts or unexpired leases rejected pursuant to the Plan).  For the reasons set forth elsewhere in this Disclosure Statement, the Debtors do not believe that there are any valid Reclamation Claims and have valued such claims at $0.

        **c.**      **Summary of Projected Distributions Under the Plan**

| | |
|---|---|
| Effective Date Cash | $8,500,000 |
| Amount of Effective Date Cash to fund distributions to Allowed Administrative Claims, including Professional Fees (excluding 503(b)(9) Claims and Reclamation Claims) | $3,000,000 |
| Amount of Effective Date Cash to fund distributions to Allowed Priority Tax Claims | $900,000 |
| Amount of Effective Date Cash to fund distributions to Holders of Allowed Class 1 Non-Tax Priority Claims | $100,000 |

| | |
|---|---|
| Amount of Effective Date Cash for distribution to Class 2 Madeleine Secured Claim | $0 |
| Amount of Effective Date Cash for distribution to Holders of Allowed Class 3 Claims (if any) | $0 |
| Amount of Effective Date Cash to fund distributions to Holders of Allowed Class 4 503(b)(9) Claims | $3,500,000 |
| Amount of Effective Date Cash to fund distributions to Holders of Class 5 Allowed Reclamation Claims (if any) and Class 5 Unsecured Claims | $1,000,000 |
| Estimated eighteen percent (18%) of Net Chapter 5 Claims Recoveries to be distributed to Holders of Class 5 Allowed Unsecured Claims. | Unknown |
| TOTAL | $8,500,000, plus eighteen percent (18%) of Net Chapter 5 Claims Recoveries to be distributed to Holders of Class 5 Allowed Unsecured Claims |

## III.

## HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS

### A.     Description of the Debtors

Prior to the commencement of their Chapter 11 Cases, the Debtors operated three separate business groups that designed, marketed and manufactured well-known, branded consumer and specialty products to retail and hospitality customers and to original equipment manufacturers. These business groups are generally referred to as (1) Anchor Hocking, (2) the Burnes Group, and (3) WearEver.

The "Anchor Hocking Debtors" are defined as: Anchor Hocking Acquisition Inc.; Anchor Hocking Inc.; AH Acquisition Puerto Rico, Inc.; Anchor Hocking Consumer Glass Corporation; Anchor Hocking CG Operating Company LLC; and Anchor Hocking Operating Company LLC. Anchor Hocking produced beverageware, cookware, bakeware, home décor items, and glass components for commercial customers, including the Anchor Hocking®, Fire-

King®, Jade-ite®, Phoenix Glass® and Toscany® brands. Anchor Hocking was founded in 1880 and was the second largest supplier of glassware in the United States. Anchor Hocking's glassware products crossed all price points through retail, specialty, business-to-business, and hospitality channels. Anchor Hocking manufactured substantially all of its products at its facilities in Lancaster, Ohio and Monaca, Pennsylvania, and marketed its products internationally. As described more fully below, substantially all of Anchor Hocking's operating assets were sold to Anchor Acquisition LLC ("Anchor Acquisition") effective April 19, 2007.

The "Burnes Group Debtors" are defined as: Burnes Acquisition Inc.; Intercraft Company; Burnes Puerto Rico, Inc.; Picture LLC; and Burnes Operating Company LLC. The Burnes Group designed and sold ready-made picture frames, photo albums, scrapbooks and related home accessories, including the Burnes of Boston®, Carr®, Connoisseur® and Rare Woods® brands. The Burnes Group was founded in 1917 and marketed and manufactured ready made picture frames, photo albums, scrapbooks and related decorative accessories in North America. The Burnes Group's wide array of brand and product lines was marketed to a variety of retailers including merchants, department stores, independent specialty retailers, photo stores, hardware, drug stores and grocery stores. The Burnes Group outsourced the manufacture of most of its products to Asian manufacturers, and manufactured the remaining portion through a maquiladora subsidiary in Durango, Mexico. As described more fully below, substantially all of the Burnes Group's operating assets were sold to C.R. Gibson, Inc. ("Gibson") effective May 26, 2006.

The "WearEver Debtors" are defined as: Mirro Acquisition Inc.; Mirro Puerto Rico, Inc.; and Mirro Operating Company LLC. Prior to the Petition Date, WearEver produced

metal bakeware, cookware and accessories, including the AirBake®, Mirro®, Regal®, SmartBake® and WearEver® brands. WearEver was founded in the 1950s, and was recognized as a leading marketer and manufacturer of multi-branded metal cookware and bakeware products and accessories. WearEver sold metal cookware, bakeware and related accessories throughout North America, principally in the opening and mid-tier price points through retail channels. WearEver manufactured its products at a maquiladora in Nuevo Laredo, Mexico, and also outsourced some production to international (primarily Asian) manufacturers. As described more fully below, substantially all of the WearEver's operating assets were sold to Groupe SEB USA and SEB N.A. ("SEB") effective August 16, 2006.

