*Amendment No. 3 to Ratification And Amendment Agreement, et seq.,* [Docket No. 1237] (the

"Third Financing Motion"), which motion was granted at a hearing conducted on March 5, 2007.

The Third Financing Motion requested for a further extension of the Ratification Agreement,

which agreement increased the Debtors' loan availability and provided an extension of the DIP

Financing through April 2, 2007 in order to allow for, *inter alia*, the sale of the Anchor Hocking

Debtors' business prior to such date, as discussed below.

    **H.**    <u>The Sale of the Anchor Hocking Debtors' Business</u>

        Following the sale of substantially all of the WearEver Debtors' assets to SEB,

the Debtors conducted a dual-track process by which the assets of the Anchor Hocking Debtors'

business, the Debtors' last remaining business group, would be marketed for sale to a potential

purchaser while the Debtors simultaneously explored the potential recapitalization of the Anchor

Hocking Debtors as an alternative to a sale. HLHZ began the sale process for the assets by

preparing an in-depth offering memorandum around October 2006, with descriptions of the

business and financial projections for the business, and providing prospective buyers with access

to the online data room established by HLHZ with respect to the proposed sale. HLHZ identified

several potential strategic or financial buyers for the assets and approached more than 220

potential buyers to solicit their interest in acquiring substantially all of the Anchor Hocking

Debtors' operating assets, which were primarily owned by Anchor Hocking CG Operating

Company, LLC and Anchor Hocking Operating Company LLC (together, the "Anchor Hocking

Sellers"). Confidentiality agreements were sent to approximately 68 potential buyers, and

approximately 55 potential buyers requested and received the offering memorandum. The

Debtors received 9 expressions of interests for all or portions of the Anchor Hocking Sellers' operating assets, and HLHZ and the Debtors negotiated with each of the potential buyers.

Wachovia was unwilling to extend the DIP Financing beyond April 2, 2007, which consequently mandated the immediate sale of the Anchor Hocking Sellers' assets.[13] Based on Wachovia's position, the Debtors were unable to continue to pursue their recapitalization strategy and devoted their efforts toward an immediate sale of the Anchor Hocking business.

On or about March 6, 2007, the Anchor Hocking Sellers entered into the Anchor Hocking Purchase Agreement with Anchor Acquisition. On March 12, 2007, the Court entered an order approving bidding and sale procedures with respect the sale of substantially all of the Anchor Hocking Debtors' assets and scheduled an auction for March 23, 2007. No competing bids were submitted for the purchase of the assets of the Anchor Hocking Sellers. On March 26, 2007, the Court entered an order approving the sale of substantially all of the Anchor Hocking Sellers' assets to Anchor Acquisition, which sale closed on April 19, 2007. Following the closing of the sale, the Debtors and Anchor Acquisition consensually resolved certain post-closing disputes in connection with the Anchor Hocking Purchase Agreement.

---

[13] The DIP Financing was subsequently extended through April 20, 2007, to allow for the closing of the sale of the Anchor Hocking Sellers on April 19, 2007, as more fully described below.

I.    **Other Significant Events During the Chapter 11 Cases**

### 1.    Filing of Schedules and Statements

On May 2, 2006 and May 11, 2006, each of the Debtors filed their Schedules of Liabilities (the "Schedules") and Statement of Financial Affairs (the "SOFAs") [Docket Nos. 140-149 and 264-281].[14]

### 2.    Meeting of Creditors

On May 8, 2006, the U.S. Trustee conducted the meeting of creditors for these Chapter 11 Cases pursuant to section 341 of the Bankruptcy Code.  A representative of the Debtors attended the meeting of creditors and fulfilled the Debtors' obligations with respect thereto.

### 3.    Establishment of Claim Bar Dates

In a chapter 11 case, prepetition claims against the debtor are generally established either as a result of being listed in the debtor's schedules of liabilities or through assertion by a creditor in a timely filed proof of claim.  Claims asserted by creditors are either allowed or disallowed.  If a claim is allowed, the claim will be recognized and treated pursuant to a plan.  If a claim is disallowed, the creditor will have no right to obtain any recovery on or to otherwise enforce the claim against the debtors.  Disallowed claims include claims disallowed by final order of the Bankruptcy Court, claims listed on the debtors' Schedules as zero, or as contingent, disputed, or unliquidated and as to which no proof of claim has been timely filed or

---

[14] Joint Schedules and Joint Statements of Financial Affairs were filed for (1) Mirro Operating Company and Mirro Puerto Rico, Inc.; and (2) Anchor Hocking Operating Company LLC, Anchor Hocking CG Operating Company LLC and AH Acquisition Puerto Rico, Inc.

deemed timely filed, claims not listed in the Schedules and for which no proof of claim has been timely filed or deemed timely filed.

As noted above, the Debtors filed their Schedules on May 2, 2006 and May 11, 2006, which, among other things, scheduled prepetition claims against the Debtors based on the Debtors' books and records. On September 1, 2006, the Debtors filed that certain *Motion of Debtors for an Order (1) Fixing Bar Date for the Filing of Proofs of Claim, (2) Fixing Bar Date for The Filing of Proofs of Claim by Governmental Units, (3) Designating Form And Manner of Notice Thereof, And (4) Granting Related Relief* [Docket No. 744] (the "Bar Date Motion"). Pursuant to the Bar Date Motion, the Debtors sought to establish the deadlines by which creditors would be required to file Proofs of Claim in these Chapter 11 Cases.

On September 13, 2006, the Court entered an order [Docket No. 769] (the "General Bar Date Order") granting the Bar Date Motion. Pursuant to the General Bar Date Order, the Bankruptcy Court established November 15, 2006 (the "General Bar Date") as (i) the deadline for both non-governmental and governmental units to file prepetition claims against the Debtors; and (ii) the deadline for all parties asserting claims against any of the Debtors arising under Bankruptcy Code section 503(b)(9) to file claims. Schedules of the filed Proofs of Claim asserted against the Debtors are maintained by the Claims Agent.

On August 2, 2007, the Court entered an order [Docket No. 1594] (the "Postpetition Administrative Claims Bar Date Order") fixing September 5, 2007 as the deadline for all entities to file Claims against the Debtors that arose on or after the Petition Date through and including August 1, 2007. In addition, the Debtors will request that the Confirmation Order

fix a bar date for all Administrative Claims arising after August 2, 2007 through the Effective Date of the Plan.

### 4.    Extensions of Exclusivity

Section 1121 of the Bankruptcy Code grants a debtor in possession the exclusive right to file a plan of reorganization for 120 days after the filing of a voluntary petition for relief under chapter 11 (the "Exclusive Filing Period") and the exclusive right to solicit acceptances to that filed plan for 180 days after the petition's filing (the "Exclusive Solicitation Period"), subject to further extension for cause. On August 4, 2006, the Debtors filed that certain *Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending the Time Periods during which the Debtors Have the Exclusive Right to File a Plan and Solicit Acceptances Thereto* [Docket No. 627)](the "First Exclusivity Motion"). Pursuant to the First Exclusivity Motion, the Debtors sought to extend (i) the Exclusive Filing Period from August 8, 2006 through and including December 6, 2006, and (ii) the Exclusive Solicitation Period from October 9, 2006 through and including February 6, 2007. The Court entered an order granting the First Exclusivity Motion on September 5, 2006 [Docket No. 747]. On November 30, 2006, the Debtors filed that certain *Motion for an Order Pursuant to 11 U.S.C. § 1121(D) Further Extending the Time Periods During Which the Debtors Have the Exclusive Right to File a Plan and Solicit Acceptances Thereto* [Docket No. 1025] (the "Second Exclusivity Motion"). Pursuant to the Second Exclusivity Motion, the Debtors sought to extend (i) the Exclusive Filing Period from December 6, 2006 through and including April 4, 2007 and (ii) the Exclusive Solicitation Period from February 6, 2007 through and including June 6, 2007. The Court entered an order granting the Second Exclusivity Motion on January 12, 2007 [Docket No. 1126]. On April 4, 2007 the

Debtors filed their *Motion for an Order Pursuant to 11 U.S.C. § 1121(D) Further Extending the Time Periods During Which the Debtors Have the Exclusive Right to File a Plan and Solicit Acceptances Thereto* [Docket No. 1365] (the "Third Exclusivity Motion"). Pursuant to the Third Exclusivity Motion, the Debtors sought to extend the Exclusive Filing Period and Exclusive Solicitation Period through and including August 3, 2007 and October 4, 2007, respectively. The Court entered an order granting the Third Exclusivity Motion on May 24, 2007 [Docket No. 1480]. On August 2, 2007, the Debtors filed their *Motion for an Order Pursuant to 11 U.S.C. § 1121(D) Further Extending the Time Periods During Which the Debtors Have the Exclusive Right to File a Plan and Solicit Acceptances Thereto* [Docket No. 1596] (the "Fourth Exclusivity Motion"). Pursuant to the Fourth Exclusivity Motion, the Debtors sought to extend the Exclusive Filing Period and Exclusive Solicitation Period through and including October 9, 2007 and December 10, 2007, respectively. The Committee filed a limited objection to the Fourth Exclusivity Motion, which objection was subsequently withdrawn pursuant to a consent order and stipulation entered into by the Debtors and the Committee and signed by the Court on September 6, 2007 [Docket Number 1664], which consent order extended the Exclusive Filing Period through and including October 9, 2007 and extending the Exclusive Solicitation Period through and including December 10, 2007.

### 5.   Extension of Removal Deadlines

The Bankruptcy Court has entered various orders extending the time by which the Debtors may remove (i) civil actions that were pending in other forums on the Petition Date (the "Prepetition Removal Deadline") and (ii) civil actions initiated in non-bankruptcy forums after the Petition Date (the "Postpetition Removal Deadline"). Pursuant to an order entered on August

3, 2007, the current Prepetition Removal Deadline is January 15, 2008. The current Postpetition

Removal Deadline is the later of January 15, 2008, or the time period set forth in Bankruptcy

Rule 9027(a)(3)(A).