**B.**      **Events Preceding the Chapter 11 Filing**

Prior to the Petition Date, each of the Debtors' three business groups suffered from a number of adverse factors that ultimately culminated in the commencement of these Chapter 11 Cases. The Anchor Hocking business, which was energy and raw material use intensive, experienced shrinking margins as a result of increasing energy and raw material costs and severe industry-wide competition at the lower-priced end of its product range. The Burnes Group business had been ravaged by competition from start-up companies which had minimal embedded overhead and by direct sales to the Burnes Group's existing and potential customers by overseas manufacturers. Meanwhile, the WearEver business had experienced deep cuts in its profit margins as a result of the rise in the cost of aluminum and competition from overseas. In addition, the Debtors collectively experienced difficulties in implementing Global Home Products' Oracle ERP system, which resulted in invoicing delays, delays in cash collections, and malfunctions in order and warehouse management systems among all three business groups.

Those events reduced the Debtors' cash flow, forcing the Debtors to delay payments to creditors, in response to which creditors delayed providing, or refused to furnish on acceptable terms the products and services necessary to the Debtors' operations. The Debtors' worsening financial condition also reduced availability and resulted in defaults under the Debtors' prepetition financing agreements with its senior secured lenders, thereby necessitating the negotiation of a series of forbearances under the Debtors' financing agreements beginning in May, 2005.

In February, 2006, the Debtors engaged the firm of Conway Del Genio Gries & Co., LLC ("CDG") as their business advisors to assist them in formulating a business plan in an effort to respond to these problems.

During March, 2006, the Debtors determined that commencing chapter 11 cases for the purpose of obtaining relief from the immediate demands of their creditors, with the goal of restructuring the Debtors' businesses and financial affairs, was in the best interests of all parties in interest. The Debtors thus engaged PSZJ as general bankruptcy counsel and commenced these chapter 11 cases on the Petition Date. The Debtors subsequently engaged Ronald F. Stengel of CDG as their Chief Restructuring Officer, effective on Petition Date and following Court approval.

### C.    The Debtors' Corporate Structure

The Debtors consist of 17 (seventeen) different corporations, all of which are directly or indirectly owned by the ultimate parent debtor, Global Home Products LLC ("Global Home"). Global Home owns 100% of GHP Holding Company LLC ("Global Holding"). Both Global Home and Global Holding are Delaware limited liability companies. Global Holding

owns 100% of each of Anchor Hocking Acquisition Inc. ("Anchor Acquisition"), Burnes Acquisition Inc. ("Burnes Acquisition"), and Mirro Acquisition Inc. ("Mirro Acquisition"), all of which are Delaware corporations, and which represent the Debtors' three primary businesses and product lines, Anchor Hocking, The Burnes Group, and WearEver. GHP Operating Company LLC ("GHP Operating"), a Delaware limited liability company, is indirectly and 100% owned by Anchor Acquisition (44%), Burnes Acquisition (36%), and Mirro Acquisition (20%). GHP Operating owns 100% of each of the Debtors' primary operating companies (collectively, the "Operating Companies"): (a) for the Anchor Hocking businesses – Anchor Hocking CG Operating Company LLC (consumer glass) and Anchor Hocking Company LLC (specialty glass), each of which is a Delaware limited liability company; (b) for The Burnes Group business - Burnes Operating Company LLC, a Delaware limited liability company; and (c) for the WearEver business – Mirro Operating Company LLC, a Delaware limited liability company. The remaining Debtors are 100% owned directly or indirectly by one of Anchor Acquisition, Burnes Acquisition, or Mirro Acquisition. A chart summarizing the corporate structure of the Debtors, including the Debtors' non-debtor foreign subsidiaries, is annexed to the Disclosure Statement as **Exhibit B**.

D.    **Equity and Significant Indebtedness**

GHPI owns approximately 97.75% of the issued and outstanding common stock of Global Home, and 100% of the issued and outstanding preferred stock of Global Home. The remaining approximately 2.25% of the Non-GHPI Equity Interests are owned by ten individuals all of whom are former officers or directors of one or more of the Debtors.