6.    **Extension of Deadline to Assume or Reject Unexpired
      Leases of Non-Residential Real Property Under
      Section 365(d)(4) of the Bankruptcy Code**

Pursuant to section 365(d)(4) of the Bankruptcy Code, absent the entry of an order

by the Court, the Debtors had until August 8, 2006, by which to assume or reject all of their

unexpired nonresidential real property leases. On June 19, 2006, the Debtors filed the *Debtors'*

*Motion for an Order Pursuant to Section 365(d)(4) of the Bankruptcy Code Extending the Time*

*to Assume, Assume and Assign, or Reject Unexpired Leases of Nonresidential Real Property*

[Docket No. 443] (the "365(d)(4) Extension Motion"). Pursuant to the 365(d)(4) Extension

Motion, the Debtors sought to extend their August 8, 2006 deadline by an additional 90 days,

through and including November 6, 2006. On July 6, 2006, the Court granted the 365(d)(4)

Motion and entered an order [Docket No. 494] extending the deadline through and including

November 6, 2006. On or around December 29, 2006, the Debtors filed their *Stipulation*

*Between Debtors and 41 Madison L.P. Pursuant to Bankruptcy Code §365(d)(4)(B) Extending*

*the Time to Assume Or Reject Lease for Premises At 41 Madison Avenue, New York, New York*

[Docket No. 1091] (the "Madison Avenue Stipulation") with respect to the Debtors' lease of

property at 41 Madison Avenue, New York, New York (the "Madison Avenue Lease"), with

their only then-remaining lease of nonresidential real property. Pursuant to the Madison Avenue

Stipulation, the deadline to assume, assume and assign, or reject the Madison Avenue Lease was

extended and the Madison Avenue Lease ultimately was assumed and assigned to Anchor

Acquisition in connection with the sale of substantially all of the assets of the Anchor Hocking Debtors.

## V.

## DESCRIPTION OF THE PLAN

A DISCUSSION OF THE PRINCIPAL PROVISIONS OF THE PLAN AS THEY RELATE TO THE TREATMENT OF CLASSES OF ALLOWED CLAIMS, EQUITY INTERESTS AND SUBSIDIARY EQUITY INTERESTS IS SET FORTH BELOW. THE DISCUSSION OF THE PLAN WHICH FOLLOWS CONSTITUTES A SUMMARY ONLY, AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. YOU ARE URGED TO READ THE PLAN IN FULL IN EVALUATING WHETHER TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN OF REORGANIZATION. IF ANY INCONSISTENCY EXISTS BETWEEN THIS SUMMARY AND THE PLAN, THE TERMS OF THE PLAN AND THE DOCUMENTS DESCRIBED THEREIN WILL CONTROL.

### A.    Description Of Classes

The Plan divides Creditors, Equity Interests and Subsidiary Equity Interests into Classes. Creditors with similar Claims are placed in the same Class as summarized below:

**Class 1 Claims**. Class 1 consists of Priority Claims against the Debtors, exclusive of Priority Tax Claims.

**Class 2 Claims**. Class 2 consists of the Madeleine Secured Claim.

**Class 3 Claims.** Class 3 consists of the Claims of any Creditor secured by a Lien against any of the Debtors assets, other than the Madeleine Secured Claim.

**Class 4 Claims**.  Class 4 consists of all 503(b)(9) Claims.

**Class 5 Claims**.  Class 5 consists of Unsecured Claims and Reclamation Claims, if any.

**Class 6 Equity Interests**.  Class 6 consists of the following subclasses:

6(A) – Class 6(A) consists of all GHPI Equity Interests.

6(B) - Class 6(B) consists of all Non-GHPI Equity Interests.

6(C) – Class 6(C) consists of all Subsidiary Equity Interests.

**Class 7 Cancelled Options and Warrants**.  Class 7 consists of all Cancelled Options and Warrants.

B.     **Treatment of Classified Claims**

**Class 1 (Non-Tax Priority Claims)**.  The Reorganized Debtors shall pay the Allowed amount of each Class 1 Priority Claim to each Entity holding a Class 1 Priority Claim as soon as practicable following the later of (a) the Effective Date, or (b) the date such Class 1 Priority Claim becomes an Allowed Claim (or as otherwise permitted by law).  The Reorganized Debtors shall pay each Entity holding a Class 1 Priority Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date; provided, however, that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity.

**Class 2 (Madeleine Secured Claim)**.  The Madeleine Secured Claim shall be deemed an Allowed Claim as of the Effective Date and remain secured by substantially all of the Reorganized Debtors' assets to the same extent and validity as existed prior to the Effective Date pursuant to the Madeleine Loan Agreement, *provided however*, that satisfaction and repayment of the Madeleine Secured Claim by the Reorganized Debtors will be on such terms as may be

agreed upon by Madeleine and the Reorganized Debtors and shall be subordinated for distribution purposes to the treatments provided for Allowed Claims under the Plan for payments made from the Claims Reserve Account and Segregated Claims Reserve Account, but solely to the extent thereof.

**Class 3 (Other Secured Claims)**.  The Debtors do not believe that there are any Class 3 Claims.  All Class 3 Claims, if any, are Disputed Claims.  At the sole option of the Reorganized Debtors, each Holder of an Allowed Class 3 Other Secured Claim, if any, shall receive one of the following treatments: (i) the Holder of such Claim shall retain its Lien on its collateral until such collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such Holder in full satisfaction, release, and discharge of such Allowed Secured Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Reorganized Debtors, the Holder of such Secured Claim will receive a Cash payment equal to the amount of its Allowed Secured Claim in full satisfaction, release, and discharge of such Secured Claim; or (iii) the collateral securing the Creditor's Secured Claim shall be abandoned to such Creditor, in full satisfaction, release, and discharge of such Secured Claim.

**Class 4 Claims (503(b)(9) Claims)**.  The Reorganized Debtors shall pay to each Holder of an Allowed Class 4 503(b)(9) Claim its Pro Rata share of the $3.5 million of Effective Date Cash allocated for distribution to all Holders of Allowed 503(b)(9) Claims in full satisfaction, release and discharge of such Claims (a) as soon as practical after the later of (i) the Effective Date, or (ii) the date on which the Bankruptcy Court enters a Final Order determining

or approving all such Allowed Class 4 503(b)(9) Claims; or (b) in accordance with the terms and

conditions of any agreement between the Holder of an Allowed Class 4 503(b)(9) Claim and the

Debtors or the Reorganized Debtors, as the case may be. The $3.5 million of Effective Date

Cash allocated for distribution to Allowed Class 4 503(b)(9) Claims shall be the sole and

exclusive source of payment of all Allowed Class 4 503(b)(9) Claims. In the event that the

Holder of an Allowed Class 4 503(b)(9) Claim does not object to confirmation of the Plan, then

such Holder shall be deemed to have accepted the treatment provided for in the Plan that is

different from that set forth in 11 U.S.C. § 1129(a)(9). Any unpaid amount of an Allowed Class

4 503(b)(9) Claim shall be available to the Holder as a setoff, on a dollar for dollar basis and

after application of any defenses available to such Holder, against the total dollar amount of any

Litigation that may be asserted by the Reorganized Debtors against such Holder of an Allowed

Class 4 503(b)(9) Claim.

**Class 5 (Unsecured Claims and Reclamation Claims).** Class 5 consists of

Unsecured Claims and Reclamation Claims.

**Class 5 (Unsecured Claims)** On the Effective Date or as soon as

practicable thereafter, each Holder of an Allowed Class 5 Unsecured Claim shall receive in full

satisfaction, release, and discharge of its Allowed Claim (i) its Pro Rata distribution of remaining

proceeds from the $1 million of Effective Date Cash allocated to Holders of Allowed Class 5

Unsecured Claims after payment of any Allowed Reclamation Claims, and (ii) its Pro Rata share

of eighteen percent (18%) of any Net Chapter 5 Claims Recoveries recovered by the

Reorganized Debtors pursuant to the terms of the Plan as additional distributions at such times

after the Effective Date as deemed appropriate by the Reorganized Debtors in their discretion.

The remaining eighty-two percent (82%) of any Net Chapter 5 Claims Recoveries shall be retained by the Reorganized Debtors.

**Class 5 (Reclamation Claims)**   All Reclamation Claims, if any, shall constitute Class 5 Claims.   All Reclamation Claims are Disputed Claims because the Debtors do not believe any valid Reclamation Claims can or do exist pursuant to, among other things, applicable law.   Solely to the extent that a Reclamation Claim becomes an Allowed Reclamation Claim, the Holder of such Allowed Reclamation Claim shall receive Effective Date Cash equal to the Allowed amount of such Reclamation Claim from the $1 million of Effective Date Cash allocated for distribution to Holders of Class 5 Unsecured Claims (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Allowed Reclamation Claim; or (b) in accordance with the terms and conditions of any agreement between the Holder of such an Allowed Reclamation Claim and the Debtors or the Reorganized Debtors, as the case may be.

**Class 6 (Equity Interests and Subsidiary Equity Interests)**.

**Class 6(A) (GHPI Equity Interests)**.   The Plan shall not alter the legal or equitable rights of GHPI Equity Interests.

**Class 6(B) (Non-GHPI Equity Interests)**.   All Non-GHPI Equity Interests shall be offered the right to subscribe to a rights offering to purchase and retain their existing Non-GHPI Equity Interests.   In order to participate in the rights offering, each Holder of a Non-GHPI Equity Interest must satisfy the following conditions: (i) no later than three (3) days prior to the Confirmation Hearing each Holder of a Non-GHPI Equity Interest must commit in writing to purchase its respective Non-GHPI Equity Interest and agree in writing to pay to the

Reorganized Debtors the Rights Offering Payment, and (ii) pay the Rights Offering Payment to the Reorganized Debtors no later than one (1) day prior to the expected Effective Date. The Debtors shall notify all Holders of Non-GHPI Equity Interests of the expected Effective Date no later than five (5) days prior to the occurrence of such expected Effective Date. If a Holder of a Non-GHPI Equity Interest fails to satisfy all of the conditions set forth in this paragraph, then such Non-GHPI Equity Interest shall be cancelled as of the Effective Date without the requirement of further action by the Debtors, the Bankruptcy Court or any party in interest. Additional documentation regarding the aforementioned rights offering will be set forth and filed in the Plan Supplement.