### 1.    The Wachovia Indebtedness

As of the Petition Date, the Debtors maintained a senior secured revolving line of credit with Wachovia Bank, National Association, as agent acting for the financial institutions party thereto as lenders ("Wachovia"), pursuant to that certain Loan Agreement, dated as of June 22, 2004, as amended (the "Wachovia Loan Agreement"). The Wachovia Loan Agreement provided for a revolving credit and term loan facility of up to $200 million. The funds loaned by Wachovia to the Debtors pursuant to the Wachovia Loan Agreement were calculated on a formula providing for advances based on a percentage of the value of the Debtors' inventory and outstanding accounts receivable, and were guaranteed by most of the other Debtors. As of the Petition Date, Wachovia was owed approximately $115 million under the Wachovia Loan Agreement (the "Wachovia Loan Indebtedness"). The Wachovia Loan Indebtedness was secured by a lien on substantially all of the Debtors' assets, including 100% of the stock held by a Debtor in any of its domestic subsidiaries, and 65% of the stock held by a Debtor in any of its foreign subsidiaries.[8]

### 2.    The Madeleine Indebtedness

As of the Petition Date, the Debtors also maintained a junior secured term loan and revolving line of credit with Madeleine LLC ("Madeleine"), pursuant to that certain Financing Agreement dated as of April 13, 2004 (the "Madeleine Loan Agreement"). The Madeleine Loan Agreement provided for a revolving credit and term loan facility of up to $210 million to the Operating Companies and their parent, GHP Operating Company LLC, secured by

---

[8]  As explained further below, after the sale of the Anchor Hocking business, the Debtors satisfied the Claims of Wachovia and fully repaid the Wachovia Loan Indebtedness from the net proceeds received from that sale.

a lien on substantially all of the Debtors' assets and guaranteed by most of the Debtors. As of the Petition Date, Madeleine was owed $201,824,678.57, all of which is under the term loan (the "Madeleine Indebtedness").

### 3.    General Unsecured Claims

In addition to the undersecured portion of the Madeleine Indebtedness, the Debtors estimate that general unsecured claims asserted against them total between approximately $80,000,000 and $100,000,000, as of the date of the Disclosure Statement.

## IV.

## THE REORGANIZATION CASE

### A.    The Voluntary Petition and Notice of Commencement of Case

On the Petition Date, the Debtors commenced their Chapter 11 Cases by filing their respective voluntary petitions for relief under the Bankruptcy Code in the Bankruptcy Court. Since the Petition Date, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court in accordance with the Bankruptcy Code.

An immediate effect of the filing of the bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against the Debtors and the prosecution of litigation against the Debtors. This injunction remains in effect, unless modified or lifted by order of the Bankruptcy Court, until such matters are addressed through the Plan.

B.    **Professionals Employed by the Debtors**

Since the Petition Date, the Bankruptcy Court has authorized the Debtors'

employment of various attorneys, accountants and other professionals. In particular, the Debtors

employed the following Professionals (the "Debtors' Professionals") to assist them in carrying

out their duties and to otherwise represent their interests in the Chapter 11 Cases: Pachulski

Stang Ziehl & Jones LLP as general bankruptcy counsel;[9] Ronald F. Stengel of CDG as the

Debtors' Chief Restructuring Officer, working with colleagues at CDG to support Mr. Stengel in

his function; Dinsmore & Shohl, LLP and Frost Brown Todd LLC each as special counsel; Epiq

Bankruptcy Solutions, LLC as the Claims Agent; Plante & Moran as 401(k) plan auditors;

PricewaterhouseCoopers LLP and Deloitte Tax LLP to provide tax services; Houlihan Lokey

Howard & Zukin Capital as investment bankers; and Johnson Associates Inc. as special

compensation advisors. The Debtors' retention of each above–noted professionals was approved

by the Bankruptcy Court. In addition, the Debtors also employed various Professionals in the

ordinary course of their business and pursuant to applicable order of the Court, as described

below.

C.    **Appointment of Committee**

On April 27, 2006, the U.S. Trustee appointed the Committee as the

representative of the Debtors' general unsecured creditor constituency in the Chapter 11 Cases.

The Committee is currently composed of seven (7) members: (i) Zhejiang Taizhou Aishida

Electrical Equipment Co., Ltd., (ii) Zhejiang Supor Cookware Co., Ltd., (iii) Asia Trading

---

[9]  Effective September 1, 2007, PSZJ changed its name from "Pachulski Stang Ziehl Young Jones & Weintraub LLP" to "Pachulski Stang Ziehl & Jones LLP."

Company, (iv) United Steelworkers of America, (v) Lewisburg Container Company, (vi) International Paper Company, and (vii) Colorbox LLC. The Committee retained Lowenstein Sandler LLC and Pepper Hamilton LLP as its bankruptcy counsel; Basham, Ringe y Correa, S.C. as Special Counsel; and Huron Consulting Services LLC as its financial advisors ("Huron");[10] (referred to collectively as the "Committee's Professionals") to assist the Committee's involvement in the Chapter 11 Cases. The Committee's retention of each of the Committee's Professionals was approved by the Bankruptcy Court.