**Class 6(C) (Subsidiary Equity Interests)**.  The Plan shall not alter the legal or equitable rights of Holders of Subsidiary Equity Interests.

**Class 7 (Cancelled Options and Warrants)**.  Holders of Cancelled Options and Warrants will neither receive nor retain any distributions or property under the Plan on account of such Cancelled Options and Warrants.

C.    **Treatment Of Unclassified Claims**

**Administrative Claims**.  Each Holder of an Allowed Administrative Claim, shall receive Cash equal to the Allowed amount of such Claim, unless such Holder shall have agreed to different treatment of such Claim, at the sole option of the Debtors or the Reorganized Debtors, as the case may be: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holders of such Claims and the Debtors or the Reorganized Debtors, as the case may be; (c)

with respect to Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), at all appropriate times until the entry of a Final Decree or an order converting or dismissing the case.

Holders of Administrative Claims, including, without limitation, Professionals, requesting compensation or reimbursement of such expenses pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code that do not file such requests by the deadline provided under the applicable Administrative Claims Bar Date Order shall be forever barred from asserting such claims against the Debtors, their Estates, the Reorganized Debtors, or the successors, assigns, or property of any of them. Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court; provided that such objection deadline is at least twenty (20) days after the filing and service of such final fee application.

Notwithstanding any provision in the Plan regarding payment of Administrative Claims to the contrary, and without waiver of any argument available that such Claim is already time-barred by prior orders of the Bankruptcy Court, all Administrative Claims that are required to be Filed and are not Filed by the applicable Administrative Claim Bar Date shall be treated as Disallowed Claims and discharged. Without limiting the foregoing, all fees payable under 28 U.S.C. § 1930 that have not been paid, shall be paid on or before the Effective Date.

**Professional Fee Claims**. Unless a different treatment is agreed upon by the Debtors or the Reorganized Debtors, as the case may be, and the applicable Professionals, the

Reorganized Debtors shall pay Professionals all of their respective accrued and Allowed fees and reimbursement of expenses arising prior to the Effective Date. The Bankruptcy Court must also rule on and allow all such Professional Fee Claims before the fees will be owed and paid. For all such pre-Effective Date Professional Fee Claims, except Bankruptcy Court fees, the fees and expenses of the Claims Agent, and U.S. Trustee's fees, the Professional in question must file and serve a properly noticed final fee application and the Bankruptcy Court must rule on the application. Only the amount of fees and expenses Allowed by the Bankruptcy Court will be owed and required to be paid under the Plan.

The Reorganized Debtors may retain and compensate professionals for services rendered following the Effective Date without order of the Bankruptcy Court.

Professionals requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered prior to the Effective Date must File and serve pursuant to the notice provisions of the Interim Fee Order, an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court.

**Priority Tax Claims**. At the sole option of the Reorganized Debtors, each Holder of an Allowed Priority Tax Claim shall receive one of the following two treatments, unless otherwise agreed by such Holder and the Reorganized Debtors: (i) payment in full of the Allowed Priority Tax Claim without interest from the Petition Date, on the later to occur of (A) the Effective Date, or as soon as practicable thereafter, or (B) the date on which such Claim

shall have become an Allowed Claim, or as soon as practicable thereafter; or (ii) deferred cash payments to the extent permitted by Section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the rate of five percent (5%) per annum, or such other rate as may be determined by the Bankruptcy Court or agreed upon by the Reorganized Debtor(s) and such Holder; *provided that*, in the event the Reorganized Debtors choose payment option (ii), the Reorganized Debtors may prepay any such Claims at any time without premium or penalty.

### D.    Settlement and Compromise of PBGC Claims

In April 2004, Anchor Hocking CG Operating Company LLC ("AHCG"), one of the Debtors in these Chapter 11 cases, established the Anchor Hocking Pension Plan for Union Employees (formerly GHP Operating Company LLC Pension Plan for Anchor Hocking Union Employees) (the "Pension Plan"). AHCG was the plan administrator and contributing sponsor of the Pension Plan. The Pension Plan was established to provide retirement benefits for certain former employees of AHCG working at certain plants formerly owned by AHCG in Lancaster, Ohio. In addition, the Pension Plan provided retirement benefits for certain former employees of Anchor Hocking Operating Company LLC ("AHSG"), working at a plant formerly owned by AHSG in Monaca, Pennsylvania.

In November 2006, the PBGC filed three consolidated (against each of the 17 Debtors), unsecured Proofs of Claim in the Chapter 11 Cases for liabilities relating to the Pension Plan. The PBGC's claims included (i) an estimated claim of $5.1 million for possible unfunded benefit liabilities under the plan ("UBL Claim"), contingent upon termination of the Pension Plan, (ii) an unliquidated claim for due but unpaid employer contributions to the plan ("DUEC Claim"), and (iii) an unliquidated claim for insurance premiums, interest and penalties

("Premium Claim"). The PBGC asserted that various components of the foregoing claims were entitled to administrative expense status or otherwise qualified as priority claims.

The PBGC later filed a Complaint on April 12, 2007, against AHCG in the United States District Court for the Southern District of Ohio seeking the involuntary termination of the Pension Plan ("Action"). On June 18, 2007, the PBGC and AHCG entered into that certain Agreement for Appointment of Trustee and Termination of Plan ("Pension Plan Termination Agreement"). Under the Pension Plan Termination Agreement, the Pension Plan was terminated effective April 12, 2007, and the PBGC was appointed as the successor, statutory trustee of the Pension Plan under applicable provisions of ERISA. As the trustee of the Pension Plan, the PBGC will pay, subject to certain statutory limitations, the plan's unfunded guaranteed benefits with its insurance funds. Following the consummation of the Pension Plan Termination Agreement, the Action was dismissed with prejudice on June 20, 2007

In June 2007, the PBGC filed amendments to its UBL Claim and its DUEC Claim (the PBGC did not filed an amended Premium Claim). In its amended UBL Claim, the PBGC asserted that the estimated amount of the Pension Plan's unfunded benefit liabilities (i.e., the shortfall between the plan's assets and its promised benefits), as of April 12, 2007, the plan's termination date, was $8,754,578. In its amended DUEC Claim, the PBGC asserted that the estimated amount of the minimum funding contributions that were not made by AHCG was $5,749,809. As before, the PBGC asserted that portions of each claim were entitled to administrative expense status or priority treatment as tax claims. Specifically, the PBGC claimed that at least approximately $2.6 million of its amended DUEC Claim qualified as an

administrative expense and priority employee benefit claim because this portion of the DUEC Claim arose post-petition and in the 180 days preceding the Petition Date.

In late June and July 2007, the Debtors and the PBGC commenced settlement discussions to resolve the PBGC's various claims. In response to the PBGC's informal requests, the Debtors provided various due diligence and background information to the PBGC to enable it to evaluate and respond to the Debtors' settlement proposals.

The parties have since reached an agreement resolving the amount, priority and allowance of the PBGC's various claims in the Chapter 11 Cases. The settlement will be separately submitted to the Bankruptcy Court for approval as a compromise of controversy. Under the proposed settlement, the PBGC shall be afforded (i) an allowed administrative expense claim under 11 U.S.C. § 503 in the liquidated amount of $912,347 (the "Allowed PBGC Administrative Expense"), and (ii) an allowed, non-priority general unsecured claim under 11 U.S.C. § 502 in the liquidated amount of $7,842,231 (the "Allowed PBGC Unsecured Claim"). All other claims held by the PBGC, including any claims arguably entitled to priority, will be deemed withdrawn and released. Each of the Allowed PBGC Administrative Expense and the Allowed PBGC Unsecured Claim will be deemed allowed without the necessity of any further filings, amendments or Court approval.

Importantly, although the settlement will be submitted for the approval of the Bankruptcy Court once it has been finalized, the allowance and payment of the PBGC's claims under the settlement are contingent upon confirmation and effectiveness of the Plan. If the Plan (or any other Chapter 11 plan of reorganization filed, or otherwise supported, by the Debtors), is not confirmed for any reason, the settlement will become null and void. In that event, the PBGC

and the Debtors (or any other party in interest in the Chapter 11 cases) may pursue and object to the allowance of the PBGC's claims without admission by either party regarding the amount, priority, validity or enforceability of such claims or any asserted liens securing such claims.

The settlement also provides for a mutual general release among the Debtors, Cerberus (and various entities affiliated with Cerberus) and the PBGC with respect to any claims relating to the Pension Plan. The settlement further contemplates that the PBGC, following confirmation of the Plan, will terminate any lien notices filed by the PBGC against any non-debtor, foreign subsidiaries of any of the Debtors (in their capacities as potential members of AHCG's "controlled group").

The Debtors believe that the terms and conditions of the proposed PBGC settlement are fair and equitable and in the best interests of the Estates and their Creditors. The settlement entails a significant (approximate 65%) reduction in the amount of the PBGC's asserted administrative and priority claims and is critical to the formulation and confirmation of the Plan. Absent the settlement, the PBGC's administrative expense and priority claims would likely approximate $2.5 million, if not higher, based on the PBGC's position with respect to such liabilities. The settlement also finally resolves the amount of the PBGC's unsecured claim and avoids further litigation over the many complex variables that are typically used to determine such claims.

E.    **Settlement and Compromise of Allowed 503(b)(9) Claims**

To the extent required, the Plan shall constitute a compromise and settlement of Allowed 503(b)(9) Claims with each such Claimant who does not object in writing to the treatment proposed for it with respect to its Allowed 503(b)(9) Claim. The Confirmation Order

will constitute an order under Bankruptcy Rule 9019 compromising and settling Allowed 503(b)(9) Claims.