**D.      First Day Motions and Other Related Relief[11]**

On the Petition Date, the Debtors sought approval from the Bankruptcy Court of certain motions and applications (collectively, the "First Day Motions"), which the Debtors filed simultaneously with their petitions for relief commencing the Chapter 11 Cases. The Debtors sought this relief to minimize disruption of their business operations as a result of the chapter 11 filings, to establish procedures in the Chapter 11 Cases for the Debtors' operations, administration of the Chapter 11 Cases and interim compensation for Professionals, and to facilitate their efforts to market the Debtors' assets for maximum value. Specifically, the First Day Motions, and other critical motions filed at the commencement of the Chapter 11 Cases addressed, among other things, the following issues:

---

[10]   The Committee terminated Huron, effective July 11, 2007, and retained Capital Solutions Group, Ltd as its financial advisors, effective July 12, 2007.

[11]   Unless otherwise defined herein or in the Plan, capitalized terms used in the descriptions of motions and applications shall have the meanings ascribed to such terms in such motion or application.

1.    **Joint Administration**

On April 10, 2006, the Debtors filed that certain *Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases* [Docket No. 3] (the "Joint Administration Motion"). By the Joint Administration Motion, the Debtors sought entry of an order authorizing and directing joint administration of the Debtors' seventeen (17) cases for procedural purposes only. The Joint Administration Motion requested that the captions of the Chapter 11 Cases be modified to reflect the joint administration of the cases. The Joint Administration Motion also requested a combined service list be used for the Debtors' jointly administered cases and that the combined notices be sent to the creditors of the Debtors' estates. The Bankruptcy Court entered an order [Docket No. 39] granting the Joint Administration Motion on April 11, 2006.

2.    **Cash Management**

In the ordinary course of business, and as is common with large businesses of the kind operated by the Debtors, the Debtors maintained an integrated and centralized cash management system to provide a mechanism for the collection, concentration, management and disbursement of funds used in the Debtors' operations (the "Cash Management System"). As of the Petition Date, the Cash Management System consisted of a network of integrated bank accounts (the "Bank Accounts") that facilitated the timely and efficient collection, concentration, management and disbursement of funds used by the Debtors.

On April 10, 2006, the Debtors filed that certain *Motion of the Debtors for an Order Under §§ 105, 345, 363, 364, 1107 and 1108 Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing*

*Cash Management System, and (IV) Limited Waiver of Section 345(b) Deposit and Investment Requirements* [Docket No. 13] (the "Cash Management Motion"). Pursuant to the Cash Management Motion, the Debtors sought authority to: (a) continue to use their existing Cash Management System; (b) continue to use the Debtors' existing checks and business forms without alteration or change, provided that upon exhaustion of the Debtors' check stock, the Debtors would designate "Debtor in Possession" on the new checks; and (c) continue to use their Bank Accounts without the need for posting a bond or providing other security pursuant to section 345 of the Bankruptcy Code. The Bankruptcy Court entered interim [Docket No. 38] and final orders [Docket No. 185] granting the Cash Management Motion on April 11, 2006, and May 4, 2006, respectively.

3.      **Employee Wages**

On April 10, 2006, the Debtors filed that certain *Motion of the Debtors Pursuant to Bankruptcy Code Sections 105(a), 363, and 507(a) for an Order Authorizing the Debtors to: (I) Pay Prepetition Wages, Salaries, Commissions, Employee Benefits and Other Compensation; (II) Remit Withholding Obligations; (III) Maintain Employee Benefits Programs and Pay Related Administrative Obligations; and (IV) Authorize Applicable Banks and Other Financial Institutions to Receive, Process, Honor and Pay Certain Checks Presented for Payment and to Honor Certain Fund Transfer Requests* [Docket No. 14] (the "Employee Wages Motion"). Pursuant to the Employee Wages Motion, the Debtors sought authority from the Bankruptcy Court to, among other things, pay certain prepetition Claims and benefits of their employees and to continue employee benefit programs in the ordinary course of business. The Employee Wages

Motion was a critical component of the Debtors' "first day" relief and was necessary to retain the employees needed to operate the Debtors' business during the Chapter 11 Cases.