As set forth in Article 5 of the Plan, any unpaid amount of an Allowed 503(b)(9) Claim shall be available to the Holder thereof as a setoff, on a dollar for dollar basis and after application of any defenses available to such Holder, against the total dollar amount of any Litigation that may be asserted by the Reorganized Debtors against such Holder of an Allowed 503(b)(9) Claim.

**Payment of United States Trustee Fees**. All outstanding amounts due under 28 U.S.C. § 1930 that have not been paid shall be paid by the Debtors on or before the Effective Date. Thereafter, the Reorganized Debtors shall pay any statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) and such fees shall be paid until entry of a Final Decree or an order converting or dismissing the Chapter 11 Cases.

F.     **Implementation Of The Plan**

The Plan will be implemented as follows:

1.     **Available Cash.**

On or as soon as practical following the Effective Date, the Claims Reserve Account and the Segregated Claims Reserve Account shall be opened by the Disbursing Agent and funded in such amounts summarized in section 2(K) of the Disclosure Statement and as provided under the Plan. The sole source of funding for the Claims Reserve Account and the Segregated Claims Reserve Account will be from the Effective Date Cash, provided, however, that each Holder of an Allowed Class 5 Unsecured Claim is also entitled to receive its Pro Rata Share of eighteen (18) percent of any Net Chapter 5 Recoveries.

2.    **Handling of Plan Assets and Collection of Plan Proceeds and Revesting of Property of the Debtors Free and Clear**

On the Effective Date, the Plan Assets and any other property of the Estates shall revest in the Reorganized Debtors, free and clear of all Claims and Liens other than those Liens recognized by the Plan, provided however that (i) Plan Assets shall be held by the Reorganized Debtors and shall be distributed only in accordance with the Plan, and (ii) except with respect to the Madeleine Secured Claim and any Class 3 Other Secured Claim whose Holder retains its Lien on its collateral as provided under Article 3(B)(3)(b)(i) of the Plan, all Plan Assets shall constitute property of the Reorganized Debtors, free and clear of the Claims of any Creditors and Liens provided that the funds deposited in the Claims Reserve Account and Segregated Claims Reserve Account shall be used to fund distributions as provided in the Plan. Any remaining amount of the $4,000,000 in Effective Date Cash, after payment of all Allowed Administrative Claims and Allowed Priority Tax Claims, shall revest in the Reorganized Debtors free and clear of all Claims and Liens other than those Liens reorganized by the Plan. All right, title and interest in any of the Debtors' net operating losses shall be retained exclusively by the Reorganized Debtors. Allowed Claims under the Plan shall be satisfied exclusively and solely from the Effective Date Cash in the amounts provided for in the Plan for distributions to the Holders of such Claims and not from any other Plan Assets, provided, however, that Holders of Allowed Class 5 Claims shall also be entitled to a Pro Rata distribution of any Net Chapter 5 Recoveries at such times deemed appropriate by the Reorganized Debtors after the Effective Date.

Any Net Chapter 5 Claims Recoveries shall be distributed or retained by the Reorganized Debtors pursuant to the terms of the Plan. In addition, from and after the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order, the Reorganized Debtors shall be free to operate without any limitation or restriction by, and without any requirement to comply with, the Bankruptcy Code, Bankruptcy Rules, or Guidelines of the United States Trustee. The Effective Date Cash in the amount of $8,500,000 as allocated by the Plan for distribution to Holders of Allowed Claims in accordance with the treatment provided to such Holders under the Plan, shall be promptly delivered to the Disbursing Agent for deposit into the Segregated Claims Reserve Account and the Claims Reserve Account, as applicable, and such funds shall be held in trust by the Disbursing Agent for distribution in accordance with the terms of the Plan.

### 3. Non-Chapter 5 Claims Litigation.

Non-Chapter 5 Claims Litigation shall be retained by the Reorganization Debtors for their sole and exclusive benefit. From and after the Effective Date, all non-Chapter 5 Claims Litigation may be prosecuted or settled by the Reorganized Debtors in their sole discretion and at their sole expense. To the extent any non-Chapter 5 Claims Litigation is already pending on the Effective Date, the Reorganized Debtors as successor to the Debtors may continue the prosecution of such Litigation.

### 4. Chapter 5 Claims.

The Litigation Consultant shall oversee and make recommendations with respect to the prosecution and settlement of any Chapter 5 Claims. The Reorganized Debtors shall reasonably cooperate with the Litigation Consultant with respect to the prosecution and/or

settlement of any Chapter 5 Claims.  The Litigation Consultant shall be responsible for

prosecuting such Chapter 5 Claims, on the Reorganized Debtors' behalf, provided however, that

the commencement of any actions, litigation and any prosecution thereof is subject to the review

and approval of the Reorganized Debtors' Board of Directors.  On or soon as practicable after

the Effective Date, the Litigation Consultant Contribution shall be deposited into the Segregated

Claims Reserve Account in order to fund the initial operations of the Litigation Consultant.  Any

fees and expenses incurred by the Litigation Consultant in excess of the Litigation Consultant

Contribution in respect to the prosecution, settlement or analysis of the Chapter 5 Claims shall be

paid solely from gross proceeds of any Chapter 5 Claims Recoveries, unless otherwise agreed by

the Reorganized Debtors.  Eighteen percent (18%) of any Net Chapter 5 Claims Recoveries shall

be deposited into the Segregated Claims Reserve Account for distribution to Holders of Allowed

Class 5 Unsecured Claims in the manner provided under the Plan.  The remaining eighty-two

percent (82%) of any Net Chapter 5 Claims shall be retained by the Reorganized Debtors.

     5.     **Payment of Plan Expenses.**

Subject to the terms of the Plan, all Plan Expenses may be paid by the Disbursing

Agent(s) from the Claims Reserve Account or Segregated Claims Reserve Account, as

applicable, without further notice to Creditors or approval of the Bankruptcy Court.  Plan

Expenses allocable to the satisfaction of Allowed Administrative Claims, Priority Tax Claims,

Class 1 Priority Claims, or Class 3 Other Secured Claims pursuant to the Plan shall be paid

exclusively from the Claims Reserve Account.  Plan Expenses allocable to the satisfaction of

Class 4 and Class 5 Claims pursuant to the Plan, as well as payment Plan Expenses relating to

the prosecution of Chapter 5 Recoveries and payment of any fees or expenses incurred by the Litigation Consultant, shall be paid exclusively from the Segregated Claims Reserve Account.

### 6.    Distribution of Effective Date Cash.

Unless otherwise agreed by the Reorganized Debtors, Madeleine and GHPI, the Effective Date Cash allocated to satisfy Claims in accordance with, and subject to, the provisions of the Plan, shall be the sole and exclusive source of distributions to Holders of Claims, provided however, that the Disbursing Agent shall only distribute such Effective Date Cash to the Holders of Allowed Claims in such amounts and at such times as are set forth in the Plan. No payments or distributions shall be made by the Disbursing Agent on account of Disputed Claims unless and to the extent such Claims become Allowed Claims. Any Effective Date Cash reserved for payment of any Disputed Claims will be held in the Claims Reserve Account or the Segregated Claims Reserve Account, as applicable, by the Disbursing Agent in accordance with the Plan pending resolution of such Disputed Claims.

### 7.    Post-Confirmation Operations of the Reorganized Debtors.

Following the Effective Date and subject to the provisions of the Plan, the Reorganized Debtors shall operate their business and generally administer the Plan, prosecute any Litigation , hold and/or dispose of the Anchor Holdings Stock pursuant to the Anchor Hocking Purchase Agreement and conduct such other business as the Reorganized Debtors deem appropriate.   The Plan Supplement shall disclose the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors.

### 8.    Full and Final Satisfaction.

Commencing upon the Effective Date, the Disbursing Agent shall be authorized and directed to distribute the amounts required under the Plan to the Holders of Allowed Claims according to the provisions of the Plan.  Upon the Effective Date, all Debts of the Debtors shall be deemed fixed and adjusted pursuant to the Plan and the Debtors shall have no further liability on account of any Claims or Interests except as set forth in the Plan.  All payments and all distributions made by the Disbursing Agent under and in accordance with the Plan shall be in full and final satisfaction, settlement, release, and discharge of all Claims.

### 9.    Discharge of the Debtors.

Except as otherwise provided in the Plan or in the Confirmation Order, rights afforded in, and all consideration distributed under, the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties.  Regardless of whether property shall have been distributed or retained pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtors shall each be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, without limitation, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is Allowed under Section 501 of the Bankruptcy Code, or (b) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based upon such debt accepted the Plan.

10.    **Distribution Procedures.**

Except as otherwise agreed by the Holder of a particular Claim, or as provided in the Plan, all amounts to be paid by the Disbursing Agent under the Plan shall be distributed in such amounts and at such times as is reasonably prudent as determined by the Disbursing Agent. On the Effective Date, or as soon as practicable thereafter, the Disbursing Agent shall: (a) establish and fund the Segregated Claims Reserve Account and the Claims Reserve Account from the Effective Date Cash in accordance with the provisions of the Plan; and (b) promptly as practicable pay, in full satisfaction of their respective claims, the Holders of (i) Allowed Administrative Claims, (ii) Allowed Priority Tax Claims, and (iii) Allowed Class 1, Class 4 and Class 5 Claims and (iv) Allowed Class 3 Claims, but solely to the extent this option is selected by the Reorganized Debtors as treatment of any Allowed Class 3 Claim in accordance with and as provided for under the Plan.

The Disbursing Agent shall make the Cash payments to the Holders of Allowed Claims: (a) in U.S. dollars by check, draft or warrant, drawn on a domestic bank selected by the Disbursing Agent in its sole discretion, or by wire transfer from a domestic bank, at the Disbursing Agent's option, and (b) by first-class mail (or by other equivalent or superior means as determined by the Disbursing Agent).