On April 11, 2006, the Bankruptcy Court entered an order [Docket No. 40] granting the Employee Wages Motion (the "Employee Wage Order"). Pursuant to the Employee Wage Order, the Debtors were authorized to honor and/or pay, in their sole discretion and up to the caps set forth in the Employee Wage Order, the benefits and programs described in the Employee Wages Motion, including: (a) outstanding prepetition wages, including associated administrative payroll processing obligations and expenses, and any uncashed checks that were issued prior to the Petition Date with respect thereto; (b) remittance of any withholding obligations attributable to the period prior to the Petition Date and to remit same to applicable taxing authorities or other appropriate third parties; (c) payment of prepetition reimbursement obligations that were incurred by employees prior to the Petition Date and to continue such payments on a postpetition basis; (d) authorization to allow employees to use accrued and unused paid time off, to the extent as may be legally required under non-bankruptcy law, and as expressly authorized by the Debtors' prepetition policies; (e) authorization to allow the Debtors to pay certain expenses related to the prepetition wages, prepetition tuition reimbursement expenses, prepetition life, accidental death and dismemberment and disability insurance expenses, and other prepetition expenses for benefit programs, as set forth in the Employee Wage Order; (f) authorization to pay certain sales bonuses and commissions earned prepetition by certain employees and certain third parties who provided critical services on behalf of the Debtors; and (g) authorization, in the Debtors' discretion, to pay prepetition workers' compensation claims in the ordinary course of the Debtors' business pursuant to the Wage order

and pursuant the *Order Clarifying (1) that the Debtors are Authorized, but Not Obligated to Continued to Process, Defend, Administer and Pay Ohio and Other State Prepetition Workers' Compensation Claims and Associated Costs*, et seq. [Docket No. 189], signed on May 4, 2006.

### 4.   Utility Services

Uninterrupted utility services were critical to the Debtors' ongoing operations. On April 10, 2006, the Debtors filed that certain *Motion of the Debtors for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment* [Docket No. 18] (the "Utility Motion"). Pursuant to the Utility Motion, the Debtors sought the entry of an order: (a) prohibiting their utility providers (the "Utility Providers") from altering, refusing or discontinuing services; (b) deeming utility providers adequately assured of future performance, pursuant to the adequate assurances provided by the Debtors in the Utility Motion; and (c) establishing procedures for determining adequate assurance of future payment. On April 11, 2006 and May 4, 2006, the Bankruptcy Court entered interim [Docket No. 44] and final [Docket No. 203] orders (the "Utility Orders"), respectively, granting the relief sought in the Utility Motion, including the requirement that the Debtors furnish Utility Providers adequate assurance of payment for postpetition utility services equal to 50% of the Debtors' estimated costs of their monthly utility consumption to each Utility Provider. The Utility Orders also set forth procedures pursuant to which Utility Providers could request adequate assurance of payment additional to the amounts required in the Utility Orders.

5.    **Rejection of Certain Executory Contracts**

Prior to the Petition Date, the Debtors determined that certain separation agreements for former officers (collectively, the "Rejected Contracts") were burdensome, provided no benefit to their estates and should be rejected immediately. The Rejected Contracts consisted of employment agreements with executives whose services were no longer required by the Debtors and who have been terminated. Since the Rejected Contracts were no longer essential to the Debtors' post petition business operations and were of no benefit to the Debtors' estates, the Debtors filed that certain *Motion for Order Under Section 365(a) of the Bankruptcy Code Authorizing the Debtors to Reject Certain Executory Contracts and Leases Fixing a Bar Date for Claims of Counterparties to the Rejected Contracts* [Docket No. 11] (the "Rejection Motion") on April 10, 2006. Pursuant to the Rejection Motion, the Debtors sought to immediately reject the Rejected Contracts effective as of the Petition Date. On April 11, 2006 [Docket No. 37] and May 4, 2006 [Docket No. 202], the Bankruptcy Court entered orders granting the Rejection Motion.

In addition to the Rejected Contracts rejected pursuant to the Rejection Motion, during the pendency of these Chapter 11 Cases, the Debtors have filed various motions and obtained orders authorizing the rejection of other burdensome contracts that were not assigned to the respective purchasers of substantially all of the operating assets of the Burnes Group Debtors, the WearEver Debtors and the Anchor Hocking Debtors.

6.    **Critical Vendors**

On April 10, 2006, the Debtors filed their *Motion of the Debtors Pursuant to Section 105(a) of the Bankruptcy Code for an Order Authorizing, But Not Requiring, the*

*Payment of Prepetition Claims of Critical Trade Vendors* [Docket No. 15] (the "Critical Vendor Motion"). Pursuant to the Critical Vendor Motion, the Debtors requested approval to pay, in their sole discretion, the prepetition claims (or a portion thereof) of certain vendors that provided critical goods or services to the Debtors (the "Critical Vendors"), up to an aggregate cap of $8,000,000. The relief requested in the Critical Vendor Motion was necessary to continue the Debtors' operations by ensuring the steady and uninterrupted supply of finished and unfinished goods and other key materials and services used in the Debtors' businesses. On April 11, 2006, the Court entered an order [Docket No. 42] granting the Critical Vendor Motion.