11.    **Disbursing Agent.**

The Disbursing Agent may employ or contract with other entities to perform the obligations created under the Plan. Any third party Disbursing Agent shall receive reasonable compensation for services rendered and reimbursement for expenses incurred in connection with the Plan or any functions or responsibilities adopted under the Plan and which amounts may be

deducted from the Segregated Claims Reserve Account as Plan Expenses. The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated under the Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan. The Reorganized Debtors may, in their discretion, select the Litigation Consultant to serve as the Disbursing Agent. Any expenses with respect to the foregoing shall be from the Litigation Consultant Contribution as Plan Expenses unless otherwise agreed by the Reorganized Debtor and Madeline.

12.    **Claims Reserve Account and Segregated Claims Reserve Account.**

On or as soon as practicable after the Effective Date, the Disbursing Agent shall (a) create and fund both the Claims Reserve Account and Segregated Claims Reserve Account from Effective Date Cash to satisfy all Allowed Claims pursuant to the treatment provided under Article 3 of the Plan, and (b) periodically deposit the portion of Net Chapter 5 Claims Recoveries, if any, allocable to Holders of Allowed Class 5 Claims pursuant to the Plan into the Segregated Claims Reserve Account for distribution to Holders of Allowed Class 5 Claims in the manner provided under the Plan.

13.    **Resolution of Disputed Claims.**

The Reorganized Debtors may object to any Claims at any time on or subsequent to the Effective Date. Unless otherwise provided in the Confirmation Order, subject to Article 5 of the Plan, the Reorganized Debtors shall be authorized to settle, or withdraw any objections to,

any Disputed Claim following the Confirmation Date without further notice to Creditors or

authorization of the Bankruptcy Court, in which event such Claim shall be deemed to be an

Allowed Claim in the amount compromised for purposes of the Plan.  Under no circumstances

will any distributions be made on account of Disallowed Claims.

**14.    Reserve Provisions for Disputed Claims.**

The Disbursing Agent shall implement the following procedures with respect to

the allocation and distribution of Cash in the Segregated Claims Reserve Account and the Claims

Reserve Account, to the Holders of Disputed Claims that become Allowed Claims:

(i)     Cash respecting Disputed Claims shall not be distributed, but, if necessary, shall be withheld by the Disbursing Agent in an amount equal to the amount of the distributions that would otherwise be made to the Holders of such Claims if such Claims had been Allowed Claims, based on the Disputed Claims Amount.

(ii)    Where only a portion of a Claim is Disputed, at the option of the Reorganized Debtors or Disbursing Agent, as applicable, interim or partial distributions may (but are not required to) be made with respect to the portion of such Claim that is not Disputed.

(iii)   The Bankruptcy Court may estimate the amount of any Disputed Claim that is either a contingent or unliquidated Claim, or as otherwise permitted pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed to be Allowed Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of distribution under the Plan.  In lieu of estimating the amount of any Disputed Claim that is either a contingent or unliquidated Claim, or as otherwise permitted under section 502(c) of the Bankruptcy Code, the Bankruptcy Court or the Disbursing Agent may determine the Disputed Claims Amount to be reserved for such Disputed Claim, or such amount may be fixed by agreement in writing by and between the Reorganized Debtors and the Holder thereof.

(iv)    When a Disputed Claim becomes an Allowed Claim, there shall be distributed to the Holder of such Allowed Claim, in accordance with the provisions of the Plan, Cash equal to the amount of Cash set aside for such Disputed Claim within the applicable sub-account of the Claims Reserve

Account or Segregated Claims Reserve Account, but in no event shall such Holder be paid more than the amount that would otherwise have been paid to such Holder if the Claim (or the Allowed portion of the Claim) had not been a Disputed Claim.

(v)     Interim distributions may be made from time to time to the Holders of Allowed Claims prior to the resolution by Final Order or otherwise of all Disputed Claims.

(vi)    No Holder of a Disputed Claim shall have any Claim against the Cash reserved with respect to such Claim until such Disputed Claim shall become an Allowed Claim.  In no event shall any Holder of a Disputed Claim be entitled to receive (under the Plan or otherwise) from the Debtors, the Reorganized Debtors, the Segregated Claims Reserve Account or the Claims Reserve Account any payment (x) which is greater than the amount reserved for such Claim by the Bankruptcy Court pursuant to the Plan, or (y) except as otherwise permitted under the Plan, of interest or other compensation for delays in distribution.  In no event shall the Reorganized Debtors have any responsibility or liability for any loss to or of any amount reserved under the Plan.

(vii)   To the extent a Disputed Claim ultimately becomes an Allowed Claim in an amount less than the Disputed Claim Amount reserved for such Disputed Claim and the Segregated Claims Reserve Account and the Claims Reserve Account contain sufficient Cash to pay any unpaid but Allowed Claims under the Plan, then the resulting surplus of Cash shall be retained in the Segregated Claims Reserve Account and the Claims Reserve Account and shall be distributed in accordance with the provisions of the Plan.

**15.    Allocation of Distributions.**

Distributions to any Holder of an Allowed Claim shall be allocated first to the

principal amount of any such Allowed Claim, as determined for federal income tax purposes, and

then, to the extent the consideration exceeds such amount, to the remainder of such Claim

comprising interest, if any (but solely to the extent that interest is an allowable portion of such

Allowed Claim).

16.     **Rounding.**

Whenever any payment of a fraction of a cent would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest cent.

17.     **Disputed Payments.**

In the event of any dispute between and among Creditors as to the right of any Entity to receive or retain any payment or distribution to be made to such Entity under the Plan, the Disbursing Agent may, in lieu of making such payment or distribution to such Entity, instead hold such payment or distribution until the disposition thereof shall be determined by the Bankruptcy Court.

18.     **Unclaimed Property.**

Any entity which fails to claim any Cash within 120 days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan, including forfeiture of any right to receive any subsequent distribution under the Plan. Upon forfeiture, such Cash (including interest thereon) shall be deposited into the Segregated Claims Reserve Account or the Claims Reserve Account, as applicable, to be distributed to the Holders of Allowed Claims in accordance with the provisions of the Plan. Entities which fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtors, the Reorganized Debtors, or the Disbursing Agent or any Holder of an Allowed Claim to whom distributions are made by the Disbursing Agent, or the property of any of them.

19.   **Setoffs.**

Nothing contained in the Plan shall constitute a waiver or release by the Debtors and/or Reorganized Debtors of any right of setoff or recoupment the Debtors and/or Reorganized Debtors may have against any Creditor, Equity Interest Holder or Subsidiary Equity Interest Holder.

20.   **Withholding Taxes.**

Pursuant to section 346(f) of the Bankruptcy Code, the Disbursing Agent shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.

21.   **United States Trustee Fees.**

All outstanding amounts due under 28 U.S.C. § 1930 that have not been paid shall be paid by the Debtors on or before the Effective Date.  Thereafter, the Reorganized Debtors shall pay any statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) and such fees shall be paid until entry of a Final Decree or an order converting or dismissing the Chapter 11 Cases.

G.   **Executory Contracts**

1.   **Rejection of Executory Contracts and Unexpired Leases**

Each executory contract and unexpired lease entered into by Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code, <u>except</u> with respect to executory contracts or unexpired leases that: (i) were previously assumed or rejected by prior orders of the Bankruptcy Court, (ii) are subject to a pending motion to assume or reject, pursuant to section 365 of the Bankruptcy Code, on the Confirmation Date, or (iii) are identified in any

Plan Supplement filed by the Debtors as (A) a contract to be assumed by one or more of the Reorganized Debtors or (B) a contract that will neither be assumed nor rejected, and which will ride through the Chapter 11 cases and will not be altered or modified by the Plan.

Nothing in the Plan shall be construed as an acknowledgement that a particular contract or agreement is executory or is properly characterized as a lease or an executory contract, as the case may be. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections (or such assumptions, as the case may be) pursuant to Section 365 of the Bankruptcy Code, as of the Effective Date. The non-Debtors parties to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property that is the subject of such executory contracts and leases.

To the extent that any contract is identified on any Plan Supplement filed by the Debtors as a contract to be assumed by one or more of the Reorganized Debtors pursuant to section 365(a) of the Bankruptcy Code (an "Assumed Contract"), the Debtors shall serve the affected counterparty to each Assumed Contract with a proposed cure notice substantially in the form of Exhibit A attached to the Plan on or prior to fifteen (15) days before the Confirmation Hearing (the "Cure Notice"). The Cure Notice shall state the date, time and place of the Confirmation Hearing as well as the date by which any objection to the assumption and assignment of the Assumed Contract must be filed and served. The Bankruptcy Court shall resolve any objections to the assumption of any Assumed Contract at the Confirmation Hearing, or at such later date as scheduled by the Bankruptcy Court. The Cure Notice will identify the amounts, if any, the Debtors believe are owed to each counterparty to an Assumed Contract to

cure any monetary defaults under section 365(b)(1) of the Bankruptcy Code (the "Cure Amounts").

Payment of any Cure Amounts shall be the sole responsibility of the Reorganized Debtors and shall be made on or before ten (10) days after the Effective Date. Payment of the Cure Amounts (if any) shall (a) effect a cure of all defaults existing as of the Effective Date; (b) compensate for any actual pecuniary loss to the counterparty to the Assumed Contract resulting from such default, (c) together with the assumption of the Assumed Contract, constitute adequate assurances of future performance thereof, and (d) shall be forever binding on the counterparty to the Assumed Contract. The Debtors may elect not to assume any Assumed Contract at any time before or on the Effective Date by serving notice to the affected counterparty of the Assumed Contract of such election.

2.      **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

All Proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Confirmation of the Plan, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the earlier of the date of the Effective Date or entry of an order of the Bankruptcy Court approving such rejection. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Confirmation of the Plan that is not Filed within such times will be forever barred from assertion against Debtors, the Reorganized Debtors, the Estate, or the property of any of them. All such Claims for which Proofs of Claim are timely and properly Filed and ultimately Allowed will be treated as Class 5 Unsecured Claims subject to the provisions of Article 3 of the Plan. Notwithstanding the

foregoing, nothing in the Plan shall be deemed to extend or otherwise affect any bar date or

deadline ordered by the Court with respect to the filing of any Claims for rejection damages for

executory contracts and unexpired leases previously rejected by the Debtors.