       7.      **Financing**

       In order to fund their operations postpetition, the Debtors sought approval for debtor in possession financing (the "DIP Financing") and to enter into the Ratification and Amendment Agreement (the "Ratification Agreement") with Wachovia. The Ratification Agreement ratified, extended, adopted and amended the terms of the Wachovia Loan Agreement and provided the Debtors with a total revolving credit commitment of up to an incremental $15,000,000, subject to borrowing base restrictions. In addition to the Ratification Agreement, the Debtors sought approval to enter into a stipulation with Madeleine for the use of cash collateral that was the subject of the Madeleine Loan Agreement. To obtain Bankruptcy Court authorization necessary to enter into such financing arrangement, the Debtors filed that certain *Motion Of Debtors For Entry Of Interim Order (I) Authorizing Debtors to Incur Post-Petition Secured Indebtedness and to Use Cash Collateral, (II) Granting Security Interests and Priority Claims Pursuant to 11 U.S.C. § 364; (3) Granting Adequate Protection; (4) Modifying*

*Automatic Stay and (5) Setting Final Hearing* [Docket No. 19] (the "First Financing Motion") on

April 10, 2006.

Pursuant to the First Financing Motion, the Debtors sought authority to enter into

the Ratification Agreement with Wachovia and approval of the cash collateral stipulation with

Madeleine (the "Cash Collateral Stipulation"). On April 11, 2006, after notice and a hearing, the

Bankruptcy Court entered an interim order [Docket No. 66] (the "Interim Financing Order")

granting the First Financing Motion and approving the Cash Collateral Stipulation. On May 4,

2006, the Court entered orders granting the First Financing Motion [Docket No. 184] and

approving the Cash Collateral Stipulation [Docket No. 185] on a final basis.[12]

E.      **The Sale of The Burnes Group**

As noted above, the business of the Burnes Group Debtors was not profitable

under their capital structure and was one of the factors that caused the commencement of the

Debtors' Chapter 11 Cases. The Burnes Group Debtors lacked sufficient cash flow or financing

to enable them to obtain the products that they needed to complete sales to their customers.

Supplier and customer uncertainty with the Burnes Group Debtors was intensifying prior and

immediately subsequent to the Petition Date.

In addition, several events occurring postpetition compounded these difficulties.

Several of the Burnes Group Debtors' suppliers threatened to sell directly to the Burnes Group

Debtors' customers following the Petition Date. Personnel retention difficulties continued to

amplify due to uncertainties over the fate of the Burnes' Group Debtors following the

---

[12] The Debtors' DIP Financing initially expired by its own terms on October 31, 2006. The Debtors' subsequent extension of their DIP Financing and ultimate repayment of the Wachovia Indebtedness is explained in section IV. (G) below.

commencement of these Chapter 11 Cases. Compounding matters further was the fact that

several Burnes vendors issued "stop" notices postpetition with respect to goods already in transit

from Asia to the Burnes Group Debtors. The Debtors' shipping company also refused to release

certain goods that were subject to "stop notices," which deprived the Burnes Group Debtors from

obtaining inventory stock to meet prospective shipment deadlines to their customers. The

Burnes Group Debtors' inability to fill customer orders made it more likely that customers would

find alternative suppliers of goods to sell at retail. Because the Burnes Group Debtors sold their

goods to a small and concentrated group of customers, the loss of significant customers would

have had a devastating effect on the Burnes Group Debtors' revenues.

      The Debtors realized that prospective purchasers of the Burnes Group Debtors'

assets required as near to normal a business as possible, given the pendency of these Chapter 11

Cases, the inability to obtain goods from vendors who stopped pending shipments postpetition,

and the Burnes Group Debtors' financing status. In addition, the Ratification Agreement and

Interim Financing Order required the Debtors to file, by May 1, 2006: (1) a motion seeking the

Bankruptcy Court's approval of an auction sale of all or substantially all of the assets of the

Burnes Group Debtors (the "Burnes Sale Motion"); and (2) a motion seeking the Bankruptcy

Court's approval of bidding procedures in connection with such auction sale. The Burnes Sale

Motion was filed in satisfaction of that condition of the then-Interim Financing Order and the

Ratification Agreement.

      Prior to and after the Petition Date, the Debtors actively marketed the Burnes

Group Debtors' business, including the equity or assets of certain non-debtor foreign affiliates,

Intercraft Burnes, S. de R.L. de C.V. (Mexico) and 690629 BC Ltd. The Debtors engaged

Houlihan Lokey Howard & Zukin Capital, Inc. ("HLHZ") in March 2006 to pursue a sale of the Burnes Group Debtors' assets and, as noted above, after the Petition Date, the Court approved the Debtors' application to employ HLHZ as the Debtors' investment bankers.