### H.    <u>Substantive Consolidation</u>

On the Effective Date, the Debtors will be deemed substantively consolidated solely for voting and distribution purposes only under the Plan. On the Effective Date, the Plan will consolidate all assets and liabilities of the Debtors' into a single estate solely for the purposes of voting and distributions under the Plan. The Debtors shall continue to maintain their separate corporate existences for all purposes other than with respect to voting on the Plan and the treatment of Claims under the Plan and any associated distributions thereunder. Pursuant to the Confirmation Order, on the Effective Date, (i) all intercompany claims by and against any Debtor will be deemed withdrawn and disallowed for distribution purposes pursuant to the Plan; (ii) all Plan Assets to be used for distributions to Creditors of any of the Debtors will be treated as though they were merged into the Reorganized Debtors; (iii) any obligation of any Debtor and all guarantees thereof executed by, or joint liability of, any of the Debtors will be treated as one obligation of the Reorganized Debtors for distribution purposes pursuant to the Plan; and (iv) any Claims filed against any Debtors shall be treated as a single Claim filed against the Reorganized Debtors for distribution purposes pursuant to the Plan. The substantive consolidation of the Debtors for voting and distribution purposes shall not affect or impair any rights, Claims or remedies or defenses of (or between) the separate Debtors as of the Petition Date, including with respect to any Litigation.

As set forth above, the Debtors' three business groups were sold pursuant to the respective sale of substantially all of the assets of the (i) Burnes Group Debtors, (ii) the WearEver Debtors, and (iii) the Anchor Hocking Debtors (collectively, the "Asset Sales"). The proceeds derived from the Asset Sales were applied to satisfy the Debtors' obligations under the Ratification Agreement. Moreover, substantially all of the Debtors remaining assets are now encumbered by the Madeleine Secured Claim of over $200,000,000. In addition, certain creditors have asserted Claims against multiple Debtors in each of the Debtors' three business groups. Absent substantive consolidation of the Debtors for voting and distribution purposes, upon which the Plan is predicated, creditors of the various Debtors' estates would not receive any distributions on account of their Claims because the Debtors' remaining assets would be wholly applied to satisfy the Madeleine Secured Claim, which Claim is undersecured. Also, in the absence of substantive consolidation, the Debtors would need to litigate the identity of the appropriate Debtor against whom the Claim, if any, resided, as well as the legal theory in support of Claims asserted against multiple Debtors. With the substantive consolidation of the Debtors for voting and distribution purposes, and the contribution of the Effective Date Cash pursuant to the terms of the Plan, unsecured creditors would receive some distribution on account of their Claims. Thus, the Debtors do not believe that any creditor is prejudiced by the substantive consolidation of the Debtors for voting and distribution purposes and all creditors with Allowed Claims will benefit if the Debtors are substantively consolidated for such purposes.

## I.    Conditions to Confirmation of the Plan

Confirmation of the Plan is conditioned upon the Court entering the Confirmation Order, in form and substance reasonably acceptable to the Debtors, Madeleine and GHPI,

approving the Plan in substantially the form filed. If the Court does not enter the Confirmation Order, then the Debtors may, at their option, withdraw the Plan and, if withdrawn, the Plan shall be of no further force or effect. Provided no stay of the Confirmation Order is then in effect, the Plan shall become effective on the Effective Date.

J.    **Conditions to the Effectiveness of the Plan**

Unless otherwise waived by the Debtors and Madeleine and GHPI, the effectiveness of the Plan is conditioned on the funding of the Plan in an amount not to exceed $8,500,000 in Effective Date Cash for distribution to Holders of Allowed Claims pursuant to the treatment provided in Article 3 of the Plan with respect to such Claims, inclusive of (i) the $3.5 million of the Effective Date Cash to be distributed, Pro Rata, to Holders of Allowed Class 4 503(b)(9) Claims, and (ii) the $1 million in Effective Date Cash to be distributed, Pro Rata, to Holders of Allowed Class 5 Unsecured Claims. The determination of whether the condition to the effectiveness of the Plan described in this paragraph has been satisfied shall be made exclusively by the Debtors.

Further conditions to the effectiveness of the Plan shall be entry of a Confirmation Order and the execution and delivery of all related documents and instruments in form and substance reasonably satisfactory to the Debtors, GHPI and Madeleine.

Notwithstanding anything to the contrary, Madeleine and GHPI reserve the right to withdraw the proposed GHPI Cash Contribution if the amount of Effective Date Cash required to fund the distributions under the Plan exceeds $8,500,000.

### K.    Effective Date

Provided no stay of the Confirmation Order is then in effect and all of the conditions to the effectiveness of the Plan in Article 7 of the Plan have been met or waived, the Plan shall become effective on the Effective Date.

### L.    Effects Of Confirmation

#### 1.    Binding Effect of Plan

The provisions of the confirmed Plan shall be binding on and inure to the benefit of the Debtors, all present and former Holders of Claims against and Equity Interests and Subsidiary Equity Interests in the Debtors, whether or not such Holders will receive or retain any property or interest in property under the Plan, their respective successors and assigns, including, without limitation, the Reorganized Debtors, and all other parties in interest in the Chapter 11 Cases, to the maximum extent permitted by applicable law, whether or not such Creditor or Equity Interest Holder has filed a Proof of Claim or Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or the Interest of such Equity Interest Holder is Impaired under the Plan, and whether or not such Creditor or Equity Interest Holder has accepted or rejected the Plan. All Claims and Debts shall be as fixed and adjusted pursuant to the Plan. With respect to any Taxes of the kind specified in Bankruptcy Code section 1146, the Plan shall bind any taxing authority, recorder of deeds or similar official for any county, state, or Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated under the Plan is to be recorded.

2.    **Limitation of Liability.**

The Debtors, the Disbursing Agent, the Committee, GHPI, Cerberus Partners L.P., Cerberus Capital Management L.P., Madeleine and each of their respective present and former officers, directors, managers, employees, agents, advisors, accountants, attorneys and representatives, will neither have nor incur any liability to any entity for any action taken in good faith or omitted in good faith to be taken in connection with or related to the Chapter 11 Cases or the formulation, preparation, dissemination, solicitation, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan or incident to the Chapter 11 Cases; provided, however, that this limitation will not affect or modify the obligations created under the Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Plan against the Reorganized Debtors.

3.    **Releases.**

As part of the Plan, the releases set forth below shall be granted pursuant to the Plan and the Confirmation Order:

a.    <u>Debtors and Committee Releases</u>

Except as provided in Section 8.D of the Plan, on the Effective Date (i) the Committee, the Debtors, their estates, and their respective officers, directors, managers, employees, agents, advisors, accountants, attorneys and representatives, shall be deemed to have released and discharged GHPI, Cerberus Partners, L.P., Cerberus Capital Management, L.P., Madeleine (collectively, the "Cerberus Released Parties"), and any of their affiliates and present and former officers, directors, managers, shareholders, agents, representatives, consultants, advisors, accountants, counsel, and employees, and the past and present members of the Board of

Directors of each of the Debtors from any and all claims, causes of action, demands, losses, whether known or unknown, in law or equity, against any of the Cerberus Released Parties or any past or present member of the Board of Directors of each of the Debtors, based in whole or in part upon any act or omission arising from or in connection with or in any way relating to the Debtors; and (ii) the Debtors, their estates and all creditors, and their respective officers and directors, shareholders, agents, representatives, consultants, counsel and employees, shall be deemed to have released and discharged the Committee and each Committee member (solely in such capacity) from any and all claims, causes of action, demands, losses, whether known or unknown, in law or equity, against each other based in whole or in part upon any act or omission arising from or in connection with or in any way to the Debtors.

        b.    <u>Other Releases</u>

Except as provided in section 8.D of the Plan, as of the Effective Date, for good and valuable consideration, to the maximum extent permitted by applicable law, each Holder of a Claim or Equity Interest that affirmatively voted in favor of the Plan, shall have agreed to forever release, waive and discharge the Released Parties of and from all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtors (including Reorganized Debtors), the Chapter 11 Cases, or the Plan whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transition, event or other occurrence taking place on or prior to the Effective Date in connection with the Chapter 11 Cases, or the formulation, preparation, dissemination, solicitation, implementation, Confirmation

or Consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan or incident to the Chapter 11 cases; provided, however, that the foregoing shall not operate as a waiver or release from any causes of action arising out of (i) any express post-Effective Date contractual obligation owing by any such present or former director, officer, employee, agent, financial advisors, attorneys or professional of the Debtors or the Committee or its members, agents, advisors, attorneys or, (ii) the willful misconduct or gross negligence of such present or former director, officer, employee, agent, attorneys or professional of Debtors or the Committee or its members, agents, advisors or attorneys, as determined by Final Order of a court of competent jurisdiction.

### 4.    PBGC Settlement Agreement

Notwithstanding the releases set forth in Section 8.C in the Plan and summarized above, nothing in the Plan shall constitute a release to any Claim asserted by the PBGC against any non-Debtor third party for breach of fiduciary duty with respect to the Pension Plan or its assets, to the extent set forth in Section 4.b of the PBGC Settlement Agreement.