HLHZ began the sale process for the assets by preparing an in-depth offering memorandum in March 2006, with a description of the business, financial projections for the business, and provided prospective buyers with access to the online data room established by HLHZ with respect to the proposed sale. HLHZ identified several potential strategic or financial buyers for the assets and approached more than 50 potential buyers to solicit their interest in acquiring the Acquired Assets. Confidentiality agreements were sent to approximately 40 of these potential buyers, and approximately 25 requested and received the offering memorandum. HLHZ and the Debtors negotiated the possible sale of the Burnes Group Debtors' assets with several of those potential buyers.

On or about May 1, 2006, the Burnes Group Debtors entered into the Burnes Group Purchase Agreement with Gibson for substantially all of the assets of the Burnes Group Debtors (the "Burnes Group Assets") in consideration of $33,550,000, subject to certain adjustments (the "Burnes Purchase Price"). The Burnes Group Purchase Agreement provided that $2,000,000 of the Burnes Purchase Price would be paid pursuant to the terms of a promissory note (the "Burnes Group Promissory Note") annexed to the Burnes Group Purchase Agreement, which would be payable in one installment on November 30, 2006.

On May 2, 2006, the Debtors filed their *Motion of the Debtors for an Order: (I) Approving Sale by The Burnes Group Debtors of Substantially All of The Burnes Group Debtors' Operating Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (II)*

*Assuming and Assigning Certain Executory Contracts and Unexpired Leases; and (III) Granting
Related Relief* [Docket No. 131]. The Burnes Sale Motion sought entry of a proposed order
authorizing the sale of substantially all of the Burnes Group assets to Gibson, or to such other
higher and better bidder. The Bankruptcy Court also entered an order approving certain bidding
and sale procedures with respect to the sale of the Burnes Group's assets on May 7, 2006
[Docket No. 186]. However, no competing bidder submitted a competing bid against Gibson.
At the hearing on the Burnes Sale Motion, the Court determined that Gibson provided the highest
and best offer for the Burnes Group Assets and entered an order (the "Burnes Sale Order")
authorizing the sale of the Burnes Group Assets to Gibson pursuant to the terms of the Burnes
Group Purchase Agreement.

The sale of the Burnes Group Assets to Gibson closed on May 26, 2006, on which
date the Debtors received the unpaid portion of the Burnes Purchase Price from Gibson (except
for the $2,000,000 portion of the Burnes Purchase Price that was payable pursuant to the terms of
the Burnes Group Promissory Note). In November, 2006, Gibson informed the Debtors that it
disputed its obligation to tender payment of the Burnes Group Promissory Note to the Debtors
and claimed that the Debtors were obligated to deliver to Gibson $1,750,000 of in-transit
inventory. The Debtors disputed they were obligated to deliver the in-transit inventory in
question to Gibson. However, in order to economically resolve their dispute with Gibson and
realize payment on the Burnes Group Promissory Note, the Debtors and Gibson agreed to settle
their dispute in exchange for payment by Gibson to the Debtors of $1,600,000 (the "Settlement
Payment") pursuant to that *Order Granting Motion Pursuant to 11 U.S.C. §105 and Bankruptcy
Rule 9019 for Approval of Compromise of Controversy Between the Burnes Debtors and C.R.*

*Gibson, Inc. and Burnes Home Accents, LLC* [Docket No. 1088]. On December 18, 2006, Gibson wire-transferred the Settlement Payment to the Debtors.

F.     The Sale of the WearEver Debtors' Business

Following the sale of the Burnes Group Debtors, the Debtors turned their attention toward marketing and selling the WearEver Debtors. As was true with the Burnes Group Debtors, the WearEver Debtors' business was also not profitable under their current capital structure. Unless the WearEver Debtors' business was quickly sold, the Debtors believed that they would be unable to continue that business as a going concern beyond the near term.

The WearEver Debtors lacked sufficient cash flow or financing to enable them to continue to obtain the products that they needed to complete sales to their customers. Especially following the Petition Date, supplier and customer uncertainty with the WearEver Debtors intensified. Among other things, the WearEver Debtors' supply chain became difficult to reopen after the commencement of these Chapter 11 Cases, creating inventory imbalances that adversely affected their customer base. In addition, personnel retention difficulties increased as a result of the growing uncertainty over the WearEver Debtors' future.

After the Petition Date the WearEver Debtors also lacked the cash liquidity to continue their business beyond the short-term. Among other things, certain key customers, who were aware of the WearEver Debtors' liquidity situation, and voiced substantial concerns about continuing to do business with the WearEver Debtors in the absence of new financing and a sale of the business.