### 5.    Injunction.

Except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Equity Interests in the Debtors, the Reorganized Debtors or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against any of the Released Parties, the Estates, or any property of the Debtors, the Reorganized Debtors, or the

Estates, with respect to any such Claim or Equity Interest; (b) the enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Released Parties, the Estates, or any property of the Debtors, the Reorganized Debtors, or the Estates, with respect to any such Claim or Equity Interest; (c) creating, perfecting or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Released Parties, the Estates, or any property of the Debtors, the Reorganized Debtors, or the Estates, with respect to any such Claim or Equity Interest; (d) asserting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtors, the Reorganized Debtors, the Estates, or any property of the Debtors, the Reorganized Debtors, or the Estates, with respect to any such Claim or Equity Interest, except to the extent provided in the Plan with respect to any potential setoff by a Holder of Allowed 503(b)(9) Claim of any unpaid amount of such Allowed 503(b)(9) Claim to the extent provided in Section 5(U) of the Plan; and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Equity Interest. Nothing contained in this section shall prohibit the Holder of a timely-filed Proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtors or the Reorganized Debtors under the Plan. Any person or Entity injured by any willful violation of such injunction may recover actual damages, including costs and attorneys' fees from the willful violator. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and Non-

GHPI Equity Interests and other debts and liabilities against the Debtors, pursuant to section 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against any Debtor at any time, to the extent such judgment relates to a discharged Claim or terminated Equity Interest.

6.    **Post-Confirmation Liability of the Reorganized Debtors and Disbursing Agent.**

The Reorganized Debtors, Disbursing Agent and their respective consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and the professionals shall not be liable for any liability, loss, damage, claim, cause of action, cost or expense, including but not limited to attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, to the Holders of Claims, Equity Interests or Subsidiary Equity Interests for any action or inaction taken in good faith in connection with the performance or discharge of his or her duties under the Plan, except that the Reorganized Debtors, the Disbursing Agent and their respective consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and the professionals may be liable for actions or inactions that are grossly negligent or which constitute willful misconduct. Any act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence or willful misconduct.

M.    **Management of Reorganized Debtors**

The Reorganized Debtors will be managed and governed by the entity or entities and/or individual(s) designated by the Debtors on or prior to ten (10) days prior to the Confirmation Hearing in the Plan Supplement.

<center>VI.</center>

## OTHER CRITICAL INFORMATION REGARDING THE PLAN

### A.    Chapter 5 Claims

The Debtors have not yet fully analyzed the Chapter 5 Claims that they may have against third parties and have not commenced any actions against potential transferees. As explained in greater detail in above, the Litigation Consultant shall oversee and make recommendations to the Board of Directors of the Reorganized Debtors, or their representative, with respect to determinations in connection with the prosecution and settlement of any Chapter 5 Claims with respect to the prosecution and/or settlement of any Chapter 5 Claims Recoveries. All Litigation, including, without limitation, all Chapter 5 Claims, is expressly preserved pursuant to section 1123 of the Bankruptcy Code.

### B.    Dissolution of Committee

Upon the earlier to occur of (i) the Claims Objection Deadline, or (ii) the date upon which the Reorganized Debtors notify the Committee that all objections to Claims, if any, have been filed with the Bankruptcy Court, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Cases. The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered or expenses incurred after the after the date on which the Committee is dissolved, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any

applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to Section 2(C) of the Plan.

C.    **Tax Implications**

The United States federal income tax consequences of the distributions contemplated by the Plan to the Holders of Claims that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any person or entity (1) who is a citizen or resident of the United States, (2) that is a corporation or partnership created or organized in or under the laws of the United States or any state thereof, (3) that is an estate, the income of which is subject to United States federal income taxation regardless of its source or (4) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control; or (b) that has elected to continue to be treated as a United States Person for United States federal income tax purposes. In the case of a partnership, the tax treatment of its partners will depend on the status of the partner and the activities of the partnership. United States Persons who are partners in a partnership should consult their tax advisors. A "Non-United States Person" is any person or entity that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "Holder" shall mean a Holder of a Claim that is a United States Person.

The United States federal income tax consequences to Holders and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was

acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; and (7) whether the Claim is an installment obligation for United States federal income tax purposes. Certain Holders of Claims (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary of United States federal income tax consequences. There also may be state, local, and/or foreign income or other tax considerations or United States federal estate and gift tax considerations applicable to Holders of Claims, which are not addressed herein. EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR WITH RESPECT TO DISTRIBUTIONS RECEIVED UNDER THE PLAN.

        1.    **Holders of Claims.**

      A Holder who received Cash (or potentially other consideration with respect to any Holders of Class 3 Claims) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who

previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

### 2.    Non-United States Persons.

A Holder of a Claim that is a Non-United States Person generally will not be subject to United States federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effective connected" for United States federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

### 3.    Importance of Obtaining Professional Tax Assistance.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

D.    **Risks Under the Plan**

As noted above, the effectiveness of the Plan is conditioned on the satisfaction of the conditions set forth in Article 7 of the Plan and summarized herein. If the Plan is not confirmed, or does not become effective as a result of the failure of one or more of these conditions, the Debtors believe that the likely alternative would be the conversion of the Chapter 11 Cases to chapter 7 cases under the Bankruptcy Code, and that Holders of Unsecured Claims would not receive any distributions on account of their Claims.

E.    **Absolute Priority Rule and Liquidation Analysis**

Pursuant to section 1129(a)(8) of the Bankruptcy Code, all classes of claims must either accept the Plan or be unimpaired under the Plan. The Plan does not satisfy the "cram down" requirements of section 1129(b)(1) with respect to Class 2, Class 4 or Class 5 because members of those classes, which classes are senior in priority to Equity Interests and Subsidiary Equity Interests, will not receive the full value of their Claims while the Holders of GHPI Equity Interests will retain such interests under the Plan. This rule is known as the "Absolute Priority Rule". Thus, if certain classes vote to reject the Plan, the Plan cannot be confirmed over the objection of such Classes because the Debtors cannot cram down the Plan on these Classes pursuant to section 1129(b) of the Bankruptcy Code under the Absolute Priority Rule.[15]

In addition to requiring the acceptance of each of the voting Classes which cannot be crammed down under the Plan, the Plan must also satisfy section 1129(a)(7) of the Bankruptcy Code. Pursuant to section 1129(a)(7) of the Bankruptcy Code, unless there is

---

[15] As discussed in section II.G of the Disclosure Statement, the Debtors will seek confirm the Plan pursuant to 1129(b) with respect to Class 7, and, to the extent necessary, with respect to Class 1, Class 3 and Class 6(B).

unanimous acceptance of the Plan by an Impaired Class, the Debtors must demonstrate, and the Bankruptcy Court must determine, that with respect to such Class, each Holder of a Claim will receive property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. This requirement is commonly referred to as the "Best Interests of Creditors Test." Because substantially all of the Debtors' remaining assets are encumbered by the Madeleine Secured Claim of over $200,000,000, the Debtors estimate that there would be no assets to collect or liquidate under chapter 7 for the benefit of Priority Claims and Unsecured Creditors, except for any net proceeds derived from the prosecution, if any, of avoidance actions by a chapter 7 trustee.

Moreover, if the Chapter 11 Cases were converted, the Debtors do not believe that there would be any remaining or available funds for a chapter 7 trustee to use to administer the chapter 7 cases in order to prosecute any material avoidance actions. And even if a chapter 7 trustee is hypothetically able successfully to prosecute any avoidance actions, all Administrative Claims would need to first paid in full prior to any distributions to Holders of Priority Claims and Unsecured Claims. In addition to Priority Claims and Unsecured Claims likely not receiving any distributions if the Chapter 11 Cases were converted chapter 7 cases, Holders of Class 4 503(b)(9) Claims, who would share Pro Rata with other Holders of Administrative Claims, would likely receive far less than the estimated 35% distribution on account of their Allowed 503(b)(9) Claims under the Plan.

Moreover, even if there were any assets for distribution to Unsecured Creditors in a hypothetical liquidation of the Debtors that were not subject to the Madeleine Secured Claim,

the net proceeds from the collection, sale and or liquidation of any such assets would be reduced by the commission payable to the chapter 7 trustee and the trustee's attorney's and accounting fees, as well as the administrative costs incurred during the Chapter 11 Cases (such as the compensation for chapter 11 Professionals).[16]

In addition, the Debtors and their Professionals have acquired knowledge of the Estates and the Claims against them that cannot be easily duplicated by a chapter 7 trustee in a cost-effective manner. The Debtors believe that, if the Plan is not confirmed, the most likely alternative will be conversion of the Chapter 11 Cases to a chapter 7 liquidation, which, as noted above, would not provide any distribution to Creditors because substantially all of the Debtors' assets would be used to satisfy the Madeleine Secured Claim. Therefore, the Debtors believe that the Plan satisfies the Best Interests of Creditors Test. At the Confirmation Hearing, the Bankruptcy Court will determine whether the Holders of Claims and Equity Interests in any Impaired Class that has not voted to accept the Plan would receive a distribution under the Plan that is at least as great as the distribution that such Holders would receive upon a liquidation of the Debtors pursuant to chapter 7 of the Bankruptcy Code.

---

[16] It is also anticipated that a chapter 7 liquidation would result in delay in the distributions to Creditors. Among other things, a chapter 7 case would trigger a new bar date for filing Claims that would be more than 90 days following conversion of the Chapter 11 Cases to chapter 7. Fed. R. Bankr. P. 3002(c). Hence, a chapter 7 liquidation would not only cost more in the way of administrative fees and delay distributions, but also raise the prospect of the allowance of additional Claims that were not timely asserted in the Chapter 11 Cases. Based on the foregoing, the Debtors submit that the Plan and the provision of the Effective Date Cash plus eighteen percent (18%) of any net Class 5 Claims recoveries for distribution to Allowed Unsecured Claims provide the only opportunity for any recovery to Creditors.

## VII.

## CONFIRMATION OF THE PLAN

The Debtors will seek confirmation of the Plan at the Confirmation Hearing, pursuant to applicable provisions of the Bankruptcy Code.

### A.    Confirmation Hearing.

The Bankruptcy Court will hold the Confirmation Hearing on _____, 2007, at _____, to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied.

### B.    Requirements for Confirmation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the provisions of section 1129 of the Bankruptcy Code have been satisfied. If all of the provisions of section 1129 of the Bankruptcy Code are met, the Bankruptcy Court may enter an order confirming the Plan. The Debtors believe that all of the requirements of section 1129 of the Bankruptcy Code will be satisfied. Among other things, the Debtors believe that the Plan will be accepted by the requisite number of votes and satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code. The Debtors submit that they have complied or will have complied with all of the requirements of chapter 11, and that the Plan has been proposed and is made in good faith. In addition, the Debtors submit that the Plan satisfies the Best Interests of Creditors Test and will not be followed by the need for further bankruptcy relief.