As was the case with the Burnes Group, the Debtors needed to quickly market and sell the WearEver Debtors' business because prospective purchasers of the WearEver Debtors'

assets would require as near to normal a business as possible, given both the pendency of these Chapter 11 Cases and the WearEver Debtors' financing status. Absent such a "near normal" business, the Debtors' believed that the going concern value of the WearEver Debtors would be lost and the purchase price would plummet. Accordingly, the Debtors actively marketed the WearEver Debtors' business commencing around May 2006. Because the WearEver Debtors continued to be unprofitable and the Debtors' financial resources were limiting the WearEver Debtors' ability to fund raw materials and finished goods inventory purchases to service customer demand, the immediate sale of the WearEver Debtors' assets was the only viable option available to maximize value of the WearEver Debtors' assets.

By order entered on June 7, 2006, the Court approved the Debtors' application to expand of engagement of HLHZ to pursue a sale of the WearEver Debtors' assets. HLHZ began the sale process for the WearEver Debtors' assets by preparing in-depth offering materials, including a management presentation and information memorandum, in May and June 2006. The offering materials contained a description of the business and financial projections for the business. In addition, HLHZ provided prospective buyers with access to the online data room established by HLHZ with respect to the proposed sale. HLHZ identified and approached more than 60 potential strategic or financial buyers to solicit their interest in acquiring WearEver's assets. Confidentiality agreements were sent to approximately 20 of these potential buyers, and approximately 15 requested and received the offering materials.

On July 7, 2006, WearEver Debtors Mirro Acquisition Inc., Mirro Puerto Rico, Inc., Mirro Operating Company LLC and non-WearEver Debtor 690649 BC Ltd. (collectively, the "WearEver Sellers") entered into the WearEver Purchase Agreement with Lifetime Brands,

Inc. ("Lifetime"). The WearEver Purchase Agreement provided for the sale of substantially all of the operating assets of the WearEver Debtors to Lifetime, including the assumption and assignment of certain executory contracts and unexpired leases, in consideration of a cash purchase price of $21,000,000. In addition, the WearEver Purchase Agreement provided for Lifetime to issue letters of credit of up to $15,000,000 for advances for the WearEver Sellers' account and in favor of certain Asian suppliers of certain designated inventory (the "Inventory Advances"). The Inventory Advances allowed the WearEver Debtors to purchase certain inventory prior to the closing of the sale to Lifetime, or, alternatively, to such other higher and better bidder. Lifetime received a superpriority claim and a perfected first priority lien on any inventory purchased with the Inventory Advances and any competing bidder was required to provide for payment to Lifetime in cash in the amount of the Inventory Advances made by Lifetime.

On July 14, 2006, the Debtors filed their *Motion of the Debtors for an Order: (I) Approving Sale by the WearEver Debtors of Substantially All of the WearEver Debtors' Operating Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 549] (the "WearEver Sale Motion"). The WearEver Sale Motion sought approval of, *inter alia*, the sale of substantially all of the WearEver Debtors' assets to Lifetime, or to such other higher and better bidder pursuant to the terms of the WearEver Purchase Agreement. The Court entered an order approving certain sale and bidding procedures with respect to the sale of the WearEver Debtors' assets on July 14, 2006 [Docket No. 547] and, *inter alia*, scheduled an

auction for August 7, 2006 (the "Auction"). Prior to the Auction, the Debtors received a timely competing bid from SEB. At the auction, SEB was determined to be the winning bidder for the purchase of substantially all of such assets. On August 11, 2006, the Court entered an order, *inter alia*, approving the sale (the "WearEver Sale") of substantially all of the assets of the WearEver Debtors to SEB in consideration of a purchase price of $35,750,000, subject to any adjustments (the "WearEver Purchase Price"). In addition to the WearEver Purchase Price, SEB also paid Lifetime the amount of the Inventory Advances that Lifetime previously advanced. The WearEver Sale subsequently closed on August 16, 2006.

    **G.**    <u>Extension of the DIP Financing and Use of Cash Collateral</u>

Following the sale of WearEver Debtors, and prior to the termination of the Ratification Agreement on October 31, 2006, the Debtors filed their *Motion (1) for Authority to Extend and Modify Debtor in Possession Financing and (II) to Extend Use of Cash Collateral* [Docket No. 893] (the "Second Financing Motion"). The Second Financing Motion sought approval of that certain *Amendment No. 1 to Ratification and Amendment Agreement and Amendment No. 8 to Loan and Security Agreement,* which amended the Ratification Agreement and extended the Debtors' DIP Financing through February 27, 2007 and also provided for an extension of the Cash Collateral Stipulation for the use of cash collateral, also through February 27, 2007. On November 16, 2006, the Court entered orders granting the Second Financing Motion [Docket No. 961] and further extending the use of cash collateral [Docket No. 956].

On or about February 28, 2007, the Debtors filed their *Motion (I) for Authority to Further Extend and Modify Debtor in Possession Financing and Authorize Payment of Loan Amendment Fee And (II) to Further Extend Use of Cash Collateral, to which is attached an*