As noted above, section 1129(b) of a Bankruptcy Code allows for Confirmation of the Plan if it does not unfairly discriminate and is fair and equitable with respect to each Class

of Claims or Non-GHPI Equity Interests that is Impaired under and has not accepted the Plan.

To the extent required, the Debtors will seek Confirmation of the Plan pursuant to 1129(b) of the

Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate

unfairly as to the Holders Claims and Non-GHPI Equity Interests in Classes 1, 3, 6(B) and 7.

      C.     **Classification of Claims and Interests**

        The Debtors believe that the Plan's classification of Claims, and Equity Interests

and Subsidiary Equity Interests fully complies with the requirements of the Bankruptcy Code.

      D.     **Acceptance**

        As a condition to confirmation of a plan, the Bankruptcy Code requires that each

class of Holders of claims or interests accept the plan, with the exceptions described below. The

Bankruptcy Code defines acceptance by a class of Holders of claims as acceptance by Holders of

two-thirds in dollar amount and a majority in number of claims of that class, but for this purpose

counts only those who actually vote to accept or reject the plan. Holders of claims who fail to

vote are not counted as either accepting or rejecting the plan.

        Classes of claims and interest that are not Impaired under a plan are deemed to

have accepted the plan. A class is Impaired if the legal, equitable, or contractual rights attaching

to the claims or interests of that class are modified, other than by curing defaults and reinstating

maturities or by payment in full in cash. A class that receives nothing under a plan is deemed to

reject such plan.

        IN THESE CHAPTER 11 CASES, CLASSES 1, 2, 3, 4, 5 and 6(B) ARE

IMPAIRED UNDER THE PLAN AND ARE ENTITLED TO VOTE THEREON. Classes 6(A)

and 6(C) are Unimpaired and are therefore not entitled to vote on the Plan and are deemed to

have accepted the Plan. Class 7 is Impaired, but is not entitled to vote on the Plan because the members of Class 7 will not receive any distributors under the Plan on account of their Cancelled Options and Warrants and therefore, Class 7 is deemed to reject the Plan.

E.       **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires a finding that Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Plan proposed by the Debtors satisfies these requirements and is "feasible" because the implementation of the Plan and the wind-up of the Debtors' affairs pursuant thereto will be funded by the Effective Date Cash. Since the sales of substantially all the Debtors' assets have all closed, distributions to Creditors under the Plan will occur and are not dependent upon any ongoing operations by the Debtors.

The Debtors have previously described how Allowed Claims will be satisfied through the distribution of Plan Proceeds to the Holders of Allowed Claims. Following the Effective Date, the Reorganized Debtors shall operate their business and generally administer the Plan, prosecute any Litigation Claims, and administer any assets requesting in the Reorganized Debtors on the Effective Date. In addition to funding Cash in the amount of the Effective Date Cash, to the extent required, GHPI shall also contribute sufficient Cash to the Reorganized Debtors to the extent required to operate their business following the Effective Date.

Therefore, the Debtors believe that Confirmation of the Plan is not likely to be followed by the need for a further bankruptcy relief by the Reorganized Debtors.

F.          **Alternatives to Confirmation of Plan**

If the Plan is not Confirmed by the Bankruptcy Court and consummated, the alternatives include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code; or (ii) confirmation of an alternative plan of liquidation under chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Debtors believe that the Chapter 11 Cases will be converted to cases under chapter 7 of the Bankruptcy Code, which would likely result in no recovery to Creditors for the reasons discussed above. Therefore, the Debtors believe that the Plan, as proposed, provides the greatest possible return available for the Holders of Claims in these Chapter 11 Cases.

VIII.

## CONCLUSION

The Debtors believe that the Plan is in the best interest of Creditors and urge

Creditors to vote to accept the Plan.

Dated: November 15, 2007

Ronald F. Stengel
Chief Restructuring Officer

Submitted by:

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Bruce Grohsgal (Bar No. 3583)
Joshua M. Fried (CA Bar No. 181541)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
dbertenthal@pszjlaw.com
bgrohsgal@pszjlaw.com
jfried@pszjlaw.com

Counsel for the Debtors and Debtors In Possession

31604-001\DOCS_SF:52523.13

# Exhibit A

# Letter from Creditors' Committee



**Lowenstein**
**Sandler**
ATTORNEYS AT LAW

To all of the Unsecured Creditors of
Global Home Products, LLC, *et al.*

**Re:     Global Home Products, LLC, *et al.***
**Case No. 06-10340 (KG)**
**United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court")**

Dear Creditors:

We write on behalf of the Official Committee of Unsecured Creditors (the "Committee") of
Global Home Products, LLC, *et al.*, the debtors and debtors in possession (the "Debtors"), in
order to solicit your <u>acceptance</u> of the Debtors' First Amended Joint Chapter 11 Plan of
Reorganization (the "Plan") that accompanies this letter. Also accompanying this letter is the
Debtors' First Amended Joint Disclosure Statement (the "Disclosure Statement") containing
detailed information regarding the Debtors and their businesses. To the extent this letter is
inconsistent with the terms of the Plan and Disclosure Statement, the Plan and Disclosure
Statement shall govern. The Committee believes that the Plan provides a treatment of your claim
that is fair and equitable and therefore supports the Debtors' efforts to obtain approval of the
Plan. The Committee urges you to vote to accept the Plan on the enclosed ballot in order to
receive a greater recovery than you are likely to receive if the Plan is not approved. The decision
to accept or reject the Plan is yours individually. You should base your decision upon all of the
information contained in the Plan and the Disclosure Statement. We urge you to read both of
these documents carefully before making any decision. By way of background, we provide you
with the following information.

The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the
District of Delaware on April 10, 2006. On April 27, 2006, the Office of the United States
Trustee formed the Committee to represent the interests of unsecured creditors. The Committee
consists of the following seven members: (i) Zhejiang Taizhou Aishida Electrical Equipment
Co., Ltd., (ii) Zhejiang Supor Cookware Co., Ltd., (iii) Asia Trading Company, (iv) United
Steelworkers of America, (v) Lewisburg Container Company, (iv) International Paper Company,
and (vii) Georgia-Pacific LLC. Since the formation of the Committee, the Committee's counsel
and the Committee's financial advisors have evaluated the Debtors' assets, liabilities and
financial condition to allow the Committee to evaluate the prospects for distributions to general
unsecured creditors in this case and to permit the Committee to analyze the various motions and
applications that the Debtors filed with the Bankruptcy Court.

The Plan is the product of significant investigation and extensive arm's-length discussions and
negotiations between the Committee, the Debtors, Cerberus Partners, L.P., Cerberus Capital
Management, L.P., and Madeleine, LLC. The Plan benefits the holders of general unsecured
claims by, among other things, providing for an aggregate <u>cash</u> distribution to general unsecured

19346/2
12/26/2007 2265794.03

To all of the Unsecured Creditors of Global Home Products, LLC, *et al.*
Page 2

creditors, subject to the conditions set forth in the Plan, of (i) $1 million, plus (ii) an additional eighteen percent (18%) of any net recoveries stemming from Bankruptcy Code chapter 5 claims recovered by the reorganized Debtors pursuant to the terms of the Plan.

In addition, the Plan provides for a recovery to holders of allowed administrative expense claims provided for by section 503(b)(9) of the Bankruptcy Code ("Section 503(b)(9) Claimants"). As set forth in more detail in the Plan, Section 503(b)(9) Claimants will share in a $3.5 million <u>cash</u> distribution, which, depending on the results of the claim reconciliation process satisfies up to approximately thirty five percent (35%) of their allowed claims. Section 503(b)(9) Claimants will receive that cash payment on the date the Plan becomes effective or as soon as practicable thereafter.

The Committee believes that the $8.5 million contribution to the Plan by Global Home Products Investors, LLC for the benefit of creditors, including Section 503(b)(9) Claimants and unsecured creditors provides for a distribution for these Claims that would not be available in a chapter 7 liquidation or dismissal of these cases. The Committee, therefore, recommends that all creditors review the Plan and the Disclosure Statement and vote to accept the Plan.

Please complete and submit your ballots to the balloting agent in accordance with the instructions contained in the solicitation package so that they are received not later than _____ __, 2008.

<div style="margin-left: 45%;">

Official Committee of Unsecured Creditors of
Global Home Products, LLC

Kenneth A. Rosen, Esq.
Sharon L. Levine, Esq.
Bruce Buechler, Esq.
Wojciech F. Jung, Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey 07068

and

David M. Fournier, Esq.
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709

</div>

# Exhibit B

# Debtors' Corporate Chart

# Global Home Products Corporate Structure



- Disregarded entity for US tax purposes
- Corporation for US tax purposes
- Partnership for US tax purposes

Anchor Hocking Acquisition Inc.

Global Home Products LLC

GHP Holding Company LLC *

Mirro Acquisition Inc.

Mirro Puerto Rico, Inc.

Anchor Hocking Inc.

AH Acquisition Puerto Rico, Inc.

Burnes Acquisition Inc.

Burnes Puerto Rico, Inc.

690649 BC Ltd.

Anchor Hocking Consumer Glass Corporation

690624 BC Ltd.

690629 BC Ltd.

Intercraft Company

690624 BC Ltd.

CKK Int. Ltd. (Hong Kong)

Intercraft Burnes, (S. de R.L. de C.V.)

Picture LLC

Intercraft Holdings, S. de R.L. de C.V. (Mexico)

Prestservco (Mexico)

GHP Operating Company LLC

Anchor Hocking CG Operating Company LLC

Anchor Hocking Operating Company LLC

Burnes Operating Company LLC

Mirro Operating Company LLC

20%

3%

36%

44%

50%

99%

1%

3%

97%

97